1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11
12   UNITED STATES OF AMERICA,          )   CASE NO. CR 02-01267(A) MMM
                                         )
13                  Plaintiff,           )
                                         )   FINDINGS OF FACT AND
14        vs.                            )   CONCLUSIONS OF LAW
                                         )
15   WILLIAM FRANTZ,                     )
                                         )
16                  Defendant.           )
                                         )
17                                       )
                                         )
18   _____)

19

20        Defendant was indicted on one count of conspiracy in violation of 18 U.S.C. § 371 and

21   four counts of tax evasion in violation of 26 U.S.C. § 7201.  He waived trial by jury with the

22   approval of the court and the consent of the government pursuant to Rule 23(a) of Federal Rules

23   of Criminal Procedure.  On May 11, 2004, defendant requested that the court make specific

24   findings of fact pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure.  Having

25   carefully considered the testimony and exhibits in evidence, briefing submitted by the parties, and

26   the relevant law, the court makes the following findings:

27
28

# I. FINDINGS OF FACT

## A.    William E. Frantz

1.    At all times relevant to the indictment, defendant William E. Frantz was a tax attorney and a partner in Frantz, Sanders & Grattan, LLP ("FS&G"), a law firm that maintained offices in Atlanta, Georgia.[1]

2.    Frantz graduated with a degree in accounting from the University of Georgia in 1961, and accepted a position with the Internal Revenue Service ("IRS").[2]

3.    Frantz worked at the IRS from 1961 to 1971, serving as a Revenue Agent, a member of the team audit group, an instructor of basic and advanced income tax classes, and a district conferee.[3]

4.    While working for the IRS, Frantz attended Emory Law School and obtained a law degree.[4]

5.    After graduating from law school, Frantz accepted a position in the tax division of Touche Ross and Company, a CPA firm.  Frantz worked at Touche Ross from 1971 until 1976.[5]

6.    In 1976, Frantz began practicing law.[6]

7.    From 1988 until 1990, in addition to practicing law, Frantz was an adjunct professor at Georgia State University in the university's masters of tax program.[7]

8.    While teaching at Georgia State University, one of Frantz's students referred Almon Glenn

---

[1]Stipulation of Facts ("Stipulated Facts"), ¶ 7.

[2]Reporter's Transcript of Proceedings ("RT") at 1327:5-7.

[3]*Id.* at 1327:12-19.

[4]*Id.* at 1328:1-12.

[5]*Id.* at 1328:16-20; 1329:1-7.

[6]*Id.* at 1329:5.

[7]*Id.* at 1330:11-13.

2

1    Braswell to him.[8]

2    9.    Braswell was the sole shareholder of a number of affiliated corporations, including (1) a

3    California corporation, G.B. Data Systems, Inc. ("GBDS") and (2) a Florida corporation,

4    Gero Vita International, Inc. ("GVI").[9]

5    10.   Frantz began preparing tax returns for Braswell in 1990 or 1991.[10]

6    11.   From 1994 to 1997, FS&G grossed approximately $1.1 to $1.3 million per year. During

7    that same time period, FS&G billed Braswell approximately $44,000 to $70,000 per year.

8    Braswell did not pay any bonuses to Frantz, nor did Frantz charge Braswell premium

9    rates.[11]

10   12.   Between 1994 and 1997, Frantz prepared or caused others at FS&G to prepare individual

11   tax returns for Braswell.[12]

12   **B.    Braswell And His Affiliated Corporations**

13   13.   GVI, Gero Vita Labs, Inc., and other affiliated corporations of which Braswell was the

14   sole shareholder (collectively, "the Affiliated Corporations") maintained integrated offices,

15   including accounting and purchasing departments, in Los Angeles, California.[13]

16   14.   The Affiliated Corporations included Life Quest Leasing, Inc.; Gero Vita Labs, Inc.; Life

---

[8]*Id.* at 1330:20-25, 1331:1-13 ("One of the students in the class was a CPA who practiced with another CPA who was formerly associated with Mr. Braswell in some capacity. . . . And this . . . student of mine approached me . . . after class on one occasion and wanted to know . . . . if I handled tax controversy type matters, and I told him I did. And he asked me if I would be interested in talking to the client of the accountant with whom he practiced. I told him I would talk to him. Q: Did you subsequently meet with Mr. Braswell? A: Mr. Braswell came from California and met with me in Atlanta. That's correct").

[9]Stipulated Facts, ¶ 1.

[10]RT at 1339:23.

[11]*Id.* at 1337:9-25, 1338:1-10.

[12]Stipulated Facts, ¶ 8.

[13]*Id.*, ¶ 2.

Force; S&G Chemical Company; Vita Industries, Inc.; Faraday Pharmaceuticals, Inc.; Vita Life of California, Inc.; Trigenesis, Inc.; Dynavite Laboratories, Inc.; Health Quest Publications, Inc.; and Academy of Longevity Research.[14]

15.  All employees that performed work for the Affiliated Corporations were nominally employees of GBDS, and received their wages from GBDS. The Affiliated Corporations' bank accounts were maintained in GBDS' name.[15]

16.  GVI and Gero Vita Labs, Inc. were engaged in the business of selling nutritional supplements by mail to the public. GBDS provided administrative services to those companies, as well as to the other Affiliated Corporations.[16] The GBDS accounting department was responsible for maintaining the books and records of the domestic corporations.[17]

**C.   Robert Miller**

17.  Robert Bruce Miller is a certified public accountant who maintained offices in Los Angeles, California, and prepared corporate tax returns for GBDS and GVI.[18]

18.  From 1994 through 1997, Frantz received information relevant to preparing Braswell's tax returns, including information about Braswell's compensation, from Miller.[19]

---

[14]*Id.*

[15]*Id.*, ¶ 3.

[16]*Id.*, ¶ 4.

[17]RT at 277:13-19 ("Q: You were responsible for the accounting, for the financial operations of these various companies, correct? A: Correct. Q: Did the companies for whose accounting you were responsible for, were those all domestic corporations that were operated out of the Marina del Ray offices? A: Yes").

[18]Stipulated Facts, ¶¶ 5-6. Miller worked for Meepos & Company, an accounting firm. See RT at 638:24-25, 639:1-2.

[19]RT at 1341:15-19; 1344:19-25 ("Q: Was that the only way you got information from Mr. Braswell or the corporations with respect to the amount of compensation to be reported on Mr. Braswell's tax returns? A: That was the only way I got Mr. Braswell's information concerning corporate income, and that is through Mr. Miller and exchanges like this").

**D.   Hemisphere Management Ltd.**

19.   Hemisphere Management Ltd. ("Hemisphere") was a publicly traded corporation that was in the business of establishing and managing off-shore corporations and bank accounts for its clients.   Hemisphere was part of a larger group of related companies known as the Hemisphere Group.  Hemisphere Holdings Ltd. was a member of the Hemisphere Group.[20]

**E.   Braswell's Offshore Bank Accounts**

20.   From 1994 through 1997, Braswell maintained foreign bank accounts either in his own name or in the names of entities he controlled in Bermuda, the Cayman Islands, and Liechtenstein.[21]

21.   Hemisphere managed a checking account in Braswell's name at the Bank of Butterfield in Hamilton, Bermuda.[22]

**F.   Deleon**

22.   Deleon was a corporation organized under the laws of Bermuda and managed by Hemisphere.[23]

23.   Hemisphere managed checking account number 1010 030568 in the name of Deleon at the Bank of Bermuda in Hamilton, Bermuda ("the Deleon Account").[24]

24.   The GBDS accounting department did not maintain books and records for Deleon or any of Braswell's other offshore corporations.[25]

25.   There is no evidence that Frantz ever prepared or filed a form TD F 90-22.1 for any of the

---

[20]Stipulated Facts, ¶ 14.

[21]See Ex. 13 at 11; Ex. 14 at 12; Ex. 15 at 13; Ex. 17 at 8.

[22]Stipulated Facts, ¶ 15.

[23]See Ex. 5.

[24]Stipulated Facts, ¶ 15.  Hemisphere also managed a savings account, number 3373677, in Deleon's name at the Bank of Bermuda in Hamilton, Bermuda.  See Ex. 122.

[25]RT at 277:20-22 (Q: So you did not have any responsibilities for accounting for any offshore operations?  A: No").

accounts held in Deleon's name. Form TD F 90-22.1 is used to report a financial interest in, or signature or other authority over, a foreign bank account.[26]

### G. The FS&G Account

26. Frantz maintained an escrow account for Braswell at Fidelity National Bank in Atlanta, Georgia (the "FS&G Escrow Account").[27]

### H. Braswell's Individual Tax Returns

27. On or about October 6, 1995, Frantz prepared or caused others at his firm to prepare an Individual U.S. Income Tax Return for Braswell for 1994 ("the 1994 Braswell Return"). Frantz signed the 1994 Braswell Return as the tax return preparer. Braswell signed the return as the taxpayer, and filed or caused the 1994 Braswell Return to be filed with the IRS.[28]

28. The 1994 Braswell Return reported on line 12 and at Schedule C that Braswell had received $3,100,000 in income for the year from consulting.[29]

29. The $3,100,000 in compensation consisted of (1) $2,000,000 booked by GBDS as a loan payable to Braswell representing his 1994 compensation, and (2) $1,100,000 booked by Life Force as a loan payable to Braswell representing his 1994 compensation.[30]

---

[26]RT at 1346:19-25, 1350:1-25.

[27]*Id.* at 1345:4-10.

[28]Stipulated Facts, ¶ 10. In his proposed findings of fact, Frantz states: "Though Frantz did not prepare Braswell's personal tax returns, he generally reviewed Braswell's returns and signed them as the tax return preparer." (See Defendant William E. Frantz's Proposed Findings of Fact And Conclusions of Law ("Def.'s Findings") at 3.) As the government notes, however, Frantz stipulated prior to trial that for each of tax years 1994 through 1997, Frantz "prepared or caused others at his firm to prepare an Individual U.S. Income Tax Return." (See Stipulated Facts, ¶¶ 10-13.) To the extent Frantz's proposed findings purport to alter facts to which he previously stipulated, the court concludes that Frantz is bound by the stipulation.

[29]Ex. 13.

[30]See Ex. 689 at 2; Ex. 10 at 7; Ex. 41 at 1, 5; see also RT at 1175:10-25, 1176:1-25, 1177:1-25, 1178:1-4. Compensation earned by Braswell from the Affiliated Corporations was accrued on the books of the corporations as a loan payable. See finding 232, *infra*. As noted by

30.   On or about October 15, 1996, Frantz prepared or caused others at his firm to prepare an Individual U.S. Income Tax Return for Braswell for 1995 (the "1995 Braswell Return"). Frantz signed the 1995 Braswell Return as the tax return preparer.[31]  Frantz also signed the tax return on Braswell's behalf and caused it to be filed with the IRS.[32]

31.   The 1995 Braswell Return reported on line 12 and at Schedule C that Braswell had received $4,000,000 in income from consulting.[33]

32.   The $4,000,000 in compensation consisted of $4,000,000 booked by GBDS as a loan payable to Braswell representing his 1995 compensation.[34]

33.   On or about October 9, 1997, Frantz prepared or caused others at his firm to prepare an Individual U.S. Income Tax Return for Braswell for 1996 (the "1996 Braswell Return"). An individual at Frantz's law firm signed the 1996 Braswell Return as the tax return preparer.  Braswell signed the 1996 Braswell Return as the taxpayer and caused the 1996 Braswell Return to be filed with the IRS.[35]

34.   The 1996 Braswell Return reported on line 12 and at Schedule C that Braswell had received $4,000,000 in income from consulting.[36]

35.   The $4,000,000 in compensation consisted of $4,000,000 booked by GBDS as a loan

the government's expert witness, Robert Sterling, the books of GBDS reflect that the $2,000,000 in 1994 compensation was reduced by $383,355, leaving a net loan payable of $1,616,644.  (RT at 1176:21-25, 1177:1; see also Ex. 10 at 7.)

[31]Stipulated Facts, ¶ 11.

[32]Ex. 14 (indicating that Frantz signed on Braswell's behalf pursuant to a power of attorney).

[33]*Id.*

[34]Ex. 689 at 2; Ex. 10 at 92, 94, 97; RT at 1182:25, 1183:1-25, 1184:1-12.

[35]Stipulated Facts, ¶ 12.

[36]Ex. 15.

payable to Braswell representing his 1996 compensation.[37]

36.   On or about October 10, 1998, Frantz prepared or caused others at his firm to prepare an Individual U.S. Income Tax Return for Braswell for 1997 (the "1997 Braswell Return"). Frantz signed the 1997 Braswell Return as the tax return preparer. Braswell signed the 1996 Braswell Return as the taxpayer and filed or caused the 1997 Braswell Return to be filed with the IRS.[38]

37.   The 1997 Braswell Return reported on line 12 and at Schedule C that Braswell had received $2,250,222 in income from consulting.[39]

38.   The $2,250,222 in compensation consisted of (1) $2,000,000 booked by GBDS as a loan payable to Braswell representing his 1997 compensation from GBDS, and (2) $200,000 paid by Trigenesis to Braswell representing his 1997 compensation from that company.[40]

**I.     Charged Unreported Income**

39.   The government charges that Frantz failed to report income to Braswell from the FS&G Escrow Account and the Deleon Account.

40.   The parties entered into a stipulation of facts, which incorporated and attached a

---

[37]Ex. 689 at 2; Ex. 902 at 11; RT at 1187:8-25, 1188:1-15.

[38]Stipulated Facts, ¶ 13.

[39]Ex. 17.

[40]Ex. 689 at 2; Ex. 693 at 2; RT at 1192:1-25, 1193:1. The government's proposed findings of fact state that "at the end of its fiscal year ending March 31, 1997, Trigenesis did an adjusting journal entry to book a $200,000 loan payable to Braswell which represented his compensation from Trigenesis in 1997." (Government's Proposed Findings of Fact and Conclusions of Law ("Gov't. Findings"), ¶ 8.) Sterling testified, however, that he was unable to locate such an adjusting journal entry, and the evidence cited by the government in support of its proposed finding does not reflect such an entry regarding the Trigenesis compensation. (See RT at 1192:19-25, 1193:1 ("Q: Now, with respect to the $200,000 from TriGenesis shown on exhibit 689 as being compensation to Mr. Braswell, were you able to identify a loan payable or entry for this $200,000? A: No, I was not. Q: And what did you conclude it was? A: That most likely the $200,000 had actually been paid to Mr. Braswell during that period").) In light of Sterling's testimony, the court concludes that the $200,000 from Trigenesis was not booked as a loan payable, but was instead paid to Braswell in 1997.

spreadsheet titled FS&G Escrow.  This spreadsheet shows banking activity reflecting specific deposits to and disbursements from the FS&G Escrow account ("FS&G Spreadsheet").[41]

41.   A column of the FS&G Spreadsheet titled "Deposits/Credits/Wires In" shows the amount and dates of deposits into the FS&G Escrow Account.[42]

42.   A column of the FS&G Spreadsheet titled "Checks/Debits/Wires Out" shows the amount and date of disbursements from the FS&G Escrow Account.[43]

43.   A column of the FS&G Spreadsheet titled "Notes" identifies the source of deposits into the FS&G Escrow Account and the disposition of the disbursements.[44]

44.   As shown in the "Notes" column, all of the deposits to the FS&G Escrow Account were wire transfers or checks issued by GBDS.[45]

45.   As shown in the "Notes" column, all disbursements from the FS&G account were made to three payees: (1) the IRS, to pay Braswell's reported and estimated taxes; (2) the bank account in Braswell's name at the Bank of Butterfield in Bermuda; and (3) the bank account in Braswell's name at the Bank of Butterfield in the Cayman Islands.[46]

46.   The IRS received the disbursements made to pay Braswell's taxes, and credited them as payments of Braswell's federal income tax liability.[47]

47.   The Bank of Butterfield in Bermuda received the disbursements sent to it and credited them

---

[41]Stipulated Facts, ¶ 16.

[42]*Id.*, ¶ 17.

[43]*Id.*, ¶ 18.

[44]*Id.*, ¶ 19.

[45]*Id.*, ¶ 20.

[46]*Id.*, ¶ 21.

[47]*Id.*, ¶ 22.

1    to Braswell's account at the bank.[48]

2    48.   The Bank of Butterfield in the Cayman Islands received the disbursements sent to it and

3          credited them to Braswell's account at the bank.[49]

4    49.   The total banking activity in the FS&G Escrow account from 1994 to 1997 was:

5          | Calendar Year | Deposits from GBDS | Expenditures to or for Braswell |
           | --- | --- | --- |
6          | 1994 | $7,300,000 | $6,195,000 |
7          | 1995 | $2,050,000 | $1,443,343 |
8          | 1996 | $3,300,000 | $2,160,000 |
9          | 1997 | $1,600,000 | $2,325,000[50] |

10   50.   The government charges that each of the disbursements shown on the FS&G Spreadsheet

11         is a specific item of unreported income that Frantz and Braswell were required to report

12         on Braswell's tax returns.[51]

13   51.   The parties' stipulation of facts incorporated and attached a second spreadsheet, titled

14         Deleon Global Trading.  This spreadsheet shows banking activity reflecting specific

15         payments from GBDS' bank account to Deleon's checking account at the Bank of Bermuda

16         ("Deleon Spreadsheet").[52]

17   52.   For each disbursement shown on the Deleon Spreadsheet, GBDS acted as paymaster for

18         GVI, with the result that each disbursement was ultimately recorded as having been made

19         by GVI on the books and records of GBDS and GVI.[53]

20   53.   The total deposits to Deleon's Bank of Bermuda checking account from 1994 to 1997 were:

21

22   ──────────────

23   [48]*Id.*, ¶ 23.

24   [49]*Id.*, ¶ 24.

25   [50]*Id.*, Ex. 409.

26   [51]*Id.*, ¶ 18.

27   [52]*Id.*, ¶ 25.

28   [53]*Id.*

| Calendar Year | Deposits From GBDS |
|---|---|
| 1994 | $500,000 |
| 1995 | $5,373,460 |
| 1996 | $2,063,170 |
| 1997 | $2,007,538[54] |

54. The government charges that each of the deposits is a specific item of unreported income that Braswell and Frantz were required to report on Braswell's returns.[55]

55. The last column of the Deleon Spreadsheet shows yearly total payments from the Deleon account to various vendors and suppliers of raw materials.[56]

56. The total payments to vendors from the Deleon Account from 1994 to 1997 were:

| Calendar Year | Payments To Vendors |
|---|---|
| 1994 | $33,358 |
| 1995 | $1,351,033 |
| 1996 | $4,178,921 |
| 1997 | $1,780,394[57] |

57. The court considers first whether the deposits to the Deleon Account by GBDS are properly considered income to Braswell that Frantz should have reported. It then considers whether disbursements from the FS&G Account are properly considered income to Braswell that Frantz should have reported.

**J.    The Creation of Vita International**

58. On September 14, 1990, Madeline Reap, a Hemisphere employee, wrote Valerie Ball at the Bermuda law firm of Cox & Wilkinson, and asked that Ball reserve the name of Vita

---

[54]*Id.*, Ex. 409.

[55]*Id.*, ¶ 25.

[56]*Id.*

[57]*Id.*, Ex. 409.

International Ltd. ("Vita") as a trading company.[58]

59.    On October 23, 1990, Christopher Weatherhill, a Hemisphere employee, sent Cox & Wilkinson a completed Company Formation Questionnaire regarding Vita.    The questionnaire identified Vita as a "cosmetics trading company" with a registered office at Trenwick House, 9 Church Street, Hamilton, Bermuda.    It stated that Vita intended to open an account at the Bank of Bermuda Ltd.; identified Braswell as the beneficial owner of all shares in the company; listed Hemisphere Holdings, Ltd. as the nominee shareholder for the Vita shares; and stated an objection to the Braswell's name being furnished to auditors.[59]    The questionnaire identified Wetherhill, Joseph Kelly, and Margaret Every as the officers and directors of Vita.

60.    The questionnaire stated that Vita would not need office space in Bermuda and would not be hiring any employees.    Hemisphere was identified as the entity responsible for keeping Vita's day-to-day records, and for providing general management and accounting for Vita.[60]

61.    On November 1, 1990, Braswell signed a nominee agreement ("Nominee Agreement") respecting Vita.    The agreement identified Braswell as the "Beneficial Owner" of Vita's shares, and Hemisphere as the "Nominee."    The Nominee Agreement stated that the Nominee would "generally act in relation to the shares upon the instructions of the Beneficial Owner or his duly authorized agent named in the Second Schedule hereto."    The agent named in the Second Schedule was Frantz.[61]

62.    On November 1, 1990, Vita was incorporated under the jurisdiction of Bermuda with

---

[58]See Ex. 103.  As originally prepared, the fax stated that the name Vita International Ltd. should be reserved as an investment company.  The word "investment" was crossed out, however, and replaced by "trading."

[59]Ex. 105.

[60]Id.

[61]Id.

registration number EC-15972.[62]  The incorporation documents for Vita identify its "type of business" as "investment holding."

63.     On November 28, 1990, Hemisphere opened a bank account for Vita at the Bank of Bermuda.[63]

### K.     The Name Change To Deleon And Deleon's Alleged Business Purpose

64.     In a letter to Wetherhill dated December 27, 1990, Frantz stated that Braswell contemplated activating Vita "in the sense that it would buy product from Europe and import that product into the United States."  Frantz asked whether Hemisphere would be able to provide corporate services including "paying bills, invoicing, preparing bills of lad[ing], shipping documents, etc."[64]  Wetherhill responded that Hemisphere could "certainly handle the administrative services you require for the Company."[65]

65.     It does not appear that serious efforts to activate Vita were made between 1991 and 1993.[66]

66.     In September and October 1993, Frantz sent a series of letters to Every, Cheryl Kyalla,[67] and Sheldon Lustigman,[68] stating that Braswell sought to revive activity in one of his offshore corporations so that it could purchase the raw materials used to make the supplements sold by GVI or Gero Vita Labs as finished products.[69]  On September 24,

---

[62]Ex. 5.

[63]Ex. 110.

[64]Ex. 111.

[65]*Id.*

[66]In notes taken during a meeting in June 1992, Frantz referred to Vita as "dormant."  See Ex. 807, RT at 1403:12-15.

[67]Kyalla was GBDS' operations manager for a period of time.  See Ex. 409 at 10; see also RT at 104:17-19.

[68]Lustigman was one of Braswell's attorneys.  *Id.*

[69]See Ex. 813 (September 14, 1993 letter from Frantz to Every stating that he had met with Braswell to discuss "one of Glenn's companies getting involved once again in purchasing foreign

1993, Braswell sent Every a letter, stating "[m]ost of the ingredients for my products come from outside of the United States.  I have never before taken advantage of purchasing directly outside the United States."[70]

67.   Because GBDS and GVI did not own manufacturing facilities, they typically contracted with manufacturing laboratories to make the supplements.  These laboratories purchased the raw materials needed to make the supplements, bottled the capsules, and labeled them.[71]

68.   Testimony at trial revealed that during 1993 and 1994, Braswell's domestic corporations were researching raw material suppliers.  Commencing in 1994, they began purchasing directly from suppliers.  Richard Adlai, who worked as GBDS' purchasing manager from 1993 to 1994, testified that toward the end of his employment with GBDS, the company was "researching the possibility of purchasing raw materials from laboratories in

product"); Ex. 815 (October 6, 1993 letter to Kyalla referencing "the use of an offshore company as a purchasing agent or source for product to be sold by one of the domestic related entities"); Ex. 816 (October 6, 1993 letter to Every referencing the use of an offshore corporation "as either a purchasing agent for which it will receive some stated percentage or as an independent supplier"); Ex. 818 (October 18, 1993 letter to Lustigman stating "Glenn is proposing to revive the activity in an offshore company to function as a source of raw material.  This offshore company would purchase foreign product and then sell it to Gero Vita International or Gero Vita Labs").  At least two of the letters Frantz sent stated that the products to be purchased by the foreign corporation were currently being purchased directly by Gero Vita and "representative brokers."  See Ex. 816 ("These products are presently being acquired through representative brokers in the United States"); Ex. 818 ("At the present time, this is product already being purchased directly by Gero Vita through brokers"); see also RT at 1613:5-11 (Testimony of William Frantz ("Q: And so you understood, did you not, sir, that before this purchasing activity that ended up being Deleon was activated that Mr. Braswell had been using his domestic companies to purchase the products from domestic United States representatives, correct?  A: If I say in here that I understood he was acquiring it from domestic entities, then that is correct").

[70]Ex. 814.

[71]RT at 95:16-25; 96:1-3.  The manufacturing laboratories were located in California, Arizona, and Missouri.  *Id.* at 96:9-19.

14

Europe."[72] Isabel Mendoza, who was responsible for accounting and marketing functions at GBDS from 1993 through 1998, testified that GBDS and GVI began ordering raw materials directly in 1994.

69.    Adlai and Mendoza testified that Braswell and the Affiliated Corporations had at least two reasons for purchasing raw materials directly from suppliers.  Adlai said Braswell told him (1) that purchasing directly in quantity would give GBDS a price advantage; and (2) that Braswell was "concerned about the quality of the finished product" and believed that purchasing raw materials directly would produce a better product.[73]  Mendoza stated that the domestic companies began purchasing raw materials directly because they concluded that they "would save a good amount of money by actually providing the raw materials [to the manufacturing laboratories] ourselves."[74]

70.    Although it is clear that Braswell's domestic corporations were capable of placing direct orders for raw materials (and were in fact doing so), Frantz testified that Braswell told him there were multiple reasons he wished to reactivate Vita and have it make such purchases.  Specifically, (1) Braswell wanted the offshore corporation to become a base for the international expansion of his business; (2) he wanted to move more of his domestic operations offshore because "of issues that had been raised by regulatory authorities"; and (3) he wanted to publish a book.[75]

71.    On January 12, 1994, Vita's name was officially changed to Deleon Global Trading, Ltd.[76]  On March 24, 1994, Every instructed the Bank of Bermuda to transfer Vita's accounts to

---

[72]See Ex. 409 (Grand Jury Testimony of Richard Adlai) at 13:16-18.

[73]Id. at 16:21-25, 17:1-6.

[74]RT at 103:3-7; 105:1-3.

[75]Id. at 1472:15-25; 1473 at 1:17.

[76]Ex. 28 at 16-18.

1    the name of Deleon.[77]

2  72.  Hemisphere continued to manage Deleon's affairs.[78]

3  73.  Following the name change, Braswell told Adlai he wanted to utilize Deleon to purchase

4    raw materials because "if [Braswell bought] directly from the supplier, he [would] not

5    [have] to pay the extra percentage profit that the lab would be charging when they

6    purchase[d] the same material. . . ."[79] As a result, Braswell told Adlai, he wanted to use

7    the Deleon name because he did not want the manufacturing laboratories to know that he

8    was purchasing raw materials directly.[80]

9    **L.    The Initial Purchase Order**

10  74.  Adlai understood that Deleon was a fictitious dba set up to act as an importer and

11    negotiator of raw materials for GBDS.[81]

12  75.  In March 1994, while employed at GBDS, Adlai facilitated the placement of one purchase

13    order in Deleon's name.[82]

14  76.  Adlai testified that decisions regarding the raw materials to be purchased were going to be

15    made by GBDS.[83] After receiving the price and terms of the order from GBDS, Every and

16    Hemisphere were supposed to prepare a purchase order in Deleon's name.[84] The goods

---

18    [77]See Ex. 125 (letter to Melody Lightbourne at the Bank of Bermuda adding Deleon Global

19  Trading account # 3373677 and deleting Vita International account # 8430779).

20    [78]Stipulated Facts, ¶ 14.

21    [79]Ex. 409 at 21:13-16.

22    [80]*Id.* at 21:22-25.

23    [81]*Id.* at 20:16-19.

24    [82]*Id.* at 23:21-23.

25

26    [83]*Id.* at 36:1-5.

27    [84]*Id.* at 33:19-25; 35:19-25 ("Q: So when this first started with this first order,

Hemisphere, the Bermuda bank, was responsible for doing the purchase order and sending the

28  payment? A: Correct").

1   were then to be shipped to GBDS' Los Angeles office.[85]  Adlai assumed that Hemisphere,

2   which he called "the Bermuda bank," would pay the supplier for the shipment upon receipt

3   of an invoice.[86]

4   77.   In March 1994, Adlai submitted final terms and prices for an order to be placed in

5   Deleon's name.  After the order was placed, Braswell directed Adlai to cancel it.[87]  No

6   materials were ever delivered to GBDS or to the manufacturing laboratories as a result of

7   the order.[88]

8   **M.   Subsequent Purchase Orders In Deleon's Name**

9   78.   From the summer of 1994 through February 1996, Mendoza, a GBDS employee, was

10   responsible for purchasing the nutritional supplements sold by GVI in capsule, tablet,

11   powder, and gel cap form.[89]

12   79.   Mendoza issued purchase orders for the bottled capsules to the manufacturing

13   laboratories.[90]  The majority of the time, the company name on the purchase orders was

14   GVI.

15   80.   Mendoza put her name on the purchase orders she issued, and had Braswell sign or initial

16   the orders before they were sent to the laboratories.[91]

17   81.   Once a purchase order was sent to a laboratory, the laboratory sent an invoice to GBDS.

18   The invoice was directed to GBDS' accounting department, which matched it with a

19   _____

20   [85]*Id.* at 33:23-25, 34:1-4.

21   [86]*Id.* at 35:19-23.  Adlai understood that Hemisphere Management was the "bank" that
22   would issue a letter of credit for Deleon.  *Id.* at 29:1-7.

23   [87]*Id.* at 40:1-10; 23:17-25.

24   [88]*Id.* at 30:1-4.

25   [89]RT at 93:5-25, 94:1-2.  Mendoza was previously involved in marketing efforts.  *Id.*

26   [90]*Id.* at 96:20-23.

27   [91]*Id.* at 97:21-25; 98:1-14; see also Ex. 217 (purchase order to Northridge Laboratories
28   from Gero Vita International).

purchase order, and forwarded the invoice to Mendoza for final approval before paying it.[92]

82.  The manufacturing laboratories were directed to ship the finished capsules either to GBDS' Arizona distribution center or GBDS' Nevada warehouse.  Payment was due on delivery of the finished product.[93]

83.  In the fall or winter of 1994, a few months after Adlai placed the initial Deleon order, Mendoza began ordering raw materials for the finished capsules.  Mendoza testified that the decision to order raw materials directly was designed to ensure product consistency and save "a good amount of money."[94]

84.  Initially, Mendoza ordered raw materials in the name of GVI.  Mendoza continued to put her name on the purchase orders, and Braswell continued to approve them.[95]

85.  Suppliers were instructed to deliver the raw materials directly to the manufacturing laboratories.[96]  Mendoza never directed the suppliers to send the raw materials to GBDS or GVI.[97]

86.  When a raw material supplier invoiced GVI, the invoice was directed to the GBDS accounting department.  The accounting department pulled the appropriate purchase order, matched it to the invoice, and forwarded the invoice and backup to Mendoza for her approval.[98]

---

[92]RT at 100:10-20.

[93]*Id.* at 100:21-25; 102:11-14.

[94]*Id.* at 103:6-22; 105:1-4.

[95]*Id.* at 106:1-9; see also Ex. 218 (purchase order from GVI to Acta Pharmacal in Sunnydale, California for Wild Yam Extract).

[96]*Id.* at 108:1-22.

[97]*Id.* at 109:11-16.

[98]*Id.* at 110:1-8.

87. In the spring of 1995, Braswell instructed Mendoza to make all raw material purchases in Deleon's name.[99]  Finished products were never ordered in Deleon's name.[100]

88. Mendoza had never heard of Deleon prior to that time.[101]

89. To facilitate the preparation of purchase orders in Deleon's name, Mendoza obtained "Deleon" letterhead from the art department.[102]

90. In March 1995, Mendoza prepared a draft purchase order to Indena, a raw material supplier, in Deleon's name.  The order was for bilberry extract and St. John's Wort.[103]

91. Mendoza negotiated the terms of the order with Greg Ris, Indena's sales representative in Seattle, Washington.  Despite that fact, she listed Indena's address in Milan, Italy, on the purchase order at Braswell's instruction.[104]

92. The draft purchase order included an "Ordered By: Isabel Mendoza" signature line and an "Approved By: Glenn Braswell" signature line, as had the earlier purchase orders Mendoza prepared.[105]

93. Mendoza asked Braswell to approve the purchase order.  Braswell did not sign the

---

[99]*Id.* at 111:22-25; 112:1-3 ("Q: What did Mr. Braswell instruct you?  A: To begin making all the raw material purchases using Deleon Global Trading.  Q: By 'using' what do you mean by that?  Do you mean using the name?  A: Yes, to purchase the materials under Deleon Global Trading").

[100]RT at 96:20-25; 97:1-5.

[101]*Id.* at 112:4-6.

[102]*Id.* at 112:22-25; 113:1-2.

[103]*Id.* at 115:18-25; 116:1-6; see also Ex. 320, at 2.

[104]See RT at 117:1-12 ("Q: Did you have any contact with anyone in Italy in connection with negotiating this purchase order?  A: No.  Q: Why did you list as the vendor an address in Milan, Italy?  A: I was instructed for the raw material purchases to show the vendors' overseas address.  Q: Even if you were actually dealing with someone in the United States?  A: Yes.  Q: And who gave you that instruction?  A: Glenn Braswell"); see also Ex. 320 at 2.

[105]See Ex. 320; compare Ex. 218.

19

purchase order; instead, he instructed Mendoza to send it to Frantz for review.[106]

94.   Mendoza faxed the purchase order to Frantz on March 28, 1995.  The fax cover sheet stated: "Glenn requested for you to review the following purchase order to make sure everything is in line or if we should make some changes.  This will be the format we plan to follow for the purchasing of raw materials in international countries."[107]

95.   After sending the fax, Mendoza did not speak with Frantz regarding the purchase order.[108]

96.   Frantz testified that he received the fax and circled the "ordered by" and "approved by" signature lines.[109]  He then called Braswell and expressed his concern that "there was business activity being conducted in the United States [by Deleon] and there should not be that business activity conducted in the United States."[110]  Frantz said he told Braswell he had understood that Hemisphere and Deleon would be placing the orders and approving the purchase orders.[111]

97.   After Mendoza sent the proposed purchase order to Frantz, Miller instructed her not to place any signatures on Deleon purchase orders.  He also told her to "split up" the purchase orders so that they reflected a cost for "the actual raw material" and for "the conversion process . . . to a standardized extract."[112]  Miller gave Mendoza a sample split purchase order.[113]  Mendoza testified that she had not previously issued "split" purchase

---

[106]RT at 118:17-18.

[107]See Ex. 320 at 1.

[108]RT at 120:3-5.

[109]*Id.* at 1621:2-19.

[110]*Id.* at 1622:1-5.

[111]*Id.* at 1622:11-12.

[112]*Id.* at 121:7-17.

[113]*Id.* at 123:10-12.

1    orders in this fashion.[114]

2    98.    After meeting with Miller, Mendoza began ordering raw materials in Deleon's name.

3           Mendoza did not include signature lines for herself or Braswell on the purchase orders.

4           Because Mendoza could not obtain pricing information for "split" orders, she arbitrarily

5           assigned prices to the raw materials and the conversion.[115]

6    99.    Braswell's secretary told Mendoza that once she issued a purchase order in Deleon's name,

7           she was to fax a memorandum to Every and Hemisphere requesting issuance of a check.

8           Hemisphere then sent the checks to Mendoza, who sent them to the supplier after she

9           received an invoice.[116]

10   100.   Mendoza testified that it generally took about a week to obtain checks from Every that

11          could be used to pay the suppliers.[117]

12   101.   Due to this delay, Mendoza had GBDS issue a check to pay a supplier on at least two

13          occasions.[118]

14

15          [114]*Id.* at 121:18-20.

16
17          [115]*Id.* at 125:7-10; see also Ex. 222 (separate purchase orders for Hawthorn leaves and the
18   conversion of the leaves into standardized extract); RT at 128:21-25, 129:1-12 ("Q: Now, had
     Roussel or Chem-West Sales quoted you a separate price for the Hawthorn leaves and then
19   another separate price of the conve[rsion] of the Hawthorn leaves into an extract?  A: No, they
     didn't.  Q: So where do these numbers come from?  A: I just made an estimate.  Q: You mean
20   an estimate?  What was your basis for estimating?  A: I really didn't have one.  I went to have
     an example shown to me, to just put a little price for the actual material itself and a higher price
21   for the conversion.  Q: Okay.  So you made up the numbers?  A: Yes.  Q: Okay.  And in doing
     that you thought you were following the directions you would be given by Mr. Miller?  A: Yes").
22
23          [116]RT at 130:1-12; see also Ex. 222 at 4 (July 5, 1995 Memorandum to Margaret Every
24   from Glenn Braswell requesting that Hemisphere prepare checks to Chem-West Sales, Weinstein
     Nutritional, Indena, and Brucia Plant Extracts for "raw material purchases"); *id.* at 5 (July 12,
25   1995 letter from Margaret Every to Glenn Braswell enclosing the requested checks).

26          [117]RT at 135:20-25.

27          [118]*Id.* at 136:1-9 ("Q: Were there ever occasions where you just needed to pay a supplier
     faster than that and couldn't wait to get a check issued from Bermuda?  A: Yes.  Q: What would
28   you do when that happened?  A: I would have to first obtain approval and then have it drawn out

102.   Mendoza testified that she was responsible for negotiating the terms of the raw materials purchase orders, and that she did not consult with anyone at Hemisphere prior to issuing a purchase order in Deleon's name.  She stated that she may have spoken to Every "once or twice on the phone," but that she never spoke to anyone else at Hemisphere, and further that vendors and suppliers knew to contact Mendoza if any "issues" came up.[119]  Mendoza never requested that Hemisphere do anything other than issue checks.[120]

103.   Mendoza sent Miller copies of raw materials purchase orders either once a week or once every few weeks.  She did not send Miller copies of the purchase orders for finished goods.  Mendoza testified that Braswell instructed her to sent the raw materials purchase orders to Miller.[121]

104.   Mendoza's successors in the purchasing department followed the procedures Mendoza had established.

105.   Beginning in February 1996, Kathy Araujo, who worked at GBDS from October or November 1995 through December 1996, assumed responsibility for making raw materials purchases.[122]  Araujo testified that when she issued purchase orders for raw materials, she instructed the vendors to fax their invoices to Every in Bermuda.[123]  Araujo stated that she did not have to consult anyone outside of GBDS before issuing a purchase order in

---

through the GB Data's internal accounting department.  Q: To have a check issued from GB Data? A: Yes"); see also Ex. 225 at 2 (Memorandum to Gary Yue from Isabel Mendoza requesting a cashier's check payable to CHEMCO Industries on behalf of Deleon Global Trading and stating "[w]e have done this once before back in April 1995"); id. at 3 (copy of check); Ex. 224 at 5-6.

[119]RT at 141:1-25.

[120]Id. at 147:19-22.

[121]Id. at 142:16-25; 143:1-16.

[122]Id. at 94:8-17.  Araujo began to assist Mendoza with her purchasing responsibilities in December of 1995.

[123]Id. at 168:20-25.

1    Deleon's name.[124]

2    106.    April Jones, who worked at GBDS from April 1996 through May 1997 as a purchasing

3    agent, testified that she used Deleon's name to purchase raw materials; that she was not

4    required to obtain Braswell's approval before sending the purchase orders; and that she did

5    not speak with anyone at Hemisphere prior to issuing the purchase orders.[125]    Jones also

6    stated that suppliers sent their invoices directly to her, and that she contacted Deleon to

7    request issuance of a check.[126]    Jones stated that on at least one occasion, she had GBDS

8    issue a check because of delay in obtaining the check from Hemisphere.[127]

9    107.    Edward Grindblat, who began working for GBDS as a purchasing manager in June

10    1997,[128] testified that he issued purchase orders for raw materials in Deleon's name, and

11    that it was standard practice to have the raw materials suppliers send their invoices to

12    GBDS.[129]    Upon receipt of the invoices, Grindblat's assistant sent check requests to

13    Bermuda.[130]    Grindblat testified that the Bermuda checks were not sent directly to the

14    vendor; rather, they were forwarded to GBDS in Marina del Rey, processed through the

16    [124]*Id.* at 169:8-11.

17    [125]*Id.* at 198:20-25; 199:1-25; 200:1-25.

18
19    [126]*Id.* at 202:2 ("The process was that the invoice came directly to me and I contacted Deleon Global Trading usually by fax requesting a check, referencing the, you know, invoice
20    number and some other administrative information so I would know when the check came to send it out to the vendor").

21
22    [127]*Id.* at 204:15-25; 205:1 (". . . [I]n order to alleviate a week from getting the check from Deleon Global Trading, we got a check issued from GB Data.  Q: Okay.  And how did you go
23    about getting that check issued by GB Data to pay that vendor?  A: I just had a conversation with Mr. Braswell and we – he authorized our accounting department to cut the check").

24
25    [128]Grindblat currently works for JOL Management, the successor company to GBDS.  He has worked for the company as a purchasing manager continuously since June 1997.  See RT at
26    224:19-25; 225:1-12.

27    [129]*Id.* at 228:1-13.

28    [130]*Id.* at 229:9-17; see also Ex. 370 at 3 (check request form to Deleon Global Trading).

accounting department, and then sent to the vendor by GBDS.[131]    Grindblat was responsible for negotiating with suppliers; he was not required to speak with anyone in Bermuda prior to issuing a purchase order in Deleon's name.[132]    He stated that approximately once a month, his assistant sent Miller documentation of the raw materials purchases made in Deleon's name.[133]

108.    When a supplier billed shipping charges separately, Grindblat said, GBDS or Gero Vita paid the additional charges; they did not request an additional check from Deleon.[134]

109.    Every summarized Hemisphere's role in Deleon's purchasing in an email she wrote on June 20, 1997.  She stated: "We have received complaints regarding the difference of time between instructions requesting drafts and the actual receipt of drafts by the client.  We will try to rectify this situation by the following means[:] 1. Instructions from client will be received by Laurie[;] 2. Draft request to be prepared immediately by Laurie[;] 3. Letter to the Bank of Bermuda requesting draft to be prepared by Laurie[;] 4. Letter to GB Data

---

[131]*Id.* at 231:10-14.

[132]*Id.* at 231:19-15; 232:1-6.

[133]*Id.* at 232:15-21 ("Q: And did your assistant Geraldine Kelly, while she was working for you, have any responsibilities in connection with Miller?  A: I believe she was collecting some of the documentation and she was sending it to him, I believe, once a month.  Q: Documentation on what?  A: On raw material purchases").

[134]*Id.* at 19-25; 273:1-17 ("Q: Do you recall ever instructing Geraldine Kelly to make check requests to pay these shipping charges?  A: No.  The shipping charges – you know, we were dealing with different suppliers differently.  Some of them, it depends on how we negotiate the price.  Some of them include freight to the final destination.  Some of them [do] not.  So actually the actual cost of the shipping [was] coming along with invoices when the product was delivered.  And that is the time we were paying for shipping if we had to pay for shipping.  Q: So in those instances where you had to pay for shipping because it hadn't been included up front as part of the overall price – A: I believe the small amount – I'm not sure, but I believe it was paid by Gero Vita or GB Data Systems.  Q: Okay.  And do you recall any instances in which you or Geraldine Kelly at your instructions asked Margaret Every to issue a check just to cover shipping?  A: I never talked to Margaret, and I don't remember asking for any additional money except what was on [the] purchase order.  Q: And that was – and then that amount would have been included in the check request sent?  A: Right").

24

to accompany the drafts to be prepared by Laurie[;] 5. 2-4 to be sent to Cash Management. Cash Management will arrange for the drafts to be collected from the Collection Department or a teller in order for the drafts and letter to be sent to G.B. Data by courier on the same day as the instructions were received."[135]

110.    Grindblat testified that placing raw materials purchase orders in Deleon's name inconvenienced the purchasing department, because "every time [he] had to explain [to the suppliers] why it's going through Deleon, not under GB Data['s] name or brand name." Although it was not a serious problem, Grindblat said that "[p]eople were getting confused and it create[d] some difficulties to establish[ing] better relationship[s] with vendors."[136] When suppliers expressed concern about the relationship between Deleon and GBDS, Grindblat told them that they could call him and that "GB Data [was] completely responsible for those payments because Deleon [was] a part of the company."[137]

111.    Grindblat testifed that, as a purchasing manager, he could see no business purpose for Deleon.[138]

112.    Grindblat spoke to Ted Ponich, GBDS' Chief Operating Officer at the time, regarding Deleon.  He told Ponich he did not feel comfortable "giving [an] explanation [about Deleon] every time [he was] negotiating."[139]

113.    A few weeks later, Ponich told Grindblat that, from that point forward, all purchase orders

---

[135]Ex. 146.

[136]RT at 233:12-21.

[137]Id. at 236:20-22.

[138]Id. at 265:21-25; 266:1-2.

[139]Id. at 235:5-9.  Grindblat said that when asked about the relationship between Deleon and GBDS, he would tell suppliers "the same thing I ha[d] been told, Deleon is a part of the company that GB Data is [the] management company and Gero Vita, it's one part of the company and Deleon is another part of the company and that Gero Vita is responsible for the finished product and Deleon is responsible for raw material."  RT at 234:15-20.

1  – including those for raw materials – should be sent under the [GVI] name.[140]

2  114.  Grindblat testified that once he began using GVI's name for raw materials purchase orders,

3  the form of the purchase orders changed in two respects: (1) the orders included a

4  signature line and contact information for Grindblat; and (2) the terms of the order were

5  generally "net 30" instead of "pre-paid," which was advantageous for GBDS' cash flow.[141]

6  **N.  Deleon Invoices**

7  115.  Weeks or months after he received the Deleon purchase orders and supplier invoices,

8  Miller instructed Dan Saito[142] to prepare sales invoices from Deleon to GVI indicating that

9  GVI owed Deleon money for the sale of various nutritional products.[143]  Saito received

10  letters written by Jones, which described "the amounts purchased and the dollar amounts

11  that the purchases were for," and was told by Miller to "mark up [the] amounts reflected

12  on the letter[s]."[144]  Although the amount of the mark-up varied over time, it was

13  consistent for each batch of invoices Miller and Saito received.[145]

14  116.  Saito never spoke with anyone at Hemisphere or Deleon, and was "not sure" what Deleon

15  and Hemisphere were.[146]

16  117.  Saito saw only one purchase order reflecting that GVI had ordered products from Deleon.

---

[140]*Id.* at 235:15-23.

[141]*Id.* at 250:20-25; 251:1-19; see also Ex. 371.

[142]As previously noted, Saito worked as a senior accountant for Meepos & Company – under Miller's direction – from 1994 through 1999.

[143]RT at 771:22-25; 772:1-9.  In order to prepare the invoices, Saito ordered blank invoices from a local printer.  See RT at 775:1-25; see also Ex. 85 (order for three-part invoices in the name of Deleon Global Trading).

[144]RT at 772:13-24.

[145]*Id.* at 772:25, 773:1-4.

[146]*Id.* at 773:19-25; 774:1-11.

He testified that he obtained the purchase order from Mendoza.[147]  Mendoza testified that she did not issue the purchase order, and that she had never issued purchase orders in GVI's name to Deleon.[148]

118.  Saito prepared two or three batches of invoices in Deleon's name.[149]  He prepared the first batch in 1995, marking up the prices listed in Jones' letters by a factor of ten.[150]  After Saito prepared the invoices, he gave them to Miller.[151]

119.  The second batch of invoices Saito prepared marked up actual purchase prices by a factor of three.[152]

120.  In 1997, in conjunction with a due diligence audit of GBDS conducted by Pricewaterhouse Coopers, Saito and Ted Risoen[153] prepared a schedule of Deleon purchasing activity for 1995.[154]  The schedule reflects that through September 1995, suppliers charged $1,434,624 for raw materials purchased in Deleon's name.[155]  During that same time period, Deleon

---

[147]Id. at 809:3-21.

[148]Id. at 127:7-21.

[149]Id. at 776:11-19.

[150]Id. at 778:3-8; 779:1-8 ("Q: The number you see on the right there, $246,000, is that dollars?  A: Yes.  Q: And where did that number come from?  A: That number was a calculated number, the amount per the letter was one-tenth of that amount, and I was instructed to record the amount, ten times of the amount on the letter"); see Ex. 31 at 1 (invoice from Deleon to Gero Vita International for "sale of various nutritional supplements and health care products" at a cost of $246,000).

[151]RT at 806:12-19.

[152]See Ex. 80 (summary of purchase orders for Deleon Global Trading from inception through 12/31/1995).

[153]Risoen, among others, brokered Braswell's effort to sell his companies to Nutraceutical in 1997 and 1998.  See RT at 607:14-25; 608:1-25.

[154]Id. at 611:22-24.

[155]See Ex. 80.

submitted invoices to GVI totaling $8,676,860.  This resulted in a "profit" to Deleon of $7,242,236.[156]

121.  No invoices from Deleon to GVI were prepared during 1996.[157] Deleon purchases for that year were invoiced in 1997.[158]

122.  A chart prepared by Risoen summarizing payments by GVI to Deleon reflects that during 1997, suppliers charged $5,466,445 for raw materials purchased in Deleon's name.[159] During that same time period, Deleon submitted invoices to GVI totaling $16,399,336. Deleon's "profit," therefore, was $10,932,891.[160]

123.  In total, Risoen and the auditors concluded that from Deleon's inception through 1997, suppliers charged GBDS $6,930,071 for raw materials purchased in Deleon's name, while Deleon submitted invoices to GVI totaling $25,076,196.  This generated a total "profit" for Deleon of $18,146,125.

124.  Risoen said he could discern no business purpose for the mark-up included on the Deleon invoices.[161]

125.  Between 1995 and 1997, GVI sent Deleon nine checks totaling $9,494,167.56.[162]  The first five checks corresponded with the first ten invoices Saito prepared in Deleon's name.[163] The next two checks were paid in 1996, while the final two were issued in 1997.  These

---

[156]*Id.*

[157]RT at 1466:25-1468:12; see also Ex. 64 at 2.

[158]Ex. 64 at 2.

[159]*Id.*

[160]*Id.*

[161]RT at 632:8-13.

[162]See Stipulated Facts at 12.

[163]See Ex. 31 at 1-10; Stipulated Facts at 12.

checks also corresponded to amounts reflected on Deleon invoices.[164]

## O.    Payments To Deleon By GBDS

126.    In 1994 and 1995, after Vita's name was changed to Deleon, GBDS sent Hemisphere checks payable to Deleon in the following amounts: (1) $500,000 on December 21, 1994; (2) $600,000 on January 17, 1995; (3) $600,000 on January 20, 1995; and (4) $500,000 on January 27, 1995.  These checks totaled $2.2 million.[165]

127.    The checks were deposited in Deleon's bank account at the Bank of Bermuda.[166]

128.    The four checks were originally classified on the books and records of GVI as "Investments – Deleon Global Trading."[167]

129.    Gary Yue, GBDS' controller, confirmed that GVI maintained a Deleon investment account on its books, but stated that he did not know why the account had been established.[168]

130.    On February 7, 1995, GVI's Deleon investment account showed a balance of $2.2 million dollars.[169]

131.    On November 13, 1995, Yue reclassified this $2.2 million from the investment account

---

[164]Stipulated Facts at 12.

[165]*Id.*, ¶ 25; see also Ex. 215 at 2, 5-7.

[166]Stipulated Facts, ¶¶ 15, 25.

[167]Ex. 215 at 1, 16, 19; see also RT at 810:21-25, 811:2-9 ("All four of these payments were paid by GB Data Systems to Deleon Global Trading.  They were recorded on the books of GB Data Systems as amounts due from Gero Vita International.  On the books of Gero Vita International, they were originally recorded as corresponding amounts due to GB Data Systems and as an asset account called investment Deleon Global Trading").

[168]RT at 290:10-22 ("Q: . . . [W]hat did that mean, that there is an investment account?  A: Normally that would mean basically GB Data or Gero Vita International is investing in another corporation or some type of asset.  Q: So it's company funds, and it's indicated on the books and records investment account as company funds?  A: Yes.  Q: Now, do you know why the Deleon investment account had been established?  A: No").

[169]RT at 295:1-4; Ex. 215 at 12.

29

to the inventory usage account, which was an expense account for the cost of goods sold.[170]

132.  Yue testified that he never saw any purchase orders from GVI to Deleon, nor any invoices from Deleon to GVI.  He said he made the reclassification because he was "instructed to" do so by Frantz.[171]

133.  Yue's testimony that Frantz instructed him to make the reclassification was not credible, given that he had previously testified before the grand jury that either Miller or Dan Saito[172] gave him this instruction, and that he could not identify any intervening event which refreshed his recollection that the instruction in fact came from Frantz.[173]

134.  While the court does not find this aspect of Yue's testimony credible, his statement that there was no backup documentation for the $2.2 million reclassification was corroborated by at least three other witnesses at trial.[174]

---

[170]RT at 295:17-25; 296:1-7; see also Ex. 215 at 16.

[171]RT at 298:1-13 ("Q: And who gave you that instruction? A: Originally I believe[d] it was Robert Miller because they were the audit group that usually made any kind of adjusting entries after we [had finished] closing the monthly books.  Q: And what do you believe now?  A: I believe that there is a possibility that I could have gotten some instructions from Bill Frantz as well.  Q: Let me be clear on this.  As of today, do you recall who instructed you?  Do you have a specific recollection of who instructed you to make this reclassification?  A: After further – I mean, from my recollection, it was from Bill Frantz").

[172]Saito worked as a senior accountant for Meepos & Company from 1994 through 1999.  He began working for the Braswell companies in 1995, and performed services for GBDS and Gero Vita.  Miller had the lead responsibility at Meepos for the Braswell companies' account.  See RT at 767:1-25; 768:1-8.

[173]See RT at 314:17-25 ("Q: Back in 2002 you told the Grand Jury that you did the reclassification 'basically because I was told to by the auditors' and that you believed it was either Dan Saito or Robert Miller, but probably Dan Saito, that told you to do the reclassification.  Do you remember giving that testimony?  A: Yes.  Q: And do you have any reason to believe that testimony was false?  A: No").

[174]See RT at 812:5-20 (testimony of Dan Saito) ("Q: Now, at some point in your work on the Braswell companies, were you assigned to find backup for this total $2.2 million inventory usage account? A: Yes. . . .  Q: What did you find?  A: I found checks, and that was about it"); RT at 454:1-20 (testimony of Francine LaPoint) (Q: And other than the check[s to Deleon], were you given any underlying documentation to support those entries [totaling $2.2 million] being

**P.      Frantz's Knowledge Of And Communications Regarding Deleon Through 1992**

135.    On October 10, 1990, after steps had been taken to form Vita,[175] Braswell sent Wetherhill a letter thanking him for "meeting with Bill Frantz and myself," and requesting that Hemisphere send "all financial statements and other information on these investments and/or entities" to Frantz.[176]

136.    On November 1, 1990, Braswell signed a Nominee Agreement that identified him as the beneficial owner of Vita's shares, and named Hemisphere Holdings as his nominee.  As noted previously, Hemisphere Holdings agreed to act in relation to the Vita shares on the instructions of Braswell (as beneficial owner) or Frantz (as Braswell's agent).[177]

137.    On December 27, 1990, Frantz sent Wetherhill a letter "re: Vita International, Ltd." Frantz acknowledged receipt of "corporate material concerning the above-referenced entity,"[178] and noted that a review of the corporate documents indicated that "three shares [of Vita] ha[d] been issued . . . [and that] the directors are in control of the unissued shares."  Frantz inquired (1) whether a nominee agreement had been prepared "whereby [the directors] hold these shares for Glenn[,]" and (2) whether, "if the three members hold the shares as a nominee of Glenn, . . . Glenn [could] serve as the director of this corporation[.]"[179]

_____

listed?   A: No"); RT at 616:1-12 (testimony of Theodore Risoen) ("I reviewed all the documentation that was in the purchasing department. . . .  Furthermore, I wrote to Margaret Every and Hemisphere management and requested the Deleon Global Trading checkbooks and check registers. . . .  I investigated everything I could find inside the company, inside the purchasing department.  I received the Deleon check registers, and I could not find any orders or purchases that related to those two invoices").

[175]See Ex. 103.

[176]Ex. 104.

[177]Ex. 107.

[178]Ex. 111 at 1.

[179]*Id.*

31

138.   Frantz testified that he did not believe he received a copy of the Nominee Agreement with the "corporate material" referenced in the December 1990 letter.[180]

139.   On January 11, 1991, Wetherhill responded, stating, *inter alia*, that Vita's current directors[181] each held a qualifying share of the corporation, and that "as a matter of course a Declaration of Trust is signed by each director stating that he or she is holding the share for the benefit of the beneficial owner." Wetherhill advised that Braswell was not prohibited from serving as a director of the company, but noted that such an arrangement might raise concerns that "management decisions [were being] made onshore causing the Company to be deemed to be resident for tax purposes."[182]

140.   Frantz testified that after receiving Wetherhill's letter, he understood that Braswell "either . . . was at that time or . . . was going to be" the beneficial owner of Vita.[183] Additionally, he "assumed" there was a written Nominee Agreement.[184] A series of letters written by and to Frantz during the 1990s confirms that Frantz assumed or believed that Braswell was in fact the beneficial owner of Deleon.[185]

---

[180]RT at 1401:6-7.

[181]The initial directors, identified by Frantz in his December 1990 letter, resigned upon incorporation. They were replaced, as earlier noted, by Wetherhill, Every, and Kelly. See Ex. 111 at 3.

[182]*Id.*

[183]RT at 1402:5-8.

[184]*Id.* at 1611:13-18 ("Q: Prior to your trip to Bermuda in January of 2000, did you make any inquiry of anyone at Hemisphere regarding whether or not there was a written nominee agreement? A: To my best recollection, I did not. I assumed there was, and I didn't make any further inquiry").

[185]See Ex. 347 (January 28, 1994, letter from Frantz to Miller stating "I'm not sure how the stock as been issued in each [offshore corporation] but, regardless, the stock has been issued for the benefit of Glenn Braswell with the only question being how it is held"); Ex. 317 (July 14, 1994, letter from Frantz to Braswell stating "You are the beneficial owner of Deleon Trading Company, a Bermuda corporation"); Ex. 348 (July 30, 1994, letter to Braswell from Frantz stating: "It is my understanding that you are the beneficial owner of Deleon Trading Company,

141.    On January 16, 1991, Hemisphere sent Braswell a letter, in care of Frantz, requesting that Braswell sign a standard share transfer form.[186]

142.    On February 27, 1991, Hemisphere sent Braswell a letter, in care of Frantz, attaching "all of the incorporating documents of [Vita] for your information." The letter requested that Braswell sign and return a waiver of notice for the first general meeting and a subscription form.[187]

143.    IRS Special Agent Patrick Caruth testified that cash transaction reports ("CTRs") for Deleon, created by Hemisphere and reporting currency transactions within the Deleon account, were faxed to Frantz and Braswell.[188] Frantz testified that he received the CTRs, and that he reviewed them when preparing Braswell's income tax returns to ascertain the interest income attributable to Braswell.[189]

144.    Frantz occasionally requested specific CTRs from Hemisphere.[190] He received a CTR reflecting each of the specific payments to Deleon that the government has charged as

---

a Bermuda corporation. I've not yet determined who the legal owner of Deleon Trading Company is at this time"); Ex. 393 (January 9, 1996, letter from Miller to Braswell, with a copy to Frantz, stating: "To the best of our knowledge, you currently own, indirectly or directly . . . Deleon Global Trading, Ltd."); Ex. 378 (November 15, 1996, letter from Frantz to James Bryan, Esq., stating: "As I understand it, [Braswell] does not directly own Deleon. The stock of Deleon is in a foreign trust of which Glenn is a beneficiary"); Ex. 330 (Interoffice memorandum from Chuck Hodges to Bill Frantz stating: "Deleon Global Trading, Ltd. ("Deleon") is a Bermuda corporation that is legally owned by Bermuda citizens. Glenn Braswell ("Braswell"), a U.S. citizen, has no direct ownership in Deleon. However, he may be considered as having ownership through a 'nominee,' i.e., the legal shareholders own their interest on behalf of Braswell. Notwithstanding, there is no formal documentation that supports any form of 'nominee' ownership").

[186]Ex. 114.

[187]Ex. 115.

[188]RT at 1000:1-16.

[189]*Id.* at 1346:1-18.

[190]See, e.g., Exs. 128, 133, 139, 140, 158, 159.

1    unreported income.[191]

2    **Q.    Communications With Knapp, Petersen & Clarke And ACF Licensing Issues**

3    145.    In 1992, Frantz and Braswell met with attorneys from Knapp, Petersen & Clarke ("KPC")

4    to discuss Braswell's desire to use an offshore entity to purchase raw materials.[192]  KPC

5    was retained because Frantz's firm did not have international expertise.  In a June 8, 1992,

6    to Crystal Russell of KPC. Frantz described KPC's engagement as "consider[ation of] the

7    tax planning proffered by Mr. Braswell concerning the use of an operating entity and an

8    investment entity."[193]

9    146.    Following this meeting, KPC proposed a three-phase project to answer Braswell's

10    questions regarding the feasibility and tax consequences of using offshore corporations to

11    "source materials" and "reduc[e] the United States federal income tax liability" of

12    Braswell's domestic corporations.[194]

13    147.    On January 31, 1994, KPC sent Braswell a letter regarding the likely tax treatment of

14    Deleon.[195]  Shahen Hairapetian, a KPC partner, was responsible for preparing the opinion.

15    Hairapetian testified that the facts on which the opinion was based came primarily from

16    Miller.[196]  Hairapetian's billing records reflect that he had a telephone conference with

17    Miller and Frantz on January 26, 1994, a few days before the opinion letter was sent to

18    

---

19    [191]Exs. 133, 138, 145, 158, 159.

20    [192]RT at 1404:20-25; 1405:1-6; see also Exs. 808, 809 (letter from KPC to Braswell
21    stating: "Thank you for the opportunity . . . to meet with you and Mr. Frantz at Mr. Miller's
22    offices. . . .  We at Knapp, Petersen & Clarke are pleased and honored by your consideration of
      our firm in connection with advising you on tax strategies for your off-shore corporate
23    operations").

24    [193]RT at 1406:10-21.

25    [194]Ex. 809.   The three phases included a feasibility review, a tax opinion, and an
26    implementation strategy.

27    [195]See Ex. 829.

28    [196]RT at 1109:18-20.

1   Braswell.[197]

2   148.   KPC's opinion letter stated that the following facts, *inter alia*, were assumed: (1) Deleon

3          was a Bermuda corporation whose shares were owned beneficially by a foreign situs trust;

4          (2) Braswell was the primary beneficiary of the trust; (3) neither Deleon nor the trust had

5          any offices, employees, or assets in the United States; (4) Deleon's primary business was

6          operated from Bermuda, and involved "the selling of products composed of foreign raw

7          materials" and manufactured abroad; (5) Deleon's primary customer was GVI, whose

8          business involved sale within the United States of the products it purchased from Deleon;

9          (6) a GBDS employee handled the purchasing of product from Deleon; and (7) all

10         transactions between Deleon and GVI were arm's length.[198]

11  149.   KPC indicated that it had been asked to address, *inter alia*, whether Deleon was a

12         controlled foreign corporation ("CFC"), and under what circumstances Deleon's income

13         would not be taxable to Braswell individually as "subpart F income."[199]   KPC also

14         analyzed whether Deleon could be deemed to be doing business in the United States and

15         could therefore be subject to United States taxation.[200]

16  150.   The KPC letter opined that Deleon would be treated as a CFC.[201]   It noted, however, that

17

18  _____

19      [197]RT at 1118:17-25; 1119:1 ("Q: Okay.  Now, does this bill reflect on January 26, 1994
    a conference that you had on the telephone with Mr. Miller and Mr. Frantz?  A: Yes.  Q: Okay.
20  And what was the point of that conference?  A: It indicates, 'Phone conferences with Bob Miller,
    CPA, and Bill Frantz, Esquire, regarding CFC and related issues regarding Glenn Braswell,
21  preliminary research on United States shareholders and attribution, office conference regarding
    research and preparation of opinion").
22

23      [198]See Ex. 829 at 3-4.

24      [199]Section 951 of the Internal Revenue Code provides that the United States shareholder of
    a controlled foreign corporation must include in his gross income, in addition to other amounts,
25  the CFC's subpart F income as a constructive dividend.  The income must be included whether
    or not the CFC distributes the income to the United States shareholder.
26

27      [200]Ex. 829 at 4.

28      [201]*Id.* at 10.

35

under the "manufacturing exception" to subpart F, income from the sales of Deleon's products would not have to be reported on Braswell's individual income tax returns if the products were "manufactured in Bermuda."[202]  "To come within the manufacturing exception and . . . avoid the application of subpart F," KPC stated, "the CFC must substantially transform the property . . . [e.g.,] wood pulp to paper; steel rods to bolts and screws; and fresh fish to canned fish."  It cautioned that "[p]ackaging, repackaging, or minor assembly operations . . . are not considered to be manufacturing operations."[203]

151.  In addition to concluding that Deleon would be treated as a CFC, KPC concluded that the company would not be deemed to be doing business in the United States and be subject to United States income taxation.  It based this conclusion on the following assumed facts: that "[n]either Deleon nor the Trust have any offices (or other fixed place of business), employees, or assets in the United States.  Deleon's primary business is operated from Bermuda and consists of the selling of products composed of foreign raw material. Deleon's products are manufactured abroad. . . .  [A]ll transactions between [GVI] and Deleon are at arms' length and reflect fair market conditions in which no party is under a compulsion to buy or sell."[204]

152.  Frantz testified that he "didn't read the discussion part that led up to [KPC's] conclusion," and that he "looked at [the letter] hurriedly in the context of whatever else I was doing at the time."[205]  He stated that he did not have any conversations with Hairapetian until December 1995, and that he did not believe he had any role in implementing KPC's opinion.[206]

---

[202]*Id.* at 21.

[203]*Id.*

[204]*Id.* at 27.

[205]RT at 1418:1-4.

[206]*Id.* at 1418:11-14.

36

153.   Frantz understood that any subpart F income generated by Deleon would be attributable to Braswell and that he would be required to report such income on Braswell's individual tax returns.[207]   Given that knowledge, and the clear relevance of KPC's opinion to the preparation of Braswell's personal tax returns, the court finds Frantz's testimony that he looked at the opinion only hurriedly and that he had no role in implementing KPC's opinion not credible.

154.   On March 15, 1994, KPC responded to a request that it recommend "the 'ideal' arrangement of the involved entities and individuals with regard to the United States federal income tax laws."[208]   KPC stated that, to provide such a recommendation, it would need additional information about Deleon, including the relationship of Deleon to GBDS, the relationship of Deleon's suppliers to Deleon, and the terms of the transactions between Deleon and GVI.[209]

155.   Frantz forwarded KPC's letter to Braswell on March 25, 1994.[210]   Frantz stated that, if Braswell wished to provide further information to KPC, he believed the following responses would be appropriate: "[t]here is no relationship between the employees of [GBDS] and Deleon"; "Deleon's suppliers are unrelated to Deleon and are nonresident

---

[207]RT at 1630:16-21 ("Q: If you had thought that Deleon was generating subpart F income at any time you were responsible for preparing the returns that we're talking about in this case, you would have included that subpart F income in the returns of Mr. Braswell? A: Correct"); RT at 1628:20-25; 1629:1-13 ("Q: All right.  So you knew that the issue of subpart F, whether or not that was being generated by Deleon, was something that was important to know, correct?  A: I knew it was an issue.  That's correct.  Q: And if subpart F income had been generated by Deleon, you also understood, did you not, that that was something that needed to be reported on Mr. Braswell's 1040's?  A: That would be correct").

[208]Ex. 830.

[209]*Id.*

[210]It is unclear how Frantz obtained a copy of the letter, as it was neither addressed nor copied to him.

aliens of the United States";[211] and a "'joint venture' would be possible between Deleon and its foreign suppliers assuming those suppliers would agree."[212] Frantz testified that he had obtained the majority of the information communicated in this letter from Braswell himself.[213]

156.    On July 13, 1994, KPC supplemented its January 31, 1994, opinion letter. KPC noted that it had been instructed to assume the following additional facts: (1) Deleon had obtained an ingredient known as "ACF" from a Swiss entity and another ingredient ("ingredient X") from an entity outside of Bermuda; (2) ACF was not contained in any product sold in the United States other than products sold by Deleon; (3) Deleon hired an independent contractor to combine ACF and ingredient X to produce the products it sold.[214]

157.    ACF 223 ("ACF") was a product sold by GVI in capsule form; it was also added to virtually all of the other products GVI marketed to the public.[215] The patent for ACF was owned by Richard Lippman.[216] Braswell's attorney, Lustigman, had prepared a licensing agreement between Lippman and Vita Industries, one of Braswell's domestic corporations, for the use of ACF in June 1990.[217] Although the agreement was never formally executed, Lustigman understood the parties had a verbal understanding that they would honor the agreement.[218]

---

[211]Frantz testified that "non-resident alien of the United States" meant "they're foreigners." See RT at 1422:6-9.

[212]Ex. 313.

[213]RT at 1420:14-25; 1421:1-25.

[214]Ex. 842 at 1-2.

[215]RT at 260:23-25; 261:1-25.

[216]Id. at 740:22-24.

[217]Id. at 740:20-25; 741:1-25.

[218]Id. at 749:18-25.

158.  In its July 13, 1994, letter, KPC noted that "[s]ince Deleon's products are composed of ACF, Product X and other ingredients, Deleon's products may be exempt [from subpart F taxation] . . . if the products are considered to be manufactured in Bermuda." It noted, however, that it would need further information to form a definitive conclusion on the issue.[219]

159.  Frantz testified he did not know KPC had issued a supplemental opinion letter until Miller sent it to him on July 15, 1994.[220] He also testified that he never read KPC's July 13 letter.[221]

160.  On July 14, 1994, a day after KPC issued its supplemental opinion, Frantz asked Brenda Bates, an associate at his firm, to research the subpart F income issue.[222] Frantz testified that he had learned of the subpart F manufacturing exception from a colleague. Because he had recently been advised that Braswell "was transferring a license to ACF to Deleon," he asked Bates to investigate whether "subpart F income is avoided . . . assuming [that there is] a product known as ACF and the manufacturer of that product [is] offshore."[223]

161.  Frantz also asked Bates to assume that Braswell was the beneficial owner of Deleon, that Deleon acquired the ACF ingredients and processed those ingredients into the ACF formula, and that it was "then sold to a U.S. entity known as Gero Vita Laboratories, Inc."[224] Frantz did not tell Bates (1) that Deleon was purchasing or considering the purchase of products in the United States; (2) that a GBDS employee would assist Deleon with the purchasing process; (3) that Deleon's accountant was in the United States; or

---

[219]Ex. 842 at 12.

[220]RT at 1431:11-15.

[221]*Id.* at 1431:23-24.

[222]Ex. 843.

[223]RT at 1428:19-25; 1429:1-7.

[224]Ex. 843.

(4) that he was concerned Deleon might be doing business in the United States.[225]

162. Frantz advised Braswell on July 14, 1994, that FS&G was "going to look into the 'subpart F' income question,'" and that it was making a series of factual assumptions. These included (1) that Braswell was the beneficial owner of Deleon and that Deleon had acquired the patent for ACF from Lippman;[226] (2) that "[a] contract will exist between Deleon Trading and Dick [Lippman] providing that [Lippman] or his foreign entity is paid the amount of $2,000 a month plus $1 per bottle sold containing the ACF formula"; (3) that "this payment to [Lippman] is for the purchase of the patent on one hand and mixing the ingredients into the ACF product on the other hand"; and (4) that "the service of mixing these ingredients into the ACF product is conducted offshore." Frantz stated that it was "important that a manufacturing process be attributable to Deleon," and that "it may be important that the manufacturing process be offshore."[227]

163. On July 19, 1994, Bates sent Frantz a memorandum stating that "if Deleon Trading manufactures or produces the tablets in Bermuda, the country in which it was organized, no foreign base company sales income . . . would result. . . . In addition, Deleon Trading would not realize foreign base company sales income . . . if Deleon incurs costs for the manufacture or production of property 'if the property sold is in effect not the property which it purchased.' . . . If the manufacturing process amounts to a substantial transformation of the purchased ingredients into a product prior to its sale, the property will be treated as manufactured by Deleon."[228]

164. On July 30, 1994, Frantz sent Braswell a letter incorporating Bates' subpart F analysis. The letter concluded that under the facts assumed by Frantz and derivatively, Bates, "no foreign base company sales income would result and consequently, no subpart F income

---

[225]RT at 1427:12-17; Ex. 843.

[226]Ex. 317.

[227]*Id.*

[228]*Id.*

to the shareholders."[229]

165.  On July 31, 1994, Frantz sent Lustigman a letter advising that he had "reviewed the ACF transaction which was discussed in a recent conference call involving you, Glenn, and myself. . . .  It is my understanding that you have drafts of agreements between the parties and I want to suggest that these agreements be concluded to reflect the fact that the payments made by Glenn's company are for the patent or licensing arrangement on one hand and the manufacturing process on the other hand."[230]

166.  In response to Frantz's letter, Lustigman prepared a new draft agreement under which the licensor of the ACF patent was California Health Technologies, a Los Angeles company to which Lippman had assigned the patent, and the licensee was Deleon.  The agreement contemplated that Deleon would acquire the ingredients for ACF and either manufacture the product or arrange for its manufacture.  The agreement provided that Deleon would pay California Health Technologies $2,000 per month and $1 per bottle for ACF products, and required that Deleon provide a report to California Health Technologies regarding the required royalty payments.[231]

167.  Lustigman sent copies of the draft agreement to Frantz and Braswell.  He testified, however, that, to his knowledge, the agreement was never executed.[232]

168.  During the due diligence audit of GBDS in 1997 and 1998, the auditors found no evidence that Deleon held a license or other rights to ACF.  The auditors saw no documents indicating that Deleon held any patents, licenses or trademarks pertinent to any of the Braswell company products, including ACF.[233]

---

[229]Ex. 847.

[230]Ex. 349.

[231]Ex. 367.

[232]RT at 753:24-25.

[233]RT at 489:15-25; 490:1-25; see also Exs. 67-A, 67-D.

169.  Frantz testified on cross-examination that other than the draft agreement prepared in July 1994, he saw no agreement between a Lippman entity and any other entity regarding ACF.[234]

170.  Frantz stated that, based on the Bates memorandum, he concluded "there would be no subpart F issue as to the role of the ACF product in this plan."[235]  The court finds this testimony not credible.  Frantz's testimony that he never read the second KPC opinion letter strains credulity, since he testified that (1) he knew in March 1994 that KPC was potentially going to prepare a second letter discussing the "ideal arrangement of the involved entities"; (2) he received KPC's second letter a day after he directed his associate to investigate the impact of subpart F and the manufacturing exception; and (3) he contacted Lustigman shortly after the KPC letter and the Bates memorandum regarding subpart F income were prepared.  It is not believable that Frantz would rely on the research of an associate "one or two years out of law school"[236] after receiving a letter from KPC, a firm which, as he acknowledged, had international tax expertise.[237]

171.  Further, it is not credible that Frantz believed there would be "no subpart F issue as to the role of the ACF product" because (1) Frantz testified he was unaware of any actual agreement regarding ACF between Lippman and any other entity, including Deleon;[238] and (2) Frantz admitted he never asked Hemisphere whether it would be legal under Bermuda law for Vita or Deleon to receive product and then alter the product in some way.[239]  Given that Frantz did not know that either Deleon or Hemisphere had manufacturing capability,

[234]RT at 1640:17-25; 1641:1-15.

[235]Id. at 1432:11-13.

[236]Id. at 1630: 11-13 ("She was right out of law school, either one or two years at this particular time.  It would have been two years at the most, probably").

[237]Id. at 1406:10-21.

[238]Id. at 1640:9-25; 1641:1-15.

[239]RT at 1619:15-19.

that he did not know the legal implications of having Deleon conduct manufacturing activity in Bermuda, and that he had no information that Deleon held a license to ACF, the court finds that his testimony regarding ACF and the subpart F issue not believable.

### R.     Frantz's Knowledge Of And Communications Regarding Deleon From 1993 To 1998

172.   In addition to his involvement with KPC and Lustigman, Frantz had numerous communications regarding Vita and Deleon during and after 1993.

173.   Between 1993 and 1997, Frantz made approximately three trips to Bermuda.[240]

174.   On July 3, 1993, Frantz wrote Wetherhill, inquiring whether Hemisphere could make "alternative recommendations" regarding the yield on the savings and investment accounts for Vita.[241]

175.   In September 1993, Frantz met with Braswell and Adlai to discuss Braswell's desire to activate Vita and begin purchasing product through it.[242]

176.   On October 6, 1993, Frantz wrote Every to "follow up" on a "recent conversation" concerning Braswell's use of Vita as a purchasing agent.[243]   A few weeks later, Frantz wrote Lustigman regarding Braswell's revival of "activity in an offshore company [that was going] to function as a source of raw material."[244]   Frantz enclosed two purchase orders, and asked that Lustigman review them to assure that distribution in the United States of the items ordered would be legal.[245]   On October 28, 1993, Lustigman wrote Wetherhill, and "advised that products of this nature may lawfully be imported into the

---

[240]*Id.* at 1411:19-25; 1512:1-2.

[241]Ex. 152.

[242]RT at 1407:17-19.

[243]Ex. 383.

[244]Ex. 346.

[245]*Id.*

1    United States."[246]  Lustigman copied Frantz on the letter.

2    177.   In a letter to Cheryl Kyalla dated October 6, 1993, Frantz stated that Every had spoken
3    with Wetherhill regarding the use "of an offshore company as a purchasing agent or source
4    for product to be sold by one of the domestic related entities.   In that Hemisphere
5    Management will provide officers and directors for this entity, their files need to reflect
6    as much information about the product and merchandising thereof as possible."[247]  Frantz
7    testified that the purpose of this letter was to inform Kyalla that Hemisphere "was going
8    to do some due diligence and they were going to need some information consistent with
9    the due diligence they were going to do before they agreed to provide the service."[248]

10   178.   On February 11, 1994, Frantz wrote Every, asking for information regarding the accounts
11   into which recent transfers had been deposited.  Every responded on February 15, 1994,
12   stating, *inter alia*, that $500,000 had been deposited to the Deleon Account.[249]

13   179.   In a letter to Kyalla dated April 6, 1994 – approximately the time Adlai placed a purchase
14   order in Deleon's name that was ultimately canceled – Frantz stated that he had spoken
15   with Every regarding "the procedure to have the bills of Deleon Trading paid."[250]  Frantz
16   said Every had verified "that it would be acceptable to make up a check disbursement
17   request and to fax to her, say, on a weekly basis for the purpose of paying suppliers, etc."
18   He told Kyalla that she "should . . . attach the bills from these suppliers to insure accurate
19   payment," and that Every would "be expecting [Kyalla] to forward these statements to
20   Hemisphere Management for payment."[251]

21

22   ───────────────────

23   [246]Ex. 384.

24   [247]Ex. 345.

25   [248]RT at 1409:12-15.

26   [249]Ex. 121 at 1-3.

27   [250]Ex. 391.

28   [251]*Id.*

44

180.    Frantz testified that he could not recall why he "got in the middle [and] got involved with writing this letter," because he did not "agree with the procedure that [was] being expressed. . . ."[252]  Frantz said he did not "give a lot of thought" to the implications of the procedure described, i.e., that suppliers would be sending their bills to Kyalla or someone else at GBDS.  He asserted, moreover, that he had a subsequent conversation with Every, and eventually "recant[ed] this as an acceptable procedure" in a letter dated April 27, 1994.[253]

181.    The letter to which Frantz referred is an April 27, 1994, letter to Miller.[254]  In the communication, Frantz stated that although he had previously thought Deleon would be purchasing foreign product and reselling it to GVI at a markup, he understood that the factual circumstances had changed.  Frantz said he now understood that "Deleon may be purchasing (or planning to purchase) product in the United States from independent laboratories.  This product would then be sold to [GVI].  An employee of [GBDS] would render some services to Deleon in this process and, finally, the accountants of Deleon would be situated within the United States."[255]

182.    Frantz informed Miller that, if such a plan were to be implemented, it "might be appropriate" to have KPC evaluate its tax implications.[256]  He identified the issues for KPC's consideration as "(1) Is Deleon a CFC[;] (2) Does Deleon have subpart F income[;] (3) Under what conditions would Deleon have 'excess passive assets'[;][257] (4) Is Deleon

---

[252]RT at 1616:16-20.

[253]*Id.* at 1617:9-17.

[254]Ex. 837.

[255]*Id.*

[256]*Id.*

[257]Frantz noted that recent changes to subpart F "generally require a U.S. shareholder of a CFC to include in its income its pro rata share of the CFC's earnings invested in 'excess passive assets.'" *Id.*

doing business in the United States."[258]

183. Frantz's letter to Miller did not "recant" the procedure of having Kyalla send check disbursement requests to Hemisphere, nor did it express Frantz's disagreement with that procedure. Accordingly, the court finds Frantz's testimony on this subject not credible. Although Frantz may have learned of a change in plans for Deleon, there is no contemporaneous evidence that he found the procedure described in his letter to Kyalla unacceptable.[259]

184. On May 4, 1994, Every sent a memorandum to Wetherhill regarding Deleon in which she expressed "concern[ ] about this company and the products . . . ." Every reported that she had "called Bill Frantz to get an idea as to what is going on as [she had] received the list of products with a request to issue purchase orders to laboratories in the U.S.A . . . ." She told Wetherhill: "It appears that they are doing what they want with the Deleon name and I really do not feel at all comfortable about it. I told Bill that I was concerned and that I wanted to discuss this with you. In the beginning, we, Deleon, were purchasing products in Europe and then selling them to one of Glenn's in the U.S.A. I don't think this was a problem. . . . Quite a few changes have taken place without us being notified."[260]

185. The same day Every sent this memorandum to Wetherhill, Frantz sent Braswell a letter recounting the conversation he had had with Every. Frantz stated he had told Every that the markup on products purchased by Deleon and re-invoiced to GVI would be 25%.[261] Frantz also told Braswell Every was concerned that "Deleon not have too much U.S. nexus which would expose the company to U.S. taxation."[262] Frantz noted his own letter of

---

[258]Id.

[259]See Def's. Reply at 26.

[260]See Ex. 124.

[261]See Ex. 840.

[262]Id.

April 27, 1994, expressing the same concern and said that Every might "want some comfort letter representing the nature of Deleon's U.S. activity."[263]

186.    On June 1, 1994, Every sent Frantz CTRs for Deleon and Sonoran that he had requested. Every's cover letter apologized for the delay and stated that she was "under the impression that the reports had been sent to you."[264]

187.    On January 13, 1995, Every sent Frantz copies of Deleon CTRs for the period from October 1 to December 31, 1994, "as per our telephone discussion." The CTRs reflected a $500,000 deposit into the Deleon Account by GBDS.[265]

188.    In early 1995, Frantz received a telephone call from Miller and Braswell regarding the proposed markup on Deleon "sales" to GVI. Frantz testified that Braswell proposed a ten times markup, and that he "neither affirmed ten times nor disaffirmed ten times."[266]

189.    On March 20, 1995, Frantz received a sample Deleon purchase order from Mendoza. Mendoza requested that he review the order, as "[t]his will be the format we plan to follow for the purchasing of raw materials in international countries."[267] As previously noted, Frantz circled the "ordered by" and "approved by" lines on the purchase order.[268]

190.    Frantz called Braswell after receiving the purchase order and told Braswell that he had understood the ordering "was going to be done by Hemisphere and Deleon."[269] Frantz said he "thought the purchasing orders would either be prepared or completed by

---

[263]*Id.*

[264]Ex. 128.

[265]Ex. 133 at 1-3.

[266]RT at 1452:12-25; 1453:1-25.

[267]Ex. 320.

[268]RT at 1621:1-15.

[269]*Id.* at 1622:11-20.

47

Hemisphere, but [he] didn't know how."[270]

191.  After Frantz called Braswell, Miller instructed Mendoza to remove the "ordered by" and "approved by" lines.[271]

192.  On July 27, 1995, Frantz requested that Every send him copies of CTRs for Deleon for January and September 1994.[272]  On August 22, 1995, Every sent Frantz the requested reports.[273]

193.  On August 25, 1995, Braswell sent Frantz a letter regarding Deleon, including "papers [Braswell had] received from Bob Miller regarding Deleon."  Braswell complained that Miller "had ordered three part invoices,"[274] and forwarded a letter from Miller that "[e]nclosed . . .  invoices from Deleon Global Trading, Ltd. to Gero Vita International for those purchase orders which have been prepared during the period of April 10 through July 17."  Miller's letter noted that, "[p]ursuant to [his] earlier conversations [with Braswell], the invoices [had been] prepared based upon a mark-up of ten times cost."[275]

194.  Frantz acknowledged that he knew, as of August 24, 1995, that a ten times markup was being used for items purchased from Deleon by Braswell's companies.[276]  He insisted, however, that he did not know Miller was preparing the invoices in Deleon's name, nor that purchase orders in Deleon's name were being issued by GBDS employees.[277]  The court does not find this testimony credible.  The evidence demonstrates that: (1) Frantz

---

[270]Id. at 1623:2-4.

[271]Id. at 1621:2-19.

[272]Ex. 138 at 1-2.

[273]Id. at 3-5.

[274]Ex. 321 at 2.

[275]Id. at 1.

[276]RT at 1658:20-22.

[277]Id. at 1658:5-25; 1661:21-25; 1662:1.

received a sample Deleon purchase order from a GBDS employee, indicating that it was the form that would be used for future purchases of raw materials in Deleon's name; (2) Frantz called Braswell to offer his comments after receiving the sample purchase order; (3) the Deleon purchase order was subsequently changed to conform to Frantz's comments; (4) Frantz received a letter from Braswell stating that Miller had "ordered three part invoices"; and (5) Frantz received a copy of a letter from Miller stating that he had charged a ten times markup. In light of this evidence and contrary to Frantz's testimony at trial, the court concludes that Frantz knew (1) that GBDS employees were issuing purchase orders in Deleon's name and (2) that Miller was preparing invoices from Deleon to GVI with a substantial markup.

195.  This finding is supported by the fact that, throughout 1995, Hemisphere employees communicated to Frantz on several occasions their concern that they were not being advised as to changes in the relationship between Deleon and Braswell's domestic companies.

196.  On November 27, 1995, Wetherhill sent Braswell a fax, with a copy to Frantz. Wetherhill stated: "Margaret has made me aware of the *two credit applications* that we have received. Margaret spoke to you a couple of weeks ago. We are concerned that we are not kept informed regarding some of the activities of this company. We have no control over its affairs and there is little liaison with your office. I am trying to contact Bill Frantz as a matter of urgency to discuss this. We cannot manage companies or be board members in these circumstances."[278]

197.  On December 2, 1995, Frantz wrote Braswell a letter, which reviewed the concerns raised by Wetherhill and Every. He stated: "On the assumption that their concern is Deleon, I'll need to review the detail of those operations and, as you suggested, it may be appropriate to submit the Knapp Petersen opinion to them. At the same time, it makes sense (as we discussed) to possibly have [KPC] review these operations and the conformity of these

---

[278]Ex. 354 (emphasis original).

49

1    operations to the facts that they have assumed in rendering that opinion."[279]

2    198.    On December 8, 1995, Braswell wrote Every, and asked her to send "a statement of

3    activity of all accounts including my personal account [and] a statement of activity, since

4    inception, for Deleon," in anticipation of a visit from Frantz "next week."[280]

5    199.    On December 15, 1995, Every wrote a memorandum to Wetherhill.  She stated: "Listed

6    below are the concerns that I have regarding Deleon.  We are not advised as to what is

7    being done on a day to day basis.  It is obvious that orders are made as we receive faxes

8    from Glenn requesting that [checks] be forwarded.  We have receive[d] instructions

9    requesting that we complete credit applications.  We do not know the customers.  There

10    is not any follow up on paperwork.  *The business is being done in the States by Glenn's*

11    *company, G.B. Data Systems Inc.  If we are to do this business should we not be arranging*

12    *the invoices etc.?*  Bill is meeting with you at 9:30 a.m. on Monday.  Please advise him

13    of our concerns."[281]

14    200.    On December 19, 1995, Frantz sent Braswell a letter regarding the meeting he had had

15    with Wetherhill on December 18.  Frantz reported that Wetherhill "believes he is not being

16    kept abreast of Deleon's operations.  He believes Deleon is conducting business in the

17    United States.  He doesn't know the people with G.B. Data who contact him.  He is

18    concerned about his and Margaret's exposure insofar as they are officers and directors of

19    Deleon and Hemisphere is now a public company.  Lastly, he added that Deleon may not

20    be in compliance with Bemuda laws. . . .  I think the 'bottom line' is that [although

21    Wetherhill] wants your business, he doesn't want to be contacted by employees that

22    Hemisphere does not know, he wants to know what is transpiring and wants you to

23    minimize the appearance of U.S. activity. . . .  I also explained to [Wetherhill] that we

24    wanted Deleon audited. . . .  He said there was no activity to audit and I told him we

25    _____

26    [279]Ex. 856 at 2.

27    [280]Ex. 392.

28    [281]Ex. 141 (emphasis original).

1      would have the deposits and disbursements audited then."[282]

2  201.  In 1996, Susan Green, GBDS' office manager, sent the Bermuda telephone company a
3      letter on Deleon Global Trading letterhead.  She requested that "a Bermuda telephone
4      number [be] set up under the name of Deleon Global Trading Limited to be forwarded to"
5      a number in the GBDS' offices.[283]

6  202.  The letter enclosed a check signed by Braswell, and Green testified that she would not have
7      sent the letter unless instructed to do so by Braswell.[284]

8  203.  Although the letter was written on Deleon letterhead, Green did not know what either
9      Deleon or Hemisphere was.[285]

10  204.  On February 19, 1996, Wetherill sent Frantz a copy of Green's letter.  The fax cover
11      sheet stated: "I attach herewith another example of matters being dealt with from the U.S.
12      Not only is a Bermuda letterhead being used, but the U.S. people are trying to initiate the
13      establishment of a Bermuda telephone number.  We cannot continue to manage a Bermuda
14      company on this basis and you need to address this matter urgently with your client."[286]

15  205.  On February 22, 1996, Frantz sent Braswell a copy of Wetherill's fax and Green's letter.
16      Frantz stated that he had discussed the matter briefly with Every, and that "[o]nce again,
17      she expressed her concern that the directors are not being kept informed or consulted."[287]
18      Frantz went on to state that "[o]f larger economic significance is the perception of
19      sufficient U.S. activity to subject Deleon to U.S. taxation."[288]

20

_____

21  [282]Ex. 323.

22  [283]Ex. 97; see also RT at 218:14-25.

23  [284]Ex. 97; see also RT at 222:8-11.

24

25  [285]See RT at 221:1-4.

26  [286]See Ex. 356 at 2.

27  [287]*Id.* at 1.

28  [288]*Id.*

206.    On March 26, 1997, Frantz sent Every a letter stating, in part, that "[a]pparently . . . one of the invoicing employees, without understanding all of the ramifications and issues, suggested that Deleon should have a Bermuda phone number which 'rolled over' to the California office of G.B. Data Systems, Inc."[289]

207.    Frantz advised Every that Green was no longer with the company, and that "[a]s far as I can tell, your phone number is on the Deleon letterhead and I would assume that if someone wanted to call Deleon in Bermuda, you would take the message and relay it as appropriate."[290]

208.    Frantz testified that, although he gave some thought to why GBDS would want a Bermuda number that rolled over to the United States, he "didn't carry it out" far enough to conclude that GBDS wanted the number so that suppliers calling GBDS would have the impression they had contacted Deleon in Bermuda.[291]  He said he was "not sure" what he meant "by the reference to invoicing employees" in his March 26, 1997, letter to Every, and that he "didn't give . . . any thought" to what the invoicing employees were actually doing.  This testimony is not credible, and the court finds that the 1996 incident involving the Bermuda telephone company supports a finding that Frantz knew purchase orders were being issued in Deleon's name by GBDS employees.

209.    On July 2, 1996, Hemisphere sent Frantz various Deleon CTRs that had "previously been sent to [Braswell]."[292]

210.    Frantz subsequently met with KPC to review Deleon's operations, and "[to] see if that influence[d] the opinion[s] they ha[d] previously given, essentially as it regards whether

---

[289]See Ex. 309.

[290]*Id.*

[291]RT at 1649:16-23.

[292]Ex. 158 at 1-2.

52

1   or not Deleon [was] doing business in the United States."[293]

2   211.   On July 24, 1996, KPC issued a second supplement to its opinion letter.  The letter was

3          sent to Braswell in care of Frantz.  KPC assumed a number of additional facts, including,

4          *inter alia*, that (1) "Deleon's only transactions with domestic entities comprise[d] . . . sales

5          of tangible property to [GVI] . . . and are at reasonable prices"; (2) that neither Braswell

6          nor any entity in which he owned an interest "ha[d] as a principal purpose the avoidance

7          or evasion of Federal income tax"; and that (3) Deleon did not "have an agent in the

8          United States[; and that no] person in the United States [held] a discretionary power of

9          attorney on behalf of Deleon, or [had] the authority to contract for Deleon."[294]

10  212.   Frantz testified he thought there was a "real concern" regarding KPC's assumption that

11         Deleon had no agents in the United States, because "a corporation acts through its agents,

12         and I thought there was, in effect, agent activity within the U.S."[295]  He admitted,

13         however, that he never told KPC Deleon had agents in the United States, even though he

14         believed that to be the case.[296]

15  213.   Frantz testified that he did not read KPC's July 24 opinion.  Instead, Frantz had an

16         associate, Chuck Hodges, review and summarize the opinion for him.  On August 1, 1996,

17         Frantz sent Braswell a letter, which enclosed the KPC opinion and stated that "when all

18         is said and done, there may be some reporting requirements."[297]

19         **S.   Deleon's Dissolution**

20  214.   After Grindblat complained to Ponich in 1997, GBDS employees no longer ordered raw

21

22         [293]RT at 1442:11-14.

23         [294]Ex. 864 at 2-3.

24         [295]RT at 1444:3-9.

25         [296]*Id.* at 1634:9-25; 1635:1-3.

26

27         [297]Ex. 324.  Notwithstanding his opinion regarding reporting requirements, there is no
    evidence that Frantz ever filed Forms 5471 or 90-22.1 for Deleon.  See finding 25, *supra*, and
28  finding 295, *infra*.

materials in Deleon's name.[298]

215.  On March 27, 1999, Frantz advised Every that $3,500,000 had been distributed from Deleon's account to Braswell in 1997, and that Braswell "would like to reflect the balance in that account as of December 31, 1998, after the payment or accrual of all management fees and other operating expenses, in his income for that year."[299]  Frantz attached a sample letter for Every to send to Braswell.[300]

216.  On March 29, 1999, $422,964.66 was transferred from the Deleon bank account to Braswell.[301]

217.  On April 22, 1999, Frantz faxed a second sample letter to Every, dated March 1, 1999, that stated: "Please be advised that we are liquidating Deleon Global Trading Ltd. as of December 31, 1998.  After payment of all fees and expenses, there is a balance available for distribution in the amount of U.S. $422,964.46."[302]

218.  On April 23, 1999, Every sent the letter to Braswell.[303]

219.  On July 5, 1999, Hemisphere's legal counsel sent Braswell a letter acknowledging his instruction that Deleon be liquidated.[304]

220.  On April 2, 2001, Hemisphere transferred its 11,996 shares of Deleon stock to Braswell; Every transferred her single share to Alison Morrison, and Wetherhill, Kelley, and Morrison simultaneously transferred their single shares to Braswell.[305]  All of the managing

---

[298]RT at 235:5-9.

[299]Ex. 151 at 19.

[300]*Id.*

[301]*Id.* at 26-29.

[302]*Id.* at 17–18.

[303]*Id.* at 15-16.

[304]*Id.* at 21.

[305]See Ex. 5 at 132-33.

directors and officers resigned.[306]  By April 2, 2001, Braswell was the owner of all 12,000 Deleon shares.[307]

### T.     The FS&G Escrow Account

221.  As previously noted, Frantz maintained the FS&G Escrow Account for Braswell at Fidelity National Bank in Atlanta, Georgia.[308]

222.  Braswell told Frantz that he wanted to maintain the Escrow Account for at least three reasons: first, to pay his taxes; second, to make gifts to his family; and third, to pay bonuses to corporate employees.[309]

223.  The Affiliated Corporations sent money to the FS&G Escrow Account whenever they accumulated a certain amount in available funds.[310]

224.  All relevant deposits and credits to the FS&G Escrow Account from 1994 to 1997 were made by wire transfer or check from GBDS.[311]

225.  Disbursements out of the FS&G Escrow Account were made by Frantz at Braswell's direction.[312]

226.  In 1994, $7,300,000 was deposited into the FS&G Escrow Account, and $6,195,000 was

---

[306]*Id.*

[307]*Id.* at 139.

[308]RT 1345:4-10.

[309]*Id.* at 1353:6-20.

[310]*Id.* at 953:17-25, 954:1-15 ("Q: Was there any minimum amount that triggered sending money to the FS&G investment account?  A: Whatever.  Whenever we have enough money, like maybe [a] hundred thousand, more or less, or something").

[311]Stipulated Facts, Ex. 409.

[312]RT at 1508:16-20 ("Q: Now, when you made payments out of the escrow account, did you do that on your own volition, or was that pursuant to Mr. Braswell's or someone else's instruction?  A: Probably 99 percent of the time it was pursuant to Mr. Braswell's instruction").

1    disbursed.[313]

2    227.    In 1995, $2,050,000 was deposited into the FS&G Escrow Account, and $1,443.343 was

3        disbursed.[314]

4    228.    In 1996, $3,300,000 was deposited into the FS&G Escrow Account, and $2,160,000 was

5        disbursed.[315]

6    229.    In 1997, $1,600,000 was deposited into the FS&G Escrow Account, and $2,325,000 was

7        disbursed.[316]

8    230.    The government charges that each disbursement from the FS&G Account constituted an

9        unreported item of income to Braswell.

10    231.    Frantz testified that he did not believe the disbursements constituted reportable income

11        because of the manner in which compensation was paid to Braswell by the Affiliated

12        Corporations.[317]

13    232.    The compensation Braswell earned from the Affiliated Corporations was accrued on the

14        books of the corporations as a loan payable.[318]  Booking the transaction in this way was the

15        functional equivalent of paying Braswell the cash compensation and having him loan the

16        money back to the company.[319]  Braswell reported as income the amounts annually booked

17        as a loan payable to him by various Affiliated Corporations, even though he did not receive

18

19

20

_____

21    [313]Stipulated Facts, Ex. 409.

22    [314]*Id.*

23    [315]*Id.*

24    [316]*Id.*

25

26    [317]RT at 1356:1-25; 1257:1-25.

27    [318]*Id.* at 863:2-6; 1265:14-18.

28    [319]*Id.* at 1265:13-17.

1    the compensation at the time it was reported.[320]

2    233.  Frantz testified that because "[Braswell] was reporting large sums of money on his tax

3        return based upon shareholder payable accounts, meaning that the company owed him the

4        money, [Frantz's] mindset . . . [was] that [the] money that came into the escrow account,

5        tax had previously been paid on it by virtue of those accruals that were put on his return

6        as income."[321]  Frantz said that he viewed the FS&G Escrow Account as a loan receivable

7        account that the Affiliated Corporations would offset against the loan payable to Braswell

8        at the end of each fiscal year.[322]

9    234.  To demonstrate why he held this belief, Frantz stated that (1) when he first started working

10        for Braswell, he became aware that "the corporate practice of [Braswell's] corporations

11        in Atlanta was [to] make disbursements either to [Braswell] or for his benefit throughout

12        the year," and that the corporations "reflected those disbursements on the corporate books

13        as a shareholder loan or an officer loan, one or the other"; (2) early in Frantz's work with

14        Braswell's California corporations, "there was [a] loan receivable account," and as the

15        controller "created an expense, he reduced the shareholder receivable by the amount of

16        compensation, but rapidly the practice was that, as the expense was accrued on the books,

17        it created a shareholder payable account"; and (3) in 1992, GBDS' controller, Kevin

---

19    [320]*Id.*  See RT at 847:6-9 ("Q: [H]ow was that compensation booked on the books and
20    records?  A: It was usually recorded as compensation, which is a corporate expense, an equal
      amount payable to Mr. Braswell.  Q: At least at the beginning of this process when that amount
21    was booked, had any cash gone to Mr. Braswell at that point?  A : Not at the time it was
      booked"); RT at 1235:1-16 ("Q: Okay.  So on the face of it, since it's – a cash basis taxpayer
22    only has to pay tax on monies he receives on the face of it, since Mr. Braswell didn't receive the
      accrued compensation, he wouldn't have to report it in the years in question?  A: Correct.  Q:
23    Okay.  Notwithstanding that, you included that in your calculations?  A: I included it because that
      is the way he accounted for it.  Q: Well, it may be the way he accounted for it, but I believe you
24    testified that, if you're looking at whether there is a deficiency or not, he did not have to conclude
25    it?  A: No.  He did not have to, but he did"); see also Exs. 13, 14, 15, 17.

26    [321]RT at 1357:10-17.

27    [322]*Id.* at 1380:6-15 (noting that in a letter to Miller, Frantz suggested that the FS&G
28    Escrow Account be considered a "shareholder loan account").

Davis, communicated to Frantz that "one of the corporate assets was an investment FSG account" that was, in fact, "a shareholder receivable account, but was carried on the books as an investment FSG account."[323]

235.    Communications sent to and received by Frantz between 1992 and 1998 show that the FS&G Account was at times offset against the corporations' loans payable to Braswell, and at other times treated as a loan receivable account that Braswell was obligated to repay to the corporations.

236.    On July 23, 1992, Kevin Davis, Braswell's corporate controller, sent a fax to Frantz, Miller and Braswell. It stated, in relevant part: "During our meeting the first week of June 1992 it was mentioned that the monies shown as being in "INVESTMENT ACCOUNTS" really should be reclassified as "LOAN RECEIVABLE – OFFICER[;]" if this is still accurate please inform me so the entry can be posted. There are a couple of facts that I have noted as (A) . . . on the reports. The (A) denotes the amount currently which would be reclassified to "LOAN RECEIVABLE – OFFICER."[324]

237.    Davis attached a balance sheet for Vita Industries to the fax. In the "Investment Accounts" section of the balance sheet, three accounts were marked with the letter "A": (1) Hemisphere; (2) Investments (Garland); and (3) Retainer – Frantz, Sanders & Grattan.[325]

238.    Frantz testified he understood from the Davis memorandum that the FS&G account would be reclassified as a loan receivable account, i.e., a corporate asset account.[326]

239.    Another portion of the Davis memorandum was addressed to Frantz directly. It stated "Bill[,] I believe this next question falls on you to answer, of the amounts transferred to the Frantz Sanders . . . escrow account a portion was used to pay Income Taxes for

---

[323]*Id.* at 1356:1-25; 1357:1-25; 1358:1-12.

[324]Ex. 726.

[325]*Id.* Frantz testified that the "Retainer – Frantz, Sanders & Grattan" account was the way the FS&G Escrow Account was carried on the books at that time. RT at 1362:8-13.

[326]RT at 1363:21-25.

Federal and State[.]  I need the entry on this so I can clear the Liabilities off of the books.  The entry should be broken down to show which company the monies were paid for if at all possible."[327]

240.   Frantz testified that he understood this paragraph to mean that because corporate income taxes had been paid out of the FS&G account, Davis "[was] asking [Frantz] to assist [Davis] in classifying those corporate payments to the respective corporations to which they apply."[328]   Frantz said he understood that either Davis or Miller would make appropriate adjustments to the companies' books.[329]

241.   Notes made by Frantz during a meeting with Davis in 1993 state: "Officer loan in [GBDS] in January '93 [–] following entry will be made (per Kevin)[:] [Debit] Officer Comp/[Credit] Loan From Officer."[330]  Frantz testified that the entry reflected a booking of compensation to Braswell and the creation of a corresponding liability account.[331]

242.   On March 29, 1994, Frantz wrote a memorandum to the GBDS file regarding a conversation with Miller.  The memorandum stated, in relevant part, that Frantz had advised Miller "that one of the entities had been making deposits into my escrow account," and that Frantz "wanted to be sure that these transfers were reflected on the corporate transferor's books."  Frantz said he asked Miller "what the disposition of the investment account was, and [Miller] offered that some adjustments would continue to be made at year end to reflect compensation to [Braswell] out of this account."[332]

243.   On March 27, 1997, Frantz wrote Miller a letter suggesting a series of adjusting journal

---

[327]Ex. 726.

[328]RT at 1370:9-15.

[329]*Id.* at 1370:21-24.

[330]Ex. 617.

[331]RT at 1375:7-8.

[332]Ex. 636.

entries for GBDS' 1997 year end to reflect corporate expenses paid out of the FS&G Escrow Account.[333]  Frantz indicated after each debit entry that the contra credit entry would be "FSG Investment."[334]  At the end of the letter, Frantz stated: "With regard to the contra entry in each case, I've suggested 'FSG Investment Account.'  As far as I'm concerned, this description is a fiction.  The alternative contra account to FSG Investments would be loan from shareholder."[335]

244.  Frantz testified that this "alternative contra account" would more properly have reflected the substance of the transactions.  He asserted that "the term [investment account was] misleading, and in substance that [the account was] and should [have been] classified as [a] loan from shareholder."[336]

245.  On August 27, 1997, Frantz wrote Miller regarding a document request received from the IRS.[337]  Frantz informed Miller that the agent was requesting documents regarding the FS&G Account, and that he was "not sure what the agent is asking here."[338]  Frantz noted: "You may recall that for some time I have been aware of an FS&G investment account and I've suggested that this was a misclassification on the balance sheet."[339]  Frantz testified that he intended by this letter to inform Miller that the "investment account" label used on the corporate books was "misleading and that in substance this was a shareholder loan

---

[333]Ex. 683.

[334]*Id.*

[335]*Id.*

[336]RT at 1381:2-4.  Frantz stated that either adjusting journal entry would have had the same effect: payments out of the account on behalf of the corporation "reduce[d] that corporate asset account regardless of its name" because the monies were expended for corporate purposes, reducing Braswell's obligation to the company.  (RT at 1381:12-21.)

[337]The audit of Braswell's corporate and personal tax returns, initiated by the IRS in 1997, will be discussed at greater length in section U, *infra*.

[338]Ex. 491 at 2.

[339]*Id.*

1   account, not an investment in [FS&G]."[340]

2   246.   Frantz's letter to Miller also stated that "[w]ith regard to [the FS&G] escrow account, I

3   hope that the [IRS] agent is not asking to see those records.  To my knowledge, our escrow

4   account does not contain any monies of [GBDS] and I don't plan to release our firm's

5   escrow account."[341]  Frantz testified that this statement reflected his belief that "the funds

6   [in the FS&G Account were Braswell's] money based upon the fact that he had paid taxes

7   on those monies."[342]

8   247.   On November 17, 1997, Frantz sent Saito a letter stating he understood that "[GBDS] or

9   one of the related entities [had been] reflect[ing] asset accounts consisting of Pelican

10   Harbor and FSG Investment.  There was also a liability account that represented [a]

11   shareholder payable."  Frantz said he understood that "these three accounts have now been

12   offset with the result that Pelican Harbor and FSG Investments are no longer corporate

13   assets."[343]

14   248.   Saito responded on December 5, 1997.  He advised Frantz that "the account balances of

15   the FSG Investment and Pelican Harbor accounts were classified to the S/H loan account

16   effective 1/31/97 on the books of [GBDS]."[344]  Saito attached a balance sheet showing that,

17   as of January 31, 1997, approximately $2.9 million of disbursements from the FS&G

18   Account had been reclassified as partial satisfaction of the loan payable to Braswell.[345]

19   249.   On April 3, 1998, Frantz wrote Miller a letter, enclosing a "redacted portion of our

20   escrow account reflecting certain payments by [Braswell] which should be corporate

---

[340]RT at 1383:22-25.

[341]*Id.*

[342]RT at 1384:5-7.

[343]Ex. 694.

[344]Ex. 695.

[345]*Id.*

deductions."[346]  The letter listed thirty-six expenses that were "to be booked pursuant to journal entries on the books of [GBDS] and DRS.  The contra entry to the various expense adjustments should be loan payable – AGB."[347]  Frantz testified that he "was telling [Miller that] . . . these [were] corporate expenses, and . . . was suggesting to [Miller that he] . . . . add it to the loan payable shareholder account."[348]

250.  GBDS and GVI made a series of adjusting journal entries on its books regarding the FS&G Account between 1993 and 1998.  These entries alternatively offset disbursements from the FS&G Account against the loan payable to Braswell or reclassified monies in the FS&G Account as a loan receivable from Braswell.

251.  In September 1993, GVI booked an adjusting journal entry in which $1 million of Braswell's compensation was used to reduce the FS&G account.[349]

252.  On December 22, 1994, Saito made a similar adjusting journal entry to reduce the FS&G investment account by $1.1 million.[350]  Saito testified that there was a corresponding $1.1 million increase in the salary expense line item, and that the adjustment was made on instructions from Miller.[351]

---

[346]Ex. 699.

[347]*Id.* at 2.

[348]RT at 1511:2-4.

[349]Ex. 49 at 4.  Dan Saito confirmed this interpretation of the entry, although he testified that the entry preceded his tenure with GBDS.  See RT at 872:12:25, 873:1-2 ("Q: [D]oes [that entry] reflect that a million dollars in compensation, officer's compensation, that was recorded on the books of GVI also was used to reduce the FS&G investment account?  A: Yes.  Q: And that was before you were there, correct?  A: Correct.  Q: So you don't know who made that adjusting journal entry?  A: That's correct").

[350]Ex. 906-A (Life Force Adjusting Journal Entries).

[351]RT at 860:19-25; RT at 861:1-15 ("Q: Could you tell us what is happening in that transaction?  A: That is a reduction of the investment balance sheet account by 1.1 million, an equal amount in the officer salary corporate deduction amount.  Q: Am I correct that the account reflects an increase in the expense in the amount of 1.1 million attributable to officer salary?  A:

253.   No adjusting journal entries reducing the FS&G Account were made between 1994 and 1997.[352]

254.   In 1996, preceding a due diligence audit of Braswell's companies,[353] Miller directed Saito to look through the check registers Miller had received from Frantz[354] and "search for expenditures that would be tax deductible on the corporate income tax returns,"[355] including compensation payments, bonuses, and legal expenses.[356] When Saito identified corporate expenses, he gave them in summary form to Miller.[357] Saito made adjusting journal entries that credited the FS&G Account for the corporate expenditures he identified.[358]

---

Yes.  Q: And it also reflects a reduction of a million-one from the investment FS&G account? A: Yes.  Q: Now, why did you make the transaction that way?  Why did you record it that way? A: I don't recall, but it would have been per Robert Miller's instructions.  Q: Okay.  So basically what this transaction encompasses is that the corporation is reflecting a million-one compensation to Braswell, correct?  A: Correct.  Q: And they are reducing the FS&G account as if that was Braswell's money by $1.1 million, correct?  A: Correct").

The government has acknowledged this adjustment and has not included it in its deficiency calculations.  See RT at 1180:14-21.

[352]On June 15, 1995, an adjusting journal entry was made reclassifying $4,385,420 of the FS&G Account to a cost of goods sold expense.  (See Gov't Findings, p. 22.)  No money was ever removed from the FS&G account as a result of the reclassification, however.  A separate reclassification for $1,350,000 was made that same day. (Id.)

[353]As previously noted, Price Waterhouse Coopers conducted a due diligence audit of Braswell's companies in 1997.  The audit was conducted in conjunction with a proposed sale of the companies to Nutraceutical.  See finding 127, supra.

[354]Frantz testified that he was aware Miller was "reviewing the check register for his [corporate] activity."   RT at 1345:13-22.

[355]RT at 829:14-18.

[356]RT at 830:13-18.

[357]Id. at 831:19-23.

[358]Id. at 892:2-10 ("Q: And is this the [entry] where you are booking various business expenses that were paid out of that account? A: Yes.  Q: And the credit is to investments FS&G,

255.   Saito said that, although Miller had received the FS&G check registers at an earlier point, he did not ask Saito to make adjustments or reconciliations to the account until 1996.[359]

256.   Following his review of the check registers, Saito prepared a summary of the FS&G account to reconcile the balances and transactions on the FS&G check registers to the amounts reflected on the corporate ledgers.[360]  He also prepared a spreadsheet to reconcile the balances reflected on the check registers with the FS&G Account balance on GBDS' general ledger.[361]

257.   As of September 13, 1996, the FS&G Account balance reflected on GBDS' ledger was $797,774.40.[362]  Saito's spreadsheet indicated that from 1993 through September 1996, Frantz had disbursed approximately $10.7 million from the FS&G Account for Braswell's personal benefit.[363]

---

correct?  A: Correct.  Q: So you're giving investments FS&G, the Braswell account, the benefit of the fact that business expenses were paid out of it, correct?  A: Correct").

[359]Id. at 854:11-25, 855:13-16 ("Q: Okay.  Now, you recall receiving these check registers concerning the FS&G account that we have talked about earlier on a periodic basis?  A: Yes . . . . Q: How often did you receive them?  A: I seem to recall receiving them on two or three different occasions . . . . Q: Is it fair to say it wasn't until 1996 that you started – that Mr. Miller started giving them to you to make adjustments with?  A: It was about that time, I believe"), 858:14-25, 859:1-3.

[360]RT at 833:20-25, 834:1-3; Ex. 35.  Saito was assigned this task in connection with the due diligence audit conducted by Price Waterhouse Coopers.  See finding 120, supra.

[361]RT at 835:4-7; Ex. 49.

[362]Ex. 49.

[363]Ex. 49.  Saito's spreadsheet reflects only that $5,059,355.93 was paid out of the FS&G Account for Braswell's benefit during this period.  (Id.)  This amount fails to take into account, however, an additional $5,735,420 that was reclassified in 1995 from the FS&G Account to payments to Deleon for cost of goods sold.  (RT at 814:16-25, 815:1-25, 816:1-25.)  Saito reviewed the check registers for the FS&G Account, and found no expenditures corresponding to these adjusting journal entries.  (RT at 8348:8-13.)  When Saito brought this fact to Miller's attention, Miller instructed him to credit the amounts to Braswell on the assumption that the payments were made "by Braswell personally."  (RT at 838:8-13.)  Neither Saito nor Risoen ever found back-up for these transactions.  (RT at 768:16-25, 769:1-25; RT at 624:15-25, 625:1-25.)

258. From September 1996 through the end of 1997, additional disbursements of approximately $2,300,000 were made to Braswell or for his benefit.[364]

259. On September 29, 1997, Saito made an adjusting journal entry ("AJE 16") that reclassified $2,943,192 in disbursements from the FS&G Account as a partial satisfaction of GBDS' loan payable to Braswell.[365]   Risoen, who at that time was part of a group of people helping to broker the sale of Braswell's companies to Nutraceutical Corporation,[366] assisted Saito with this reclassification.[367]

260. Risoen testified that he also assisted the company controller with a series of adjustments

As a result, it is appropriate to eliminate the "credit" Braswell received for making these payments, and add $5,735,420 to the $5,059,355.93 calculated by Saito, for a total of $10.7 million.  (See RT at 838:22-25, 839:1-10 ("Q: Now, if you eliminate this adjustment you made to Mr. Braswell's column for adjusting journal entry number 11 and adjusting journal entry number 15, what does that do to your bottom line calculation shown on page 1?  A: At the bottom of page 1, the schedule indicates that Mr. Braswell owes the FS&G Account approximately $5,059,000.  If I eliminate the two entries for the $4,385,000 and $1,350,000 entries, the bottom line amount that Mr. Braswell owes to the FS&G account would increase by approximately $5.7 million.  Q: So we would have a total there of $10.7 – A: Approximately.  Q: – million?  A: Yes")).  Frantz appears to concede that the $5.7 million is properly added to the amount Braswell owed the corporations.  (See RT at 1732:1-4.)

[364]RT at 1732:1-11 ("Q: Okay.  So making the adjustment by putting back in those adjusting journal entries made by Mr. Saito you concluded that through this time period 10.7 million was paid out on Mr. Braswell's behalf?  A: Yes.  Q: Did you then add anything else to that number?  A: Yes.  Q: And what did you add?  A: That takes us through September of 1996.  And there were disbursements in 1997 on Mr. Braswell's personal benefit of some 2,300,000");  see also Stipulated Facts, Ex. 409.)

[365]See Ex. 902 at 13; see also RT at 875:19-24 ("Q: If you would look down to adjusting journal entry, entry number 16, would you tell me what that reflects?  A: That reflects an entry of $2,943,192.48.  That was reducing the loan payable amount to Mr. Braswell and also reducing the balance on the investment FS&G account").

[366]RT at 607:16-18.

[367]Id. at 646:15-23 ("We wanted to do the Price Waterhouse audit in '97 . . . and it was getting so close to 9/30/97 that we decided we would close 9/30/97.  So Mr. Saito and I sat down over a long weekend and closed the books for the company.  Q: And that is when some of these adjustments that we have been talking about were made?  A: I believe so.  Without going back and looking, yes").

1    in 1998.[368]

2    261.   On or about October 14, 1998, an adjusting journal entry ("AJE 20") reclassified

3           $3,168,597.27 of the FS&G Account as a "loan to shareholder account."[369]

4    262.   On or about November 18, 1998, another adjusting journal entry ("AJE 8") was made that

5           eliminated $9,943,597 from the FS&G Account and reclassified it as "Loan Receivable –

6           AGB."[370]

7    263.   On or about November 19, 1998, two adjusting journal entries ("AJE 1 and AJE 2") were

8           made that reduced the loan receivable from Braswell by $2,555,688.45 and $9,112,897.79,

9           respectively.[371]   These amounts were offset against royalty payments due to Braswell by

10          the corporations.[372]

11   264.   Both Risoen and Saito testified they believed that after these two entries had been made,

12          any amount Braswell owed the corporation had been "written off."[373]

13   265.   In addition to these communications and accounting entries – which show that the

14          corporations at times treated the FS&G Account as a shareholder receivable account, and

15          at other times treated disbursements from the account as a reduction of the loans payable

16          owed to Braswell – there is evidence which suggests that the corporations viewed the

17          FS&G Account as an investment account.

18

19          [368]*Id.* at 647:18-21.   Risoen identified the controller at that time as a "Mr. Maldonado."

20          [369]See Ex. 912 at 5; see also RT at 1735:4-19 ("[T]hat is an entry that is transferring the
21   amount that was then on the books as investments FSG over to an account called "loans to
22   shareholder" of some 3,168,000.   Q: Is that basically a reclassification of it or a different name
     – it is a reclassification or actually just a change on the books as to how it's being classified?   A:
23   I understand it's a – well, it's reclassifying it from an account in the name of investments FSG to
     an account in the name loans to shareholder").

24
25          [370]See Ex. 912 at 10; see also RT at 1736:22-25.

26          [371]Ex. 912 at 11; RT at 1737:15-22.

27          [372]Ex. 912 at 11.

28          [373]RT at 651:8-23, 652:1-25, 884:17-21.

266. Through the end of 1995, the FS&G Account was listed as an "investment account" on the books of Affiliated Corporations that made deposits to the account.[374]

267. Some of the corporations that identified the FS&G Account as an "investment account" on their general ledger also carried separate shareholder receivable accounts.[375] Withdrawals of corporate funds by, or payments to, Braswell were offset against these other receivable accounts.[376]

268. On its tax returns for the years ending September 1994 and September 1995, GVI identified "Investments - F.S.G." as an asset on the corporate balance sheet.[377] It did not, however, make an entry on line 7 of Schedule L, Loans to Stockholders.[378]

269. Given this omission, Frantz conceded that one could not discern, from the face of the Affiliated Corporations' tax returns, that they were treating the FS&G Account as a loan receivable account rather than an investment account.[379]

270. Frantz also conceded that the amounts disbursed from the FS&G Account were not linked

---

[374]Ex. 69, p. 3 (listing among GBDS accounts "Investments - F.S.G."), 10 (listing among GVI accounts "Investments - F.S.G."), 17 (listing among Life Force accounts "Investments - F.S.G."), 20 (listing among Health Quest Accounts "Investments - F.S.G.").

[375]Ex. 69 at 3, 10, 14, 17, 20, 24, 35.

[376]Ex. 10 at 72-74.

[377]Ex. 16 at 7; Ex. 18 at 15.

[378]Ex. 16 at 4; Ex. 18 at 7.

[379]RT at 1564:11-18, 1565:6-17 ("Q: Now, at line item 7, loan to stockholders, that's blank, isn't it?  A: That's correct.  Q: Which means on the loan to stockholder line on the balance sheet and assets, GVI was not showing on the face of the return that Mr. Braswell [owed] the corporation any money, was he – was it?  A: Correct . . . .  Q: Does it show, on the face of the return, to someone who wouldn't have your understanding that an investment account in FS&G is really a receivable?  Does it show, based on the words of the return and the schedules on the return, that Mr. Braswell owed the corporation what had been taken out of your escrow account?  A: No, it does not.  Q: So from the face of the return, it doesn't appear, just based on the face of the return, does it, that the investment account was being treated by the corporation as a loan to Mr. Braswell, does it?  A: It does not").

on the face of the corporate tax returns to compensation paid to Braswell by the corporations.[380]  Although Frantz testified that he gave the FS&G Account check registers to Miller to review, he admitted that the returns[381] reflected substantially more money in the FS&G Account than was actually in the account at the time they were filed.[382]  As a result, Frantz likely knew that Miller was not reconciling the corporate books with the check registers he provided.

271.    On direct examination, Saito testified that the FS&G Account was classified as an asset "that is actually like a bank account, the same way that a regular business checking account would be an asset."[383]  He acknowledged, moreover, that, although cash payments to

_____

[380]RT at 1590:22-25, 1591:1-7 ("Q: Okay.  So the $6,195,000 had been paid out during 1994 [from the FS&G Account], was not reported anywhere on the [GBDS] return we have looked at just now, right?  A: 4 million was reported on the [GBDS] return.  Q: And on the face of the return, that $4 million was not linked to the 6 million that came out of your escrow account, correct?  A: Correct.  Correct").

[381]Frantz reviewed the corporate tax returns.  RT at 1523:5-9.

[382]See, e.g., RT at 1552:13-20 ("Q: So the return that Mr. Miller had prepared after you made the check register available to him, at least as to this account, the FS&G investment account that I just asked you about as shown on exhibit 16, was off by approximately $1,300,000, right?  A: If you're comparing numbers, the answer is yes.  Q: The return is showing, as an asset, more than $1.3 million than was actually there; isn't that correct?  A: Yes").

[383]RT at 813:6-17.  Julie Castanetas, who was employed in the GBDS accounting department during the years in question, testified that the FS&G Account was "an investment in the name of FSG.  It's an investment account . . . owned by the company."  (RT at 953:11-16.)  Although the government contends that Castanetas' testimony supports a finding that the FS&G Account was an investment account rather than a loan receivable account, Castanetas later testified that she had "no idea" how the FS&G account was used.  (RT at 955:6-22 ("Q: Do you know what the FS&G account was used for?  A: I have no idea.  Q: Did anyone ever tell you that the money from the FS&G investment account was going to Mr. Braswell's bank accounts at the Bank of Butterfield in the Cayman Islands in Bermuda?  A: I don't know about that.  Q: Were you and the accounting department – you and, to your knowledge, the staff of the accounting department[,] ever asked to make adjustments to the FS&G investment account to reflect payments to Mr. Braswell?  A: I can't recall right now.  Q: Did you ever make adjustments to the FS&G investment account on your own to reflect payments to Mr. Braswell?  A: I'm not too sure").  Castanetas' testimony, therefore, does not support a finding that the Affiliated Corporations considered the FS&G Account an investment account.

Braswell were typically reconciled in a loan to/from shareholder account, such reconciliations were not made for payments out of the FS&G account.[384]

272. On cross-examination, however, Saito agreed that "the payments made out of the FS&G account for [Braswell's] benefit [were] money that he was receiving, and, therefore, the loan payable to him needed to be correspondingly reduced."[385] He admitted that "had it been handled properly," the corporations would have recorded payments from the FS&G Account either as a reduction of the loan payable to Braswell or as a reduction of the Investment FS&G Account.[386] Saito testified that this would have been the proper accounting treatment in light of the fact that the corporations accrued Braswell's compensation as an increasing loan payable on their books each year.[387]

273. Similarly, Risoen testified he understood that Saito's 1996 and 1997 reconciliations were intended to offset part of the FS&G Account against the loan payable maintained by the Affiliated Corporations.[388] He agreed that the companies "should have" offset disbursements from the FS&G Account for Braswell's personal use "against the loan payable Braswell account."[389] Like Saito, Risoen testified that the personal expenses paid out of the FS&G Account on Braswell's behalf could have been booked by the corporations

---

[384]RT at 847:24-25, 848:1-25 ("A: . . . [C]ash payments to Mr. Braswell from a particular corporation would be recorded as a – into the officer or shareholder account. So an amount paid, a cash payment to Mr. Braswell, would be recorded as an amount due from Mr. Braswell . . . . Both the payments due from Mr. Braswell and the payments due to Mr. Braswell were recorded to that same due to/from shareholder account . . . . Q: Did the accounting department make adjustments of the sort you described to reflect payments for Mr. Braswell's income taxes out of the FS&G account? A: Not to my knowledge").

[385]*Id.* at 858:14-17.

[386]*Id.* at 863:19-25, 864:1-7.

[387]RT at 863:19-23.

[388]*Id.* at 643:8-13.

[389]*Id.* at 644:9-20.

"either as [a] reduction to the loan payable account or in addition to a loan receivable [from] Braswell."[390]

## U.    The Audit

274.    Marianna Kaplan, an IRS Revenue Agent, initiated an audit of the Braswell corporations in June 1997.[391]  The audit was expanded to include Braswell's personal returns in August 1997, when Kaplan began to review Braswell's 1995 return.[392]

275.    Kaplan first met with Frantz in September 1997.  At that time, Frantz and Miller were the authorized representatives for Braswell and the Braswell corporations.[393]  In December 1997, Braswell signed a formal power of attorney identifying Frantz and Miller as his personal representatives for the audit.[394]

276.    Kaplan met with Frantz approximately fifteen times during the course of the audit.  Each meeting lasted a half to a full day.[395]

277.    During the course of the audit, Kaplan issued a series of information document requests ("IDRs") that she reviewed with Frantz.[396]

278.    After her initial meeting with Frantz and Miller, Kaplan issued an IDR that requested a

---

[390]*Id.* at 657:2-4.

[391]*Id.* at 524:19-21.

[392]*Id.* at 524:22-23.

[393]*Id.* at 526:10-20 ("Q: [D]o you remember when your first meeting with Mr. Frantz was?  A: September of '97.  Q: And who else was present?  A: Mr. Miller.  Q: And who was Mr. Miller?  A: Mr. Miller was also representing Mr. Braswell and GB Data and Gero Vita International on the audits.  Q: At your first meeting, who were the authorized representatives for Braswell and the Braswell companies?  A: Mr. Frantz and Mr. Miller").

[394]Ex. 408.

[395]RT at 534:14-20.  Kaplan testified that John Wade, an IRS International Examiner, was present at some of the later meetings.  See RT at 535:3-4.

[396]RT at 533:9-25, 534:1-13; see also Ex. 204.  Kaplan defined IDRs as "the information that we request in order for us to conduct our audit.  It's for documents and/or testimony."  RT at 533:9-10.

written statement from the Braswells regarding the entities they owned.[397]

279.   In November 1997, following a meeting at which Frantz was not present, Kaplan issued another IDR that asked, *inter alia*, "[w]hy there is an A/C #0-165-0 called 'Investments – Deleon Global Trading on GVI books?  Is GVI or any other related entities or persons investors in Deleon Global Trading?"[398]   Kaplan testified that, by this question,  she "wanted to know who own[ed] Deleon Global Trading."[399]   She also stated that she reviewed the IDR at a subsequent meeting with Frantz.[400]

280.   Kaplan met with Frantz in December 1997.[401]  During this meeting, Frantz gave Kaplan a list of companies owned by Braswell.[402]  Although Deleon was not on the list, Frantz told Kaplan that Deleon was also owned by Braswell.[403]

281.   Following the December meeting, Kaplan issued another IDR.  The IDR requested information regarding Deleon, including a list of Deleon's customers; a list of Deleon's shareholders; invoices; and a list of Deleon's suppliers.[404]  Although she reviewed the request with Frantz, Kaplan never received a list of shareholders or copies of Deleon's

---

[397]Ex. 204 at 8 ("Please provide a letter from Mr. and Mrs. Braswell of all the entities owned by them").  This same IDR requested information regarding Braswell's cash flow because, as Kaplan testified, "[t]he $4 million that Mr. Braswell was reporting on his individual tax return was just a journal entry on the books.  There was no money going to Mr. Braswell, and I wanted to know . . . his source of money."  RT at 537:5-9.

[398]Ex. 204 at 10.

[399]RT at 538:12.

[400]*Id.* at 537:22-25.

[401]RT at 538:16-22.

[402]*Id.* at 539:21-25.

[403]*Id.* at 539:16-17 ("During that meeting, Mr. Frantz stated that Deleon was owned by Mr. Braswell").

[404]Ex. 204 at 13-14.

1    financial statements.[405]

2    282.   Following the December 1997 meeting, Kaplan requested that an international examiner

3           be assigned to the case because she believed "that Deleon was owned by Mr. Braswell and

4           it was an offshore entity, and [she] needed help with that."[406]   John Wade, an IRS

5           International Examiner, was thereafter assigned, and attended approximately six meetings

6           with Kaplan and Frantz.  Wade also issued IDRs.[407]

7    283.   On January 7, 1998, Kaplan met again with Frantz.  During the meeting, Frantz stated that

8           Deleon did not have any customers other than GVI.[408]

9    284.   Kaplan's next meeting with Frantz was in February 1998.[409]  Following the meeting,

10          Kaplan issued another IDR,[410] which once again requested information about Deleon.

11          Kaplan testified that she continued to seek information because she had not received a list

12          of Deleon shareholders or the company's financial statements.[411]

13   285.   In February 1998, Wade issued an IDR, which requested an explanation of all related

14          Braswell entities, foreign and domestic, as well as a description of the business functions

15          of the entities.[412]

16   286.   On March 19, 1998, Kaplan and Wade met with Frantz.[413]

17   287.   During the meeting, Frantz told Wade and Kaplan that he wanted to recant his earlier

18   _____

19   [405]RT at 541:10-17.

20   [406]Id. at 542:18-20.

21   [407]Id. at 542:17-15, 543:1-4, 534:14-18, 384:11-16.

22   [408]Id. at 543:5-24.

23   [409]Id. at 544:1-14.

24   [410]Ex. 204 at 18-20.

25   [411]RT at 545:1–11.

26   [412]Ex. 200-A, RT at 385:1-9.

27   [413]RT at 545:12-21.

28

statement that Braswell owned Deleon.  He said that although Braswell did not own Deleon, he controlled it and could sign contracts on its behalf.[414]  Frantz also said that although he had attempted to get information regarding Deleon's ownership from Hemisphere, he had been unable to do so.[415]

288.  Frantz testified that he made these statements as a result of several communications he had with Margaret Every.  Frantz said that after Kaplan asked him to obtain a list of Deleon's shareholders, he communicated the request to Every.[416]  He stated that Every told him Braswell was not a shareholder and that when he expressed surprise, Every said: "If you go to the public records, [Braswell] is not a shareholder."[417]

289.  Frantz testified that he then asked Every if there were any agreements purporting to give Braswell an interest in Deleon or a nominee agreement pursuant to which others held stock for Braswell.  He said that Every answered "no."[418]

290.  As evidence that such conversations occurred, Frantz proffered a December 9, 1997, memorandum written by Chuck Hodges at his direction.  The memorandum stated that "Deleon Global Trading Ltd. . . . is a Bermuda corporation that is legally owned by Bermuda citizens.  Glenn Braswell . . . , a U.S. citizen, has no direct ownership in Deleon.  However, he may be considered as having ownership through a 'nominee,' i.e. the legal shareholders own their interests on behalf of Braswell.  Notwithstanding, there

---

[414]*Id.* at 546:2-8, 1464:12-16.

[415]*Id.* at 386:12-17 ("[Frantz] told [Kaplan] that [Braswell] controlled or owned Deleon and that he was recanting it; that he was unable to get information from Hemisphere Management Company located in Bermuda, and so he was recanting that [Braswell] owned this thing.  I guess he was saying he didn't").

[416]*Id.* at 1460:1-8.

[417]RT at 1460:9-15 ("And Margaret Every said, "Well, Glenn is not a shareholder."  I said, "I've been operating under the assumption that he is a shareholder."  I said, "What do you mean he is not a shareholder?"  She said, "If you go to the public records, he is not a shareholder.").

[418]*Id.* at 1460:16-20.

73

is no formal documentation that supports any form of 'nominee' ownership."[419]  Frantz testified that these were the facts regarding Deleon that he had learned from Every.[420]

291.    On January 15, 1998, Frantz wrote Every a letter.  The letter stated, in relevant part, that Frantz and Every "ha[d] discussed within the last month [the IRS examination] as well as Deleon Trading Company.  As I understand from that conversation, Glenn Braswell is not a shareholder of record of Deleon Trading Company.  Moreover, there are no agreements which purport to give him any voting rights in Deleon Trading Company.  You indicated that you could send me a copy of the recorded document indicating who the shareholders of Deleon Trading are.  The Internal Revenue agent is requesting that information and I therefore renew my request that you send me this public record."[421]  Frantz testified that despite this letter, Every did not send him the requested documentation.

292.    Frantz's testimony regarding this issue is not credible.  Frantz was involved in the formation of Vita and its revitalization as Deleon.[422]  He was identified as Braswell's authorized agent in the Nominee Agreement, which also stated that Braswell was the beneficial owner of the Deleon shares held by Hemisphere.[423]  Frantz communicated with Hemisphere and Every frequently, and testified that Hemisphere never failed to take or return his calls.[424]  Given these facts, it is not believable that Frantz did not know the manner in which Deleon's share were held.  Nor is it credible that Frantz could not obtain the relevant information and documents from Hemisphere.  Consequently, the court finds

---

[419]Ex. 876.

[420]RT at 1462:5-7.

[421]Ex. 877.

[422]See findings 58-63, *supra*.

[423]See finding 61, *supra*.

[424]See findings 172-214, *supra*; RT at 1611:19-25, 1612:7-25.

that Frantz was not truthful with Wade and Kaplan during the March 1998 meeting.[425]

293. The court further concludes that Frantz's testimony regarding his conversation with Every is not credible. Even if Every told Frantz that no nominee agreement existed, Frantz could not have believed this statement given his extensive involvement in the formation of Vita and its reactivation as Deleon, and the fact that he was identified as Braswell's agent in the nominee agreement. This conclusion is supported by Hodges' December 1997 memorandum, which stated that "[Braswell] may be considered as having ownership [of Deleon] through a 'nominee.'" Despite his assertion that Every told him there was no nominee agreement, Frantz conceded that he did not correct the factual assumption in Hodges' memorandum following his purported conversation with Every.[426]

294. After the March 1998 meeting, Wade issued an IDR that again requested information

---

[425]By telling Wade and Kaplan that Braswell did not own Deleon, Frantz left them with the impression that Braswell had no ownership interest of any kind in the company. In fact, as Hodges' memorandum reflects, Frantz knew that Braswell was the beneficial owner of the business. The fact that Braswell was not the owner of record because he did not own the company's shares does not make Frantz's statement true.

[426]RT at 1493:25, 1494:1-2, 1495:4 ("Q: Did you ever tell Mr. Hodges that the facts were wrong because Ms. Every had told you that Mr. Braswell didn't own Deleon through nominees? A: I did not – No"). Frantz insists the memorandum does not undercut his testimony because "the facts that Mr. Frantz told Mr. Hodges to assume were 100% consistent with Mr. Frantz's conversation with Ms. Every. . . . Mr. Frantz had previously understood that Braswell owned Deleon. Ms. Every suddenly told him that Braswell was not a shareholder of Deleon, and that no nominee agreement existed. After that conversation, Mr. Frantz could simply have assumed that the absence of any documentation meant that Braswell did not own Deleon. Instead, Mr. Frantz took the prudent step of asking Mr. Hodges to research whether Braswell would nonetheless be deemed to own Deleon . . . based on the assumed fact that Braswell might have an undocumented ownership interest in the company." (See Def's. Reply at 16-17.) The court rejects this assertion. Frantz testified that Every not only told him that no nominee agreement existed but that no agreement existed giving Braswell an interest in Deleon. Accordingly, the facts stated in the Hodges memorandum are inconsistent with what Every purportedly told Frantz. Had Every in fact communicated to Frantz the facts he recited at trial, it is likely that he would have corrected Hodges' factual assumptions.

75

regarding Braswell, Deleon, and the relationship between the two.[427]  Although Frantz testified that he used the term "beneficial owner" to describe Braswell's relationship with Deleon in "all of our research memorandums,"[428] he could not recall whether he used such a description in his discussions with Wade and Kaplan.[429]  Frantz acknowledged that he did not provide any additional information regarding Deleon's ownership following his "retraction" at the March 1998 meeting.[430]

---

[427]Ex. 200A at 2 ("What is the relationship between A. Glenn Braswell and Deleon Global Trading (Bermuda).  Such as Mr. Braswell is the owner of [GBDS], but no outstanding common stock has been issued.  How is the ownership established, and/or control exercised.  Please supply documentation regarding control").

[428]RT at 1489:2-4.

[429]*Id.* at 1489:12-15 ("Q: Did you ever tell the revenue agents during the audit that Mr. Braswell was the beneficial owner of Deleon?  A: I don't recall one way or the other"); *id.* at 1491:9-14  ("You don't have – you don't recall whether or not you told the agents that Mr. Braswell was the beneficial owner of Deleon, do you?  A: I don't recall using that terminology. I may have, but the question was do I recall, and I do not recall using that terminology").  Frantz stated that, even if he had believed Braswell was the beneficial owner, he would not have told the agents that fact unless they asked him a direct question: "Q: If you had thought during the audit that Mr. Braswell was the beneficial owner of Deleon, would you have told the agents that fact? A: If I thought during the audit that he was the beneficial – well, I certainly would have responded to their question.  If they asked me did I think he – was the beneficial owner, I would have responded to that question."  (RT at 1491:15-21.)

[430]RT at 1492:7-13 ("Q: You recall [the agents'] testimony that except for saying that Mr. Braswell – you were retracting the statement that Mr. Braswell owned Deleon; you never said anything more.  You never said he did own it in any fashion, did you?  A: I don't remember adding anything to the issue, Mr. Rochmes").  This statement is corroborated by Wade's testimony that Frantz told him "Mr. Braswell had some control over it but he did not own Deleon."  (RT at 387:21-22.)  Frantz argues "Kaplan testified that Mr. Frantz . . . repeatedly told her that Braswell had control over Deleon [and] also told her and . . . Wade that Braswell had authority to contract on behalf of Deleon."  (Def's Reply at 16.)  While Kaplan acknowledged that Frantz told her Braswell controlled Deleon (see, e.g., RT at 546:5-7), there is no evidence that Frantz ever stated that Braswell *owned* Deleon.  This omission is significant given that Frantz was intimately involved in Vita's formation and its reactivation as Deleon, and that Braswell designated Frantz as his agent in a nominee agreement that indisputably established Braswell beneficially owned Deleon.  Although Frantz testified that he did not believe he received a copy of the nominee agreement (see RT at 1401:6-7), the court concludes that as the agent for Braswell

295.   During the March 1998 meeting, Wade asked Frantz why no Forms 5471 had been filed for the 1995 and 1996 tax years.[431]  Frantz responded that he had not been able to obtain the forms for the relevant years.[432]  Although Frantz eventually filed Forms 5471 with respect to four controlled foreign corporations, he did not file one regarding Deleon.[433]  Frantz told Wade, who requested that a Form 5471 be filed for the company, that Braswell "did not own or control greater than 50 percent of Deleon," and that he was "trying to get the information [regarding ownership] from Hemisphere and . . . Hemisphere wasn't cooperating."[434]  Because he asserted that Braswell did not own the company, Frantz maintained that no Form 5471 needed to be filed for Deleon.[435]

296.   In approximately September 1998,[436] Wade and Kaplan showed Frantz a purchase order that had both GVI and Deleon's names on it.[437]  Wade testified that Frantz appeared surprised when he saw the order.[438]  Wade said that Frantz asked where the agents had obtained the document, and that, upon reviewing it, he said: "I guess you established control."[439]  Kaplan's testimony was similar.  She said that after reviewing the document,

designated in that agreement, Frantz knew of its terms.

[431]RT at 388:7-12.  A Form 5471 is an "information return that is required to be filed in duplicate by a U.S. individual or a U.S. person, because [the owner] could be a corporation, that owns 51 percent of the outstanding stock or control of a foreign entity."  (RT at 388:1-4.)

[432]Id. at 388:7-12.

[433]Id. at 390:1-10; see also Ex. 8.

[434]RT at 397:23-25, 398:1-9.

[435]Id. at 398:2-4.

[436]Id. at 551:22-24.

[437]Id. at 401:21-25, 402:1-6; Ex. 203.

[438]Id. at 402:19-20 ("He was surprised.  I thought his jaw was going to hit the table").

[439]Id. at 402:7-14 ("Q: What did Mr. Frantz say when you showed him [the purchase order]?  A: 'I guess you established control.'  Q: Did he ask about the origin of the document?

Frantz left the room with Miller.  When he returned, she stated, Frantz said "that [the agents had] proved control and that Deleon does a markup of three to ten times."[440]  Frantz never told the agents that Deleon was involved in manufacturing.[441]

297.  Kaplan testified that the FS&G Account was not a significant issue during the IRS audit of the corporate and individual returns.[442]  She said that Frantz told her some of Braswell's personal expenses were paid out of the FS&G Account,[443] and that he gave her a copy of the check register for the account.[444]

### V.    The 1997 Return And The Esch Memoranda

298.  In 1997, during the IRS audit, Ed Garland – one of Braswell's attorneys – retained John Esch to provide services in connection with the audit.[445]  Esch was an attorney and certified public accountant with Arthur Andersen & Co. who specialized in tax.[446]  Esch testified that he considered himself part of an "audit defense team" whose other members included Jack Andrews, Thor Risoen, Joe Pagani, and Frantz.[447]  Esch testified that Frantz "was the one who actually would have the face-to-face meetings with the [IRS] and . . . was, I guess, basically the person out front."[448]

---

A: Yes.  Q: What did he say?  A: He inquired where did we get this, and [Kaplan] responded that she received it in documentation received from Mr. Miller.").

[440]*Id.* at 552:7-9.

[441]*Id.* at 559:12-13.

[442]*Id.* at 554:21-23.

[443]*Id.* at 554:17-20.

[444]*Id.* at 578:10-13; see also Ex. 207.

[445]RT at 670:18-25, 671:2-5.

[446]*Id.* at 669:3-21.

[447]*Id.* at 671:8-16.

[448]*Id.* at 671:20-23.

299.   On November 18, 1997, Esch prepared a memorandum that was later forwarded to Frantz.[449]  The memorandum stated, in relevant part, that "[t]he only activity conducted by Deleon is through its Agents (employees of [GBDS], its outside accountant and employees of Hemisphere House).  Fees are being paid by Deleon only to Hemisphere House.  Deleon does nothing to add value to the raw materials it purchases and sells."[450]  Esch concluded it was "reasonably clear that any income of Deleon would be attributed back to Mr. Braswell's U.S. Income tax return under the 'Subpart F' rules of the Internal Revenue Code."[451]

300.   As respects the FS&G Account, Esch noted that Braswell's "companies . . . made payments to an escrow account maintained by FS&G.  These payments consisted of personal expenses of Mr. Braswell (most notably federal income tax payments) as well as termination payments related to discharged company employees.  These payments were charged to an investment account and not deducted by the companies, so there is no problem from that standpoint.  The amounts that related to personal expenses should have reduced the payable to Mr. Braswell which existed in prior years."[452]

301.   Esch concluded that "[t]he primary objective must be to prevent these potential problems from escalating to allegations of criminal tax evasion.  Obviously, the best scenario is to never have these allegations put forward.  The potential civil tax deficiencies and penalties are substantial and we should seek to minimize them, but the primary concern must be the

---

[449]Ex. 334.  Exhibit 334 was admitted at trial for the limited purpose of establishing Frantz's knowledge of Esch's opinions.  It was not admitted as evidence of the truth of those opinions.  (RT at 680:3-12.)

[450]Ex. 334 at 6.

[451]*Id.*

[452]*Id.*

criminal side."[453]  Frantz testified that he read Esch's memorandum upon receiving it.[454] He further testified that he never told Esch the facts set forth in the memorandum regarding Deleon were inaccurate.[455]

302.   On January 19, 1998, Esch sent Frantz another memorandum.  He noted that payments from the FS&G Account, "after reduction by deductible company expenses, have been maintained in asset accounts on the company books.  Most of these remaining amounts appear to represent personal expenditure type items of Glenn's, including income tax payments.  In some instances, large amounts were transferred from this escrow account to offshore accounts in Glenn's name or under his control."[456]

303.   Esch observed that "[t]he[ ] FS&G items don't represent a deduction problem since they have not been deducted.  The potential problem is that the IRS might choose to interpret them as constructive distributions to Glenn, which have obviously not been reported . . . . We should discuss our strategy on this particular situation.  We should consider having [Risoen] do a detailed analysis of this account from the outset with a reclassification of appropriate amounts to the shareholder receivable/payable account."[457]

304.   Esch, Risoen, and other members of the tax team gave Frantz the information needed to prepare Braswell's personal tax returns for 1997.[458]

---

[453]Id.

[454]RT at 1672:18-20.

[455]Id. at 1670:6-22.

[456]Ex. 335.

[457]Id.

[458]RT at 655:9-14.

## II.  ULTIMATE FINDINGS OF FACT

### A.  Deleon

#### 1.  Deleon Was A Sham Corporation

305.  Whether a corporation is genuine or a sham is a question of fact.  *Bateman v. United States*, 490 F.2d 549, 553 (9th Cir. 1973); see also *United States v. Wapnick*, 60 F.3d 948, 955, n. 3 (2d Cir. 1995) (noting the district court's jury instruction that "[i]t is your responsibility to judge the facts and determine whether the corporations . . . were sham corporations").

306.  In *Moline Properties v. Commissioner*, 319 U.S. 436, 438-39 (1943), the Supreme Court addressed sham corporations, and stated that "[t]he doctrine of corporate entity fills a useful purpose in business life.  Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, *so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity*" (emphasis added).

307.  Several courts have stated that the *Moline Properties* test is a disjunctive one.  See *United States v. Creel*, 711 F.2d 575, 578 (5th Cir. 1982) ("[a]lthough only one of the two parts of the *Moline Properties* test need be satisfied, it is patently obvious that L.C.C. was both organized for a business purpose and actually carried on business activity"); *Skarda v. Commissioner*, 250 F.2d 429, 433-34 (10th Cir. 1957) ("[f]or tax purposes, where the purpose for the creation of the corporation is a business one or the creation is followed by business activity, the corporate entity will not be disregarded"); *In re Frazier*, 82 B.R. 114 (N.D. Cal. 1987) (referencing "both parts of the disjunctive *Moline Properties* test"); *McDonald v. Commissioner*, 68 T.C.M. (CCH) 1400, 1994 WL 692768 (1994) ("[b]ased on a long line of cases both in this Court and in other courts, we have concluded that a corporation's separate tax identity will not be disregarded if (1) the corporation served an intended business function or (2) actually engaged in business. . . .  The two-part analysis is disjunctive, so that if either part is satisfied, the corporation's tax existence is

established"); *Hipp v. Commissioner*, 47 T.C.M. (CCH) 623, 1983 WL 14752 (1983) ("*Moline* established a two-prong test with the first part pertaining to whether incorporation served a business purpose and the remaining aspect concerning the entity's business activities. . . . The business purpose and business activity tests are alternative requirements"); *Rogers v. Commissioner*, 34 T.C.M. (CCH) 1254, 1975 WL 2907 (1975) ("[c]ourts have recognized . . . that *Moline* establishes a two-pronged test, the first part of which is business purpose, and the second, business activity").

308.  Other courts, including the Ninth Circuit, have held that the ultimate inquiry under *Moline Properties* is a unitary one – whether the corporation served a purpose other than the avoidance of taxes. See *Asa Investerings Partnership v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000) (rejecting petitioner's claim that *Moline Properties* established a two-part test, and stating "courts have understood the 'business activity' reference in *Moline* to exclude activity whose sole purpose is tax avoidance. This reading treats 'sham entity' cases the same way the law treats 'sham transaction' cases, in which the existence of formal business activity is a given but the inquiry turns on the existence of a nontax business motive. . . . Thus, what the petitioner alleges to be a two-pronged inquiry is in fact a unitary test – whether the 'sham' be in the entity or the transaction – under which the absence of a nontax business purpose is fatal"); *Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506, 512 (7th Cir. 1997) (stating that *Moline Properties* and its progeny "engender the principle that a corporation and the form of its transactions are recognizable for tax purposes, despite any tax-avoidance motive, so long as the corporation engages in bona fide economically-based business transactions"); *Wapnick*, *supra*, 60 F.3d at 955 (affirming the trial court's jury instruction that "[i]n order to be a separate taxable entity, a corporation must be established for a business purpose *and must do business in the ordinary meaning of that term*" (emphasis added)); *Zmuda v. Commissioner*, 731 F.2d 1417, 1420-21 (9th Cir. 1984) (noting that the "business purpose" and "economic substance" rules are not distinct, because "[b]oth simply state that the Commissioner may look beyond the form of an action to discover its substance. . . . The terminology of one

rule may appear in the context of the other because they share the same rationale.  Both rules elevate the substance of an action over its form.  Although the taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation"); *National Investors Corp. v. Hoey*, 144 F.2d 466, 468 (2d Cir. 1944) (under *Moline Properties*, "a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, . . . the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning; and . . . escaping taxation is not 'business' in the ordinary meaning"); see also *Shaw Const. Co. v. Commissioner*, 323 F.2d 316, (9th Cir. 1963) (citing Judge Learned Hand's formulation in *Hoey*); 10 MERTENS LAW OF FEDERAL INCOME TAXATION, § 38:12 (2004) ("[a] corporation may not be disregarded for taxation purposes, if a bona fide intention in creating it was that the corporation itself should have some real substantial business function, or it if actually engages in business"); compare *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990) (conducting a sham transaction analysis, rejecting defendants' argument that "a court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits *and* that the transaction has no economic substance," and affirming an earlier holding that "the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses").

309.    Whichever test they apply, all courts agree that the threshold for meeting the *Moline Properties* standard is low.  See *Munroe v. Commissioner*, 961 F.2d 220, 1992 WL 73044, * 3 (10th Cir. Apr. 9, 1992) (Unpub. Disp.) ("[o]ur holding in *Crouch* indicates that the threshold for the *Moline Properties* business purpose test is low.  Indeed, the language of *Moline Properties* suggests a low threshold: a business purpose behind a corporation may involve an effort to 'serve the creator's personal or undisclosed convenience"); *Britt v. United States*, 431 F.2d 227, 237 (5th Cir. 1970) ("[b]usiness activity is required for

recognition of the corporation as a separate taxable entity; the activity may be minimal");
*Cane Creek Sportsman's Club, Inc. v. Commissioner*, 76 T.C.M. (CCH) 509, 1998 WL 655751 (1998) ("[o]nly a minimal amount of business activity is required to meet the second prong of the *Moline Properties, Inc*. test"); *McDonald*, *supra*, 68 T.C.M. (CCH) 1400 ("it is rare that a corporation's tax identity (short of an absolute sham) will be ignored. . . . [T]he corporation will be ignored if it is a sham used solely for tax avoidance purposes"); *Strong v. Commissioner*, 66 T.C. 12, 24 (1976) ("[t]he degree of corporate purpose and activity requiring recognition of the corporation as a separate entity is extremely low"), affd. without opinion, 553 F.2d 94 (2d Cir. 1977); but see *Dooley v. Commissioner*, 48 T.C.M. (CCH) 1372, 1984 WL 15191 (1984) (stating that "the second prong of the *Moline Properties* analysis . . . does not depend on the quantum of business activity but simply on whether any activity is related to the transaction of business. . ."); cf. *Asa Investerings*, *supra*, 201 F.3d at 513 ("[w]e note that the 'business purpose' doctrine is hazardous.  It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way to minimize tax.  When the business purpose doctrine is violated, such structuring is deemed to have gotten out of hand, to have been carried to such extreme lengths that the business purpose is no more than a facade.  But there is no absolutely clear line between the two").

310. Although mindful that *Moline Properties* sets a low standard, the court nonetheless finds that the evidence adduced regarding Deleon and its operations establishes beyond a reasonable doubt that (1) Deleon had no business purpose other than avoiding taxation and (2) Deleon conducted no "business activities" other than avoiding taxation.

311. Frantz testified that Braswell incorporated Deleon to advance three business purposes; (1) he wished to utilize Deleon as the base for an international expansion of his corporations; (2) he sought to reduce his exposure to United States regulatory agencies that

84

1    monitored nutritional supplements; and (3) he wanted to publish a book.[459]

2    312.    Other than Frantz's testimony, no evidence supports the assertion that Deleon was formed

3    to launch an international expansion of Braswell's corporations.  Contemporaneous letters

4    to Hemisphere and others indicate that Braswell intended to use Deleon as a "purchase

5    agent" for raw materials to be obtained from foreign markets, not as a base from which

6    to launch international operations.[460]  In 1990, for example, Frantz inquired whether

7    Hemisphere could provide corporate services related to shipping; he did not ask whether

8    Hemisphere had the ability to serve as a base for an international expansion of Braswell's

9    corporations.[461]  It is true that the initial purchase order issued in Deleon's name purported

10   to evidence a purchase of saw palmetto from an Italian manufacturing company.[462]  The

11   transaction, however, was negotiated with the Seattle, Washington office of the Italian

12   concern and the purchase order was ultimately cancelled.  To the extent, moreover, that

13   Braswell had plans to expand into international markets, it is clear that GBDS employees

14   were going to control and implement that expansion.  It was GBDS employees, for

15   example, who were instructed to research raw material suppliers abroad, and who

16   negotiated price and terms of sale for all raw materials purchases.[463]  Deleon, in fact, had

17   no employees or place of business from which to launch such an expansion.[464]  Given the

18   dearth of evidence indicating that Deleon was established to serve as a base for an

19

20   _____

21   [459]See RT at 1472:15-25; 1473:1-17.  In his post-trial brief, Frantz asserts that Braswell
     wanted to use Deleon as a raw materials purchaser to conceal from the manufacturing laboratories

22   the fact that he was purchasing the materials directly.  This contention is addressed in finding 321,
     *infra*.

23
     [460]See Exs. 813, 815, 816, 818.
24

25   [461]Ex. 111.

26   [462]Ex. 409 (Adlai Grand Jury Testimony) at 20:13-15.

27   [463]RT at 103:3-7.

28   [464]Exs. 105, 121.

85

international expansion of the Affiliated Corporations, the court concludes that Frantz's testimony regarding this purpose for its formation is unsupported and self-serving. *Casebeer*, *supra*, 909 F.2d at 1364-65 (noting that although the taxpayer's testimony regarding business purpose "is necessary 'to prove that [there was a] bona fide profit motive [for the corporation],' there is no requirement that the tax court believe him," and concluding the tax court's finding that the testimony was "self-serving" was not clearly erroneous); *Saba Partnership v. Commissioner*, 85 T.C.M. (CCH) 817, 2003 WL 289605 (2003) ("we reject petitioner's contentions that the partnerships were organized and operated to achieve nontax business purposes. Contrary to petitioner's position, we have not substituted our own judgment for that of Brunswick's corporate officers. We have simply rejected their testimony as being both self-serving and unsupported by the record as a whole").

313. Similarly, there is no evidence that Braswell sought to reduce his exposure to regulatory authorities by incorporating Deleon. There is no evidence that having Deleon order the raw materials used to make GVI's supplements would have reduced regulatory exposure in any way. Rather, the evidence reveals that laboratories located in the United States used any products Deleon ordered to manufacture supplements, and that the supplements were then sold by GVI or another of the Affiliated Companies, all of which did business in Marina Del Rey, California.[465] It is a reasonable inference that the activities of the manufacturing laboratories and of GVI were subject to regulation by United States authorities. Given the lack of evidence that Deleon reduced Braswell's regulatory exposure in any way, the court finds Frantz's testimony regarding this purpose unsupported and self-serving.

314. Finally, there is no evidence that Braswell wished to incorporate Deleon to facilitate his publication of a book. There is no contemporaneous evidence that book publication was

---

[465]See RT at 108:1-22 (establishing that the raw material suppliers were instructed to deliver the materials directly to manufacturing laboratories in the United States).

ever discussed with Hemisphere. Moreover, Frantz's testimony regarding the issue was that Wetherhill told Braswell that if he wanted to publish a book, Hemisphere managed a book publisher that could assist him.[466] Frantz admitted that he did not believe Hemisphere or Deleon would have published a book written by Braswell.[467] Accordingly, this cannot constitute a legitimate business purpose for incorporating Deleon. See, e.g., *Aldon Homes, Inc. v. Commissioner*, 33 T.C. 582, 597-98 (1959) ("[w]e are convinced, however, from our study of all the facts and circumstances that none of the alleged advantages in the use of multiple corporations in the development of Tract 17169 constituted any actual business purpose in the instant case. The alleged business purposes impressed us simply as a lawyer's marshaling of possible business reasons that might conceivably have motivated the adoption of the forms here employed but which in fact played no part whatever in the utilization of the multiple corporate structure").

315. There is, however, evidence that Braswell sought to incorporate Deleon for the purpose of purchasing raw materials.[468] This alone does not constitute a legitimate business purpose, however, given that GBDS personnel were already ordering raw materials in GVI's name.[469] See *Horn v. Commissioner*, 45 T.C.M. (CCH) 413, 1982 WL 11032 (1982)

---

[466]*Id.* at 1473:7-11 ("And I recall Chris Wetherhill saying, 'We've got a client. We manage a client that is a book publisher, so that would be a good fit.' So he wanted to publish a book. He wanted to do that in an offshore entity"); *id.* at 1623:19-20 ("Hemisphere said that one of the companies they managed was a book publisher so they could handle that").

[467]*Id.* at 1624:18-22 ("Q. You took by that that Hemisphere itself would be publishing a book if Mr. Braswell asked it to? A. No. One of the clients that they managed was a book publisher, so I took it by that conversation that one of their clients would publish the book").

[468]See findings 64-73, *supra*.

[469]See RT at 106:1-9, Ex. 218. Frantz concedes this is the appropriate analysis: "[i]t is . . . clear that Braswell had a legitimate business purpose for purchasing raw materials rather than finished product. The question therefore becomes whether Braswell had a legitimate business purpose for using an offshore company (Deleon) to purchase the raw material rather than simply buying it through GVI or one of his other affiliated companies." (See Def.'s Proposed Findings at 12).

87

(while the limitation of personal liability can constitute a valid business purpose, "[i]n the instant cases . . . Horn's and Hornsby's personal liabilities for Associates' debts were already limited by virtue of Associates' corporate status. Nothing in the record shows that Services' incorporation added to the protection that Horn and Hornsby already enjoyed. Under the circumstances, we do not believe that this asserted purpose was in fact a purpose for Services' incorporation but was, at most, a plausible afterthought").

316.   The focus of the *Moline Properties* test is whether "the creator has secured for himself, by using a corporate entity, a business advantage not available absent the corporation." *Dooley*, *supra*, 48 T.C.M. (CCH) 1372.  The tax court, for example, has found a proper business purpose where "where the corporation was used to insulate the creator from personal liability" (*Dooley*, *supra* (citing *Bolger v. Commissioner*, 59 T.C. 760 (1973)); where "the corporation was used to obtain financing at rates that would have been usurious if made to the creator as an individual or partnership" (*Dooley*, *supra* (citing *Strong v. Commissioner*, 66 T.C. 12 (1976)); where "the corporation was used to facilitate the orderly liquidation of a bankrupt estate" (*Dooley*, *supra* (citing *Hagist Ranch, Inc. v. United States*, 295 F.2d 351 (7th Cir. 1961)); and where "United States citizens used a corporation to engage in a farming business in Mexico when they would not have been able to do so without the corporation" (*Dooley*, *supra* (citing *Raffety Farms, Inc. v. United States*, 511 F.2d 1234 (8th Cir. 1975)).  Because there is no evidence that Deleon was created to obtain "a business advantage not available" absent its incorporation, and because the evidence in fact demonstrates that any business advantage that could have been achieved had already been obtained through GBDS and GVI, the court concludes that having Deleon purchase the raw materials used to manufacture the supplements does not constitute a legitimate business purpose.

317.   In order for this to constitute a legitimate business purpose, it would have to be more advantageous for Braswell to purchase the raw materials offshore than to continue having one of his domestic corporations make the purchases.  While Adlai testified that Braswell wished to move purchasing activity from GBDS/GVI to Deleon because he did "not want

his name . . . exposed" to the manufacturing laboratories, this rationale does not justify a finding that Deleon had a legitimate business purpose.[470]   All of the raw materials purchases were negotiated by GBDS personnel; suppliers were told to contact GBDS if any issues arose; and suppliers sent the materials to the manufacturing laboratories that made the supplements for GVI.   Making the purchases in Deleon's name, therefore, did not conceal Braswell's involvement in the purchases from the vendors.   Nor did it conceal his involvement from the manufacturing laboratories.   Having previously purchased the raw materials for Braswell's companies, and charged a mark-up on the raw materials' price, the manufacturing laboratories would have realized that the materials were being purchased directly by Braswell's companies and shipped directly to them by the vendors.   They would also have been able to discern that Braswell could purchase the materials at prices equivalent to or below the prices they had previously been charged.   Given these facts, concealment of the involvement of Braswell and his companies in raw materials purchasing cannot constitute a valid business purpose for forming Deleon.   See *O'Cheskey v. United States*, No. 3-00-CV-0142-P, 2001 WL 1658144, * 15-16 (N.D. Tex. Dec. 21, 2001) (rejecting an argument that the creation of separate related corporations and allocation of assets to them should be honored because the corporations were always operated as a single economic entity, and creditors dealt with them as such); compare *Kidde Industries v. United States*, 40 Fed. Cl. 42, 51, 81 A.F.T.R.2d 98-326 (Ct. Cl. 1997) (concluding that a corporation had a legitimate business purpose for establishing an offshore captive insurance company because the corporation could not satisfy the self-insurance requirements of all fifty states before its existing policy expired, the captive allowed the company to maintain existing prices and policies for catastrophic insurance, and creating a captive insurer furthered the company's goal of creating an insurance subsidiary that would serve as a separate profit center); cf. *Horn*, *supra*, 45 T.C.M. (CCH) 413 ("[t]he fourth purpose (resolving a personality conflict between the X-ray technician and the office

---

[470]Ex. 409 at 21:5-8, 22-25.

89

manager) is also not the equivalent of a business activity. Surely it is not the ordinary business response to a conflict between two employees to establish a separate corporation to hire one of the employees"); *Nutt v. Commissioner*, 39 T.C. 231, 249 (1962) ("[i]t is not . . . the personal purpose of a taxpayer in creating a corporation which is determinative of whether its separate entity will be disregarded for Federal tax purposes, but rather whether a bona fide intention in creating it was that the corporation, itself, should have some substantial business function or actually engage in a business activity," citing *Jackson v. Commissioner*, 233 F.2d 289 (2d Cir. 1956)).

318.   The facts in the record, moreover, establish beyond a reasonable doubt that there was no valid business purpose for incorporating Deleon. Grindblat, GBDS' purchasing agent, testified that he could see no business purpose for Deleon, as purchasing in Deleon's name subjected the Affiliated Corporations to less favorable credit terms and resulted in payment delays and complications.[471] Risoen, who conducted a due diligence audit of the Affiliated Corporations, testified that he could discern no business purpose for the mark-up included on the Deleon invoices.[472] The government's expert, Robert Sterling, testified that Deleon served no business purpose "other than to mark up the cost of the inventory."[473] Defendant's expert, Darryl Hallett stated he understood there was evidence that Deleon "was formed for a business purpose to buy product offshore, I think."[474] He offered no

---

[471]RT at 265:21-25; 266:1-2.

[472]*Id.* at 632:8-13.

[473]RT at 1243:14-17. Frantz contends that Sterling agreed Deleon "was not a sham at the outset, but contends that it later became a sham." (Defendant William E. Frantz's Brief in Support of Proposed Findings of Fact And Conclusions of Law ("Def's. Brief") at 14.) Sterling did testify that Deleon was "a legitimate corporation when it was formed." (RT at 1241:17-18.) this testimony, however, referenced the fact that Vita (and later Deleon) were legally incorporated in Bermuda. (See RT at 1241:12-16 ("Q: Okay. And at the time that Deleon was initially reformed or renamed, at that point in time, do you believe it was a viable corporation? A: I believe it was – yes, a corporation, yes, formed in Bermuda. It existed, yes").

[474]RT at 1720:1-4.

opinion, however, as to why having Deleon purchase raw materials for the manufacture of supplements was a legitimate business purpose when GBDS personnel were already engaged in making such purchases.[475]

319.   Accordingly, the court finds that the government has established beyond a reasonable doubt that the only purpose for incorporating Deleon was to reduce the payment of corporate income taxes.[476]   Because "[e]scaping taxation is not a business activity" (*National Carbide Corp. v. Commissioner*, 336 U.S. 422, 437, n. 20 (1949) (citing *Hoey*, *supra*, 144 F.2d at 466)), the government has proved that Deleon was not established for a legitimate business purpose.  See *Haberman Farms, Inc. v. United States*, 182 F. Supp. 829, 833 (D. Neb. 1960) (concluding that "[the taxpayers] have asserted a number of legitimate business purposes as justifications for the transfers of property.  The evidence does not bear out these assertions"); compare *United Parcel Service of America v. Commissioner*, 254 F.3d 1014, 1018 (11th Cir. 2001) (holding that the restructuring of an excess-value business "served the genuine need for customers to enjoy loss coverage and for UPS to lower its liability exposure"); *Sacks v. Commissioner*, 69 F.3d 982, 989 (9th Cir. 1995) (concluding that a taxpayer "had a business purpose" for his sale-leaseback scheme, namely, "making money after taxes by leasing out solar water heaters").

320.   The second prong of the *Moline Properties* test inquires whether the allegedly sham corporation actually conducted business activities.  Notwithstanding the low threshold set by *Moline Properties*, the court concludes the government has proven beyond a reasonable doubt that Deleon did not engage in sufficient business activity to warrant treatment as a

---

[475]Hallett conceded, moreover, that even if Deleon had originally been formed for a legitimate business purpose, this would not be determinative in deciding whether it was a sham corporation.  See RT at 1763:1-13.  He also emphasized that he was not opining that Deleon was not a sham, but only that there was a reasonable argument it was not a sham.  See RT at 1762:21-25.

[476]Frantz concedes this was one of the reasons for incorporating Deleon.  (See Def.'s Proposed Findings at 12 ("Third, the record supports the inference that Braswell wanted to reduce his corporate income taxes by utilizing a Bermuda corporation")).

1   separate taxable entity.

2   321.   Deleon maintained no offices in Bermuda and had no employees.[477]   GBDS employees

3   researched raw materials suppliers, negotiated the terms of the purchase orders with those

4   suppliers, prepared purchase orders in Deleon's name, and ultimately issued the purchase

5   orders; they did not consult with Hemisphere in performing any of these activities.[478]   The

6   products ordered in Deleon's name were sent directly to manufacturing laboratories located

7   in the United States.[479]   Deleon did not receive the materials or perform any activities with

8   or on them.   Suppliers were instructed to contact GBDS purchasing agents if they had

9   questions regarding the purchase orders, and Grindblat told suppliers that GBDS would be

10   responsible for payment of the invoices submitted.[480]

11   322.   Except for Kathy Araujo, every purchasing agent who testified stated that suppliers and

12   vendors were instructed to send their invoices to GBDS.[481]   GBDS employees then sent

13   check requests to Hemisphere, which prepared and forwarded the checks to GBDS.[482]   On

14   those occasions where a check from Hemisphere was delayed, GBDS issued checks

15   directly to the vendors.[483]   GBDS also paid for shipping and freight charges when those

16   charges were separately billed.[484]

17

18

19

---

20   [477]Exs. 105, 121.

21   [478]See findings 102-107, *supra*.

22   [479]*Id.*

23

24   [480]RT at 141:1-25; RT at 236:20-22.

25   [481]See RT at 130:1-12; *id.* at 202:2; *id.* at 228:1-13; but see *id.* at 168:20-25.

26   [482]See RT at 130:1-12; *id.* at 204:15-25; 205:1; *id.* at 229:9-17; Ex. 146.

27   [483]RT at 204:15-25; *id.* at 136:1-9.

28   [484]RT at 272:19-25.

323.    There is no evidence that GVI ever issued purchase orders to Deleon.[485]  There is also no evidence that Deleon or Hemisphere prepared invoices to GVI.  Rather, there is evidence that Saito prepared invoices to GVI on Deleon's behalf from Marina Del Rey, that he did so months after the raw material purchases had been made, and that he added a considerable mark-up to the actual cost of the products.[486]

324.    The evidence shows that Hemisphere, the company responsible for managing Deleon, did not know what activities were being conducted in the company's name;[487] that Hemisphere employees were contacted only to provide checks;[488] that they felt "[t]he business [was] being done in the States by Glenn's company";[489] and that they informed Frantz there "was no activity [of Deleon] to audit."[490]

325.    Deleon neither held nor maintained property in its own name; it did not hold itself out to third parties as an independent corporation; and it did not obtain loans, purchase materials, or issue invoices.  Although checks were drawn on Deleon's bank account, they were written only at the behest of GBDS employees, and were sent to GBDS so that that company could forward them to vendors in payment of invoices the vendors had directed to GBDS.  Although Deleon maintained check registers, there is no evidence that it kept

---

[485]*Id.* at 778:3-8.  As previously noted, Saito testified that he saw only one purchase order reflecting that GVI had ordered product from Deleon.  He further testified that he obtained the purchase order from Mendoza.  Mendoza testified that she did not issue the purchase order, and that she had never issued purchase orders in GVI's name to Deleon.  See finding 117, *supra*.

[486]RT at 776:11-19; 780:24-25; 781:1-5.

[487]Ex. 124.

[488]Ex. 354.

[489]Ex. 141.

[490]Ex. 323.

formal books and records.[491]  Similarly, although Deleon followed some corporate formalities, e.g., naming directors and officers and issuing stock,[492] there is no evidence that it paid salaries, dividends, or held any annual meetings between January 1994 and December 1998.[493]

326.  In light of the evidence in the record, the court finds that the government has established beyond a reasonable doubt that Deleon conducted no legitimate business activity.  See *Wapnick v. Commissioner*, 83 T.C.M. (CCH) 1245, 2002 WL 215993 (2002) (concluding that corporations were shams where they "did not follow any corporate formalities such as maintaining books and records, issuing stock, holding annual meetings, electing officers, or issuing financial statements.[494]  They did not have employees, they paid no salaries or dividends, and they did not conduct any legitimate business. . . .  Petitioner contends that the 13 corporations provided tax preparation, money lending, and check cashing services.  We disagree.  There are no documents in evidence that show there were any business transactions between a client and any of the corporations.  No checks payable to any of the 13 corporations were produced at trial"); *Bailey Yelding* v. *Commissioner*, 61 T.C.M. (CCH) 3017, 1991 WL 114821 (1991) (concluding that a corporation was a sham where it lacked "any substance or attributes other than its designated name and its status, if any, under local law.  It kept no books or records, had no employees, paid no salaries or dividends, transacted no business, neither entered nor executed contracts or

---

[491]See RT at 1748:3-10 (Hallett's testified that he was "not aware of a general ledger in the name of Deleon or GBDS" and that he was not aware "of evidence in this case that there were corporate minute books [for Deleon] on the premises of GBDS").

[492]Ex. 5.

[493]Ex. 5 at 121-122.

[494]Compliance with corporate formalities, or lack thereof, is not determinative in assessing whether a corporation should be treated as a sham for tax purposes.  See *Horn*, *supra*, 45 T.C.M. (CCH) 413 (citing *Aldon Homes*, *supra*, 33 T.C. at 600).  As *Wapnick* makes clear, however, it is a factor in assessing whether a company is conducting business activity under the second prong of the *Moline Properties* test.

other arrangements, held no assets other than as nominee of the liquor license under which petitioner conducted and operated the business, made no sales, collected no proceeds or monies, paid no expenses, and had no commercial, agency, business, or other function. In sum, it was a mere corporate shell, a 'dummy'"); *Horn*, *supra*, 45 T.C.M. (CCH) 413 (finding that a corporation was a sham where, *inter alia*, it "did not obtain credit from an unrelated third party . . . did not pay for its own rent, utilities, and overhead . . . was not issued a license in its own name . . . [and] did not maintain any log of X-rays taken or any patient cards. . . . Associates' patients were unaware of Services' existence. . . . Services did not advertise or list in the local telephone directory"); 10 MERTENS LAW OF FEDERAL INCOME TAXATION, *supra*, § 38:13 (including, among the factors relevant in evaluating when a corporate entity should be disregarded, whether a corporation "holds no director's meetings and declares no dividends and generally is almost completely inactive[;] [and whether it makes] representations . . . to the public or the business world as to who does the business"); see also *Northern Indiana Public Service Co.*, *supra*, 115 F.3d at 513 (stating that "[t]ransactions involving a foreign corporation are to be disregarded for lack of meaningful economic activity if the corporation is merely transitory, engaging in absolutely no business activity for profit – in other words, it is a 'mere skeleton,'" but noting, in the case before it, that "Finance conducted recognizable business activity. . . . Significantly, Finance derived a profit. . . . [It] also reinvested the annual . . . interest income in order to general additional interest income [and] borrowed funds from unrelated third parties"); compare *United Parcel Service*, *supra*, 254 F.3d at 1018 (holding that there was economic benefit to transactions because they generated "genuine obligations enforceable by an unrelated party," and because UPS' Bermuda subsidiary was "an independently taxable entity that [was] not under UPS's control"); *IES Industries, Inc. v. United States*, 253 F.3d 350, 355-56 (8th Cir. 2001) (noting that "these were not transactions conducted by alter-egos of IES or straw entities conducting ADR trades. . . . Each trade was an arm's length transaction"); *Mills v. Commissioner*, 132 F.2d 753, 755-56 (1st Cir. 1943) (holding that a corporation was not a sham where it "made

purchases of cotton and wool in its own name and retained title until it transferred the same to Esmond.  It carried its inventory on its own books; it made contracts with third persons in its own name; it filed an income tax return in the year in question and reported commissions from Esmond as income"); *McDonald*, *supra*, 68 T.C.M. (CCH) 1400 (corporation not a sham where it "provided tax services to clients, prepared and signed tax returns, rented office space, received fees and made deposits, paid bills, and filed its own tax returns"); *Rogers*, *supra*, 34 T.C.M. (CCH) 1254 (finding that a corporation was not a sham where it "obtained and renegotiated loans, loaned money . . . maintained and used bank accounts, paid state franchise taxes, and filed various statements and reports which were required of it to maintain its corporate existence").

327.   This conclusion is reinforced by Hallett's testimony.  Although Hallett testified that Deleon conducted business activity, he assumed, in offering that opinion, that GBDS employees had acted as Deleon's agents.[495]  On cross-examination, Hallett conceded that he knew of no evidence indicating that Deleon had consented to have GBDS employees act as its agents.[496]  He also conceded there was evidence that Hemisphere expressed concern that

---

[495]RT at 1721:18-24 (" . . . Deleon is doing business.  Its business is buying and reselling goods.  And the bulk of that business is carried on within the United States, the goods are purchased in the United States, the goods are sold in the United States.  The agents for GB[DS] are negotiating and arranging the purchase in the United States.  There is some activity in Bermuda of managing the bank account, but I think the bulk of the business, a substantial part of the business, is carried on within the United States").

[496]Although Hallett testified that he believed there were facts demonstrating that Deleon consented to have GBDS conduct purchasing for it, he did not specifically identify them.  Rather, he relied on the concept of implied consent, suggesting that if Deleon knew GBDS employees were engaged in purchasing on its behalf, its knowledge constituted implied consent.  See RT at 1763:9-25, 1764:1-14 ("Q: And then you said that there were facts that indicated that Deleon purchased goods, purchased raw materials and resold the goods, and you used that factor in your analysis.  Am I right?  A: Yes.  Q: And am I also right that you reached this second conclusion by attributing to Deleon the activities of the GBDS personnel and GBDS outside accountants who were involved in creating and processing the paperwork in the name of Deleon, right?  A: Well, my view was that they could be viewed as performing those functions on behalf of Deleon.  Look at it that way.  Q: When you looked at the evidence in this case, you didn't find any evidence that these GBDS personnel and GBDS outside accountants were ever hired by Deleon to perform any

it did not know what activity was being conducted in Deleon's name or whether it was authorized;[497] that there was no evidence that GBDS or GVI kept Deleon's books and records, even though GBDS maintained the books and records of the Affiliated Corporations;[498] that there were no general ledgers or corporate minute books for Deleon at GBDS;[499] and that there was no evidence that the GBDS accounting department received Deleon purchase orders, even though similar GVI purchase orders were generally routed through it.[500]  Frantz, moreover, did not make any effort to correct KPC's assumption in its July 24, 1996, letter, that Deleon did not have agents in the United States.[501]  This contemporaneous conduct is more probative than after-the-fact reconstruction by Frantz's expert.

328.   Moreover, even if the court were to conclude that Deleon conducted minimal business activity as that term is used in *Moline Properties*, it would find under the law of this and other circuits that such activity could not give rise to a separate taxable entity in the absence of a legitimate business purpose.  In *Asa Investerings*, *supra*, the D.C. Circuit held that business activity alone was insufficient to avoid a sham corporation finding.  It stated: "[W]hat the petitioner alleges to be a two-pronged inquiry is in fact a unitary test

---

of these functions, did you?  A: I didn't see any evidence that there was a formal employment agreement or anything like that.  W: And do you understand that in order for these GBDS personnel and GBDS outside accountants to be acting as agents for Deleon, Deleon would have to consent to their acting as agents?  A: Well, I would say that if Deleon is aware they are doing it and they are doing it, there could be implied consent or express consent.  There would be facts there – there were facts there that indicated to me they were doing arguably acts on behalf of Deleon").

[497]RT at 1767:9-19.

[498]*Id.* at 1747:3-17.

[499]*Id.* at 1748:2-13.

[500]*Id.* at 1771:20-25; 1772:1-3.

[501]*Id.* at 1734:9-25; 1635:1-3.

– whether the 'sham' be in the entity or the transaction – under which the absence of a nontax business purpose is fatal." *Asa Investerings*, *supra*, 201 F.3d at 512.  The court found support for this conclusion in the Ninth Circuit's holding in *Zmuda*, *supra*, stating:  "The Ninth Circuit has similarly held that 'business activity' is inadequate in the absence of a nontax business purpose.  In *Zmuda*, [the court stated that] '[a]lthough the taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation.'"  *Id.* at 513 (citing *Zmuda*, *supra*, 731 F.2d at 1421).  Thus, even were the court to consider Deleon's check-writing "business activity," it would conclude that the government had proved beyond a reasonable doubt that there was no legitimate business purpose for the activity.  Under *Zmuda* and *Asa Investerings*, this justifies a finding that Deleon was not a separate taxable entity as defined in *Moline Properties*.

329.  Accordingly, the court finds that the government has established, beyond a reasonable doubt, that Deleon was a sham corporation.  See *Zmuda v. Commissioner*, 79 T.C. 714, 719 (1982) ("[i]t is well established that a taxpayer has the legal right to minimize his taxes or avoid them totally by any means which the law permits. . . .  However, this right does not bestow upon the taxpayer the right to structure a paper entity to avoid tax when that entity does not stand on the solid foundation of economic reality").

## 2.    Frantz Knew Deleon Was A Sham Corporation

330.  The court also concludes that the government proved beyond a reasonable doubt that Frantz knew Deleon was a sham corporation.  Frantz was intimately involved in the initial formation of Vita, the steps taken to rename Vita Deleon, and the early operation of Deleon by Hemisphere.[502]  Frantz knew that, prior to the activation of Deleon, GBDS employees were ordering the raw materials used to make the supplements sold by Braswell's companies in the United States.[503]  While Frantz testified that Braswell had

---

[502]See findings 58-73, *supra*.

[503]See finding 66, *supra*; see also Exs. 816, 818; RT at 1613:5-11.

several business purposes in activating Deleon, there is no evidence that, once it was activated, Braswell made any effort to use Deleon to achieve any of these purposes. And, while Adlai testified that Braswell wanted to conceal his involvement in raw materials purchasing from the manufacturing laboratories, this could not be achieved for the reasons earlier stated.[504]

331.   The evidence in the record – including Frantz's April 6, 1994, letter to Kyalla, the draft purchase order he received from Mendoza, and the complaints he received from Hemisphere – establishes beyond a reasonable doubt that Frantz knew GBDS employees were negotiating raw materials purchases using Deleon's name and issuing purchase orders on its behalf.[505]   Frantz's testimony to the contrary is not credible. The same evidence also establishes beyond a reasonable doubt that Frantz knew Deleon was conducting no real business activity and that its sole function was to issue checks at GBDS' request to pay invoices received from the raw materials vendors.

332.   Frantz testified that (1) he knew GVI was sending money to Deleon and (2) he knew GVI was expensing the Deleon purchase orders and including them in cost of goods sold as part of the "purchasing arrangement" between the entities.[506]   He also conceded that he received CTRs confirming that GBDS made significant payments to the Deleon Account.[507] Given Braswell's 1995 correspondence with Frantz, which enclosed Miller's letter to

---

[504]See finding 317, *supra*.

[505]See findings 172-213, *supra*.

[506]RT at 1530:15-18 (Q: You were not aware that Gero Vita, for instance, was expensing items attributable to Deleon and including them in cost of goods sold? A: That was a part of the program. So whenever the program started, I knew that would be the result"); *id.* at 1532:17-25 ("Q: And you didn't know that Gero Vita had been sending money to Deleon? A: I assumed that GVI was sending money to Deleon pursuant to the purchasing arrangement. Q: So once that arrangement at least got started, you knew that money was going from Gero Vita or some domestic entity of Glenn Braswell's to the Deleon bank account at the Bank of Bermuda, correct? A: I would say I assumed that that is what was happening").

[507]Exs. 133, 138, 145, 158, 159.

Braswell, the evidence establishes beyond a reasonable doubt that Frantz also knew Miller and Saito were preparing, in Marina Del Rey, Deleon invoices to GVI that marked up the raw materials' cost.[508]  Frantz thus knew that any monies paid to Deleon were being accounted for through the false invoices generated by Miller and Saito.  Therefore, the government has proved beyond a reasonable doubt that Frantz knew Deleon was a sham corporation.

### 3.    Braswell Controlled The Deleon Account

333.    Braswell owned and controlled Deleon through a nominee agreement.[509]

334.    Although Braswell was not a signatory on the Deleon bank account,[510] the three individuals who were worked for Hemisphere.  Hemisphere Holdings Ltd. held Braswell's shares in Deleon as his nominee, and was required to act at Braswell's, or his agent Frantz's, direction in matters respecting the company.[511]

335.    The evidence established that Braswell exercised actual control over the Deleon Account.  Requests to Every for checks were in Braswell's name.[512]  On December 30, 1996, Frantz wrote Wetherill, and requested that "[t]o the extent . . . any of [Braswell's] deposits [were] not presently with [the Bank of] Butterfield," they should be transferred there.[513]  When Every inquired whether "all of the business accounts, Deleon and Sonoran, should be transferred,"[514] Frantz responded by "confirm[ing] [Braswell's] desire that all such

---

[508]See findings 194-195, *supra*.

[509]Ex. 105.

[510]See Def's. Proposed Findings at 10, n. 3; Ex. 109 at 3.

[511]See Ex. 109 at 3; Ex. 105.

[512]See, e.g., Ex. 222 at 4 (memorandum from Braswell to Margaret Every requesting that checks on the Deleon account be prepared for Chem-West Sales, Weinstein Nutritional, Indena, and Brucia Plant Extracts).

[513]Ex. 143 at 1.

[514]*Id*. at 2.

100

1      funds be ultimately consolidated."[515]

2   336.   Frantz's own expert, moreover, testified that "[i]f we sham the corporation, [Braswell] has

3           the control [over the Deleon Account]."[516]

4   337.   Accordingly, the court concludes the government has proved beyond a reasonable doubt

5           that Braswell controlled the Deleon Account.

[515]*Id.* at 3.  On cross-examination, IRS Special Agent Caruth testified that notwithstanding the December 1996 request, Hemisphere did not move the Deleon account.  (See RT at 1079:21-23).  Frantz contends that Hemisphere declined to move the account because Braswell was not an authorized signatory.  He asserts this proves that Braswell did not have control over the account.  (See Def.'s Proposed Findings at 10, n. 3 (stating that Deleon's bank account was not within Braswell's control and referencing, as support for this assertion, the fact that "Braswell was not an authorized signatory on the Deleon bank account.  When the request was made to Hemisphere to move the Deleon account from the Bank of Bermuda to Butterfield, Hemisphere declined to make the change")).  Given the strength of the contrary evidence, the fact that Hemisphere did not move the account after Braswell requested that it do so does not raise a reasonable doubt with respect to whether Braswell in fact controlled the Deleon Account.

[516]RT at 1778:2-9 ("Q: In your sham analysis, then, you went one step further than my last question.  You simply eliminated Hemisphere altogether.  It's just his bank account, or it's a bank account in his name and he has [signing] authority over it?  A: I assume he is in control of it.  If we sham the corporation, he has the control"); see also RT at 1777:16-22 (stating that if Deleon was a sham, he viewed "Braswell [as being] in control of [its bank] account" and that the question then became whether Braswell's "control over the account . . . mean[t] it [was] his income").

101

### 4. Even Though Braswell Controlled the Deleon Account, He May Have Held The Payments To Deleon As A Corporate Custodian or Trustee For GBDS

338. Because the government has established beyond a reasonable doubt that Deleon was a sham corporation, and has further proved beyond a reasonable doubt that Braswell controlled the Deleon account, payments made to the account between 1994 and 1997 are properly considered payments to Braswell. The government has accordingly established a prima facie case of demonstrating that Braswell received income that he failed to report on his tax returns. See *United States v. Miller*, 545 F.2d 1204, 1215, n. 13 (9th Cir. 1976) ("The government establishes a prima facie case when it demonstrates that the taxpayer had unexplained funds which could be considered as income which the taxpayer fails to report in his return").

339. Once the government has established a prima facie case, the burden shifts to the taxpayer to overcome the "logical inference" of the evidence adduced by the government. See *United States v. Curtis*, 782 F.2d 593, 596 (6th Cir. 1986) ("In the present case . . . the government established that defendant took money from the corporation and deposited it to his personal account. Curtis presented no evidence that he had an obligation to repay the corporation for the money he received. He thus failed to overcome the logical inference to be drawn from the government's evidence, which was that the money was income to Curtic"); *United States v. Leonard*, 524 F.2d 1076, 1083 (2d Cir. 1975) (noting that "[i]n prosecutions for income tax violations, production of a rather slight amount of evidence by the Government . . . may transfer the burden of going forward to the defendant," but cautioning that "the ultimate burden of persuasion remains with the Government"); *United States v. Garcia*, 412 F.2d 999, 1001 (10th Cir. 1969) ("Evidence of unexplained funds in the hands of the taxpayer establishes a prima facia case of understatement of income making it incumbent on the taxpayer to overcome the logical inferences drawn from the facts proved"); *Campodonico v. United States*, 222 F.2d 310, 313 (9th Cir. 1955) (same); *Davis v. United States*, 226 F.2d 331, 335-36 (6th Cir. 1955)

("As for the claim that the trial court erred in placing upon appellant the burden of explaining that the gross receipts of his corporation did not constitute taxable income of appellant, the court did not thrust such a burden upon him. While, of course, the burden of proof does not shift in a criminal case, it is the rule that when the government establishes a prima facie case, it is then for the defendant to overcome the inferences reasonably to be drawn from the proven facts. Thus, evidence of unexplained funds or property in the hands of a taxpayer establishes a prima facie case of understatement of income, and it is then incumbent on him to overcome the logical inferences to be drawn from such proof"); see also *United States v. Bok*, *supra*, 156 F.3d 157, 163 (2d Cir. 1998) (noting that once the government has come forward with evidence of tax evasion, the taxpayer may face a burden of production, but cautioning that "the allocation of the burden of going forward to the taxpayer does not affect the ultimate burden of persuasion, which always remains with the government").

340.    The government is not required to characterize the income received by Braswell. See *Davis*, *supra*, 226 F.2d at 335 (rejecting defendant's argument that "the government has not fixed a label of some kind on the funds that he took from his corporation," and stating that "[i]t is not necessary to describe them as additional salary, illicit bonuses, or commissions, or anything more than wrongful diversions, since, as above mentioned, substance controls over form, and taxation is concerned with the actual command over the property taxed"), cited with approval in *Miller*, *supra*, 545 F.2d at 1213.

341.    Although it was not required to characterize the income Braswell received through Deleon, it can be fairly inferred from the arguments presented that the government contends the monies constituted constructive dividends to Braswell.[517]  Under relevant tax law, a

[517]The government does not explicitly argue that payments to Deleon should be considered dividend income to Braswell. A fair reading of its proposed findings suggests that this is the characterization it advocates, however. (See Gov't. Proposed Findings at V:11, n. 3 ("Eliminating the false invoices and markups would add back $7,242,236 in earnings to GVI for its fiscal year ending September 30, 1995, more than enough earnings to characterize all of the $7,936,630 of Deleon specific items paid to Braswell through GVI's fiscal year ending September

103

distribution or payment to a shareholder constitutes a constructive dividend, reportable as income, when the corporation "confers an economic benefit upon a shareholder without expectation of repayment and the corporation on the date of the deemed distribution had current or accumulated earnings and profits."[518] *Zhadanov v. Commissioner*, 83 T.C.M. (CCH) 1553, 2002 WL 731708 (2002).

342.   A taxpayer can be charged with the receipt of constructive dividend income even though the corporation "has not observed the formalities of dividend declaration, and has not made a pro rata distribution to the entire class of stockholders, and even though neither the corporation nor the shareholder intended a dividend and the corporation did not record the distribution as a dividend for bookkeeping purposes." *Crosby v. United States*, 496 F.2d 1384, 1388 (5th Cir. 1974); see also *Noble v. Commissioner*, 368 F.2d 439, 443 (9th Cir. 1966) ("To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders, declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits under a claim of right or without any expectation of repayment," citing *Healy v. Commissioner*, 345 U.S. 278, 281 (1953)).[519]

---

30, 1996 as dividends"). The government does not argue, for example, that the payments to Deleon constituted salary or payments for goods sold to the corporation by Braswell.

Similarly, although Frantz does not explicitly argue that the Deleon payments are dividends, the cases he cites regarding proper tax treatment of the payments use this analytical framework. So too did his expert at trial. See RT at 1715:18-23 (Hallett: "[T]he issue, as I understand it, in this case [is] whether when funds come into the possession of a sole shareholder and [are] under his unfettered control are those constructive dividends, are those income or is he holding them on behalf of a corporation").

[518]The Ninth Circuit has held that the earnings and profits requirement generally utilized in civil cases is not applicable in the criminal context. See *Miller*, *supra*, 545 F.2d at 1214. The *Miller* case and its implications in a criminal case such as this are discussed *infra* in section II.B.

[519]As a result, the court does not find determinative the fact that GVI deducted the payments to Deleon as costs of goods sold each year. Traditionally, a corporation may not deduct dividend payments. See *Meridian Wood Products Co., Inc. v. United States*, 725 F.2d 1183,

343.   Because the government has met its prima facie burden, the court must examine whether Frantz has overcome the logical inference that payments to the Deleon Account constituted constructive dividend income to Braswell that was reportable on his tax returns. *Curtis*, *supra*, 782 F.2d at 596.

344.   Not all payments to shareholders are deemed constructive dividends and taxed as personal income. A shareholder can avoid having a payment classified as taxable income if he can establish that he was holding the money as an agent, trustee, or custodian of the corporation, and that the distributed funds were to be used primarily for the corporation's, not the shareholder's, benefit. See *Stone v. Commissioner*, 865 F.2d 342, 343 (D.C. Cir. 1989) ("even when a corporation officer is its sole shareholder . . . and he transfers corporate funds to his personal checking account, and his dealings with the corporation are 'extremely informal,' there is no constructive dividend so long as he can show that his intent 'was to use such funds for corporate purposes as an agent of the corporation,'" citing *Nasser v. United States*, 257 F. Supp. 443, 449 (N.D. Cal. 1966)); *Ireland v. United States*, 621 F.2d 731, 735 (5th Cir. 1980) ("In order for a company-provided benefit to be treated as income, the item must primarily benefit taxpayer's personal interests as opposed to the business interests of the corporation"); *Crosby*, *supra*, 496 F.2d at 1388-89 ("Not every corporate expenditure incidentally conferring economic benefit on a shareholder is a constructive dividend. . . . Of determinative significance is whether the distribution was primarily for shareholder benefit. . . . The line between primarily for

---

1191 (9th Cir. 1984) ("The test for constructive dividends is twofold: the expenses must be nondeductible to the corporation, and they must represent some economic gain, benefit, or income to the owner-taxpayer"); *McKay v. United States*, 957 F.2d 689, 692, n. 2 (9th Cir. 1992) ("If a corporation cannot deduct a particular expense and the expense confers an economic gain, a benefit, or income to the taxpayer, the expense should be treated as a constructive dividend"). The characterization of a payment on the corporation's books, however, is not determinative. See, e.g., *Noble*, *supra*, 368 F.2d at 442-43 ("Dividends may be formally declared or they may be constructive. The fact that no dividends are formally declared does not foreclose the finding of a dividend-in-fact. . . . Intention of the parties is not controlling. The fact, as stipulated by the parties, that the corporation and the petitioners did not intend these payments to constitute dividends, is not decisive").

shareholder benefit and primarily for corporate benefit is often a difficult one to draw" (internal citations and quotation marks omitted)); *Nasser*, *supra*, 257 F. Supp. at 447 ("Specifically at issue is the question of whether the 'transfers' or 'withdrawals' in 1960 and 1961 were 'distributions within the meaning of Section 61 and Section 316(a) of the Internal Revenue Code . . . and therefore taxable as dividend income, or whether the funds were transferred to plaintiff to be used by him as an investment agent on behalf of the corporation for its purposes and therefore not a dividend"); *Han v. Commissioner*, 83 T.C.M. (CCH) 1824, 2002 WL 1298745 (2002) ("money a taxpayer receives in his or her capacity as a fiduciary or agent does not constitute taxable income to that taxpayer"); *Zhadanov*, *supra*, 83 T.C.M. (CCH) 1553 ("we have held that a sole shareholder's physical control over unreported corporate cash does not result in constructive dividends where the shareholder evidences an intention to hold and use those funds for corporate purposes"); *Noble v. Commissioner*, No. 7721-00S, 2002 WL 1825333 (Tax Ct. June 10, 2002) ("Not every corporate expenditure conferring an economic benefit to the shareholder is a constructive dividend. The deciding factor is whether the expenditure was primarily for the shareholder's benefit and there was no expectation of repayment"); *AJF Transportation Consultants, Inc. v. Commissioner*, 77 T.C.M. (CCH) 1244, 1999 WL 34817 (1999) ("a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit," citing *Diamond v. Commissioner*, 56 T.C. 530, 541 (1981)); *Hammer v. Commissioner*, 57 T.C.M. (CCH) 1144, 1989 WL 83955 (1989) (where the unreported income and earnings of a corporation were withdrawn from a corporate account by shareholders but "kept separate and segregated from other accounts and assets," the shareholders "did not utilize any of the unreported income of the corporation to pay any personal expenses or debts [and] all of the corporate funds and earnings thereon were returned to or used for the benefit of the corporation," the shareholders did not realize income).

345.    Whether a payment constitutes a constructive dividend and whether a shareholder is acting

as a trustee or agent for the corporation are questions of fact.  See *O'Rourke v. United States*, 347 F.2d 124, 127 (9th Cir. 1965) ("The question of whether or not the transaction constituted a constructive dividend is one of fact; specifically, whether [the defendant] took corporate money and held it as his own personal asset"; likewise it is a question of fact "whether [the defendant] intended to act as trustee or was a trustee in fact"); *Hood v. Commissioner*, 115 T.C. 172, 180 (2000) ("The determination of whether the shareholder or the corporation primarily benefits is a question of fact"); see also *Loftin & Woodward, Inc. v. United States*, 577 F.2d 1206, 1215 (5th Cir. 1978) ("The determination of a constructive dividend is a question of fact. . .").

346.  Although the court has determined that Braswell controlled the Deleon Account, this is not conclusive evidence that payments to that account by GBDS were for his benefit.  See *Zhadanov*, *supra*, 83 T.C.M. (CCH) 1553 ("Although control over an asset can be evidence of an economic benefit, control of an asset by a shareholder-officer does not necessarily result in a benefit that is taxable to the shareholder. . . . [A] sole shareholder's physical control over unreported corporate cash does not result in constructive dividends where the shareholder evidences an intention to hold and use those funds for corporate purposes"); *Han*, *supra*, 83 T.C.M. (CCH) 1824 ("a shareholder who takes personal control of corporate funds is not taxable on them so long as it is shown that he held the funds as an agent of the corporation and/or deployed them for a corporate purpose"); *Alisa v. Commissioner*, 35 T.C.M. (CCH) 1113, 1976 WL 3439 (1976) (stating that "[t]he fact that there may be only one controlling or dominating shareholder does not affect the requirement that he personally benefit from the questioned distribution," and concluding that despite petitioners' control of certain funds, the fact that "none was used for [their] own personal purposes" indicated that they "did not personally benefit from the funds in question"); see also *United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993) (holding, on review of a criminal sentence, that "we do not think the district court erred in making the factual determination that the funds diverted from ADM to Swaffham, Gemona and Bourbonia should be considered constructive dividends because the funds came under the

107

control of Dale and Ashton *and the diversion was made primarily for their benefit*" (emphasis added)).[520]

347.   Rather, the court must examine Braswell's intent at the time of the transfer and thereafter. In *Nasser*, *supra*, 257 F. Supp. at 447, the court noted that "[t]he primary factual determination is recognized to be the intention of the sole-shareholder of the corporation at the time the transfer is made." In evaluating such intent, the *Nasser* court stated, three types of evidence are relevant: (1) the testimony of the taxpayer himself; (2) objective evidence that is contemporaneous with the transfer of funds; and (3) evidence as to acts subsequent to the date of transfer. *Id.* at 447-48. Noting that "[t]he [shareholder's] original intent is not conclusive," the court stated that if "the original intention of a taxpayer at the time of withdrawal is found to be a sufficiently definite corporate investment purpose, then . . . a further inquiry [must be made] into the actual use and disposition of the funds transferred to the taxpayer[']s control in an attempt to determine whether the original purpose was vitiated by such use and disposition." *Id.* at 448; see also *Stone*, *supra*, 865 F.2d at 344 ("The fact finder must infer the individuals' intent in part from the objective evidence as to their actions, which may be ambiguous, and in part from their own testimony, which is almost by definition self-serving").

348.   There is limited evidence of Braswell's intent at the time GBDS made payments to Deleon. Braswell did not testify at the trial, and Frantz did not specifically address whether payments to Deleon were being held by Braswell in trust for GBDS.[521] The court can look

---

[520]At least one court has held that where the corporation maintains control of the funds in question, the funds are not considered income to the individual shareholder until they are used for the shareholder's benefit. See *Rendel v. Commissioner*, 70 T.C.M. (CCH) 1571, 1995 WL 738591(1995) ("In the instant case, during 1892 and early 1983, sufficient control over the offshore trust bank accounts was maintained and exercised on behalf of CCMI so that the funds transferred by CCMI in 1982 through the trusts and into the Alpha account are to be treated as properly taxable to petitioners in 1983, the year in which CCMI's funds were first used by petitioners for petitioners' personal benefit").

[521]Frantz testified that he did not believe Deleon was a sham corporation; as a result, there was no reason for Frantz to address whether payments to Deleon constituted dividend income to

to the ultimate disposition of the funds, however, as well as other objective evidence, in assessing Braswell's intent at the time of the payments and thereafter.  See *Crosby*, *supra*, 496 F.2d at 1390 (concluding that "the amount of the dividend constructed must be limited to the fair rental value of the improvements which were made primarily for shareholder benefit"); *Nasser*, *supra*, 257 F. Supp. at 448 (concluding the evidence supported a finding that "the plaintiffs' original intention in all of the withdrawals was to employ the transferred funds as a fiduciary solely for corporate investment purposes" where, *inter alia*, "at all times during which the transferred funds were deposited in [the shareholder's] personal accounts, he had individual savings accounts with close to $300,000 in cash on hand," and "although [the shareholder's] dealings with the corporation were extremely informal and although at various times [he] had apparent unrestricted control over the funds . . . at no point in all of the transfers involved was the overriding corporate purpose aspect of the transactions sublimated to a personal or private usage"); *Zhadanov*, *supra*, 83 T.C.M. (CCH) 1553 (concluding, despite shareholders' physical control of corporate cash, that they did not have dividend income because contemporaneous documents recorded the cash as a corporate asset; the record "contain[ed] no evidence that the [shareholders] lived a lavish lifestyle inconsistent with their reported income"; although the shareholders occasionally used the cash to pay expenses, "the expenses in question appear to have been [corporate] expenses, not personal expenses"; and the shareholders "kept corporate records and [the] cash in the safe [at their home] because they believed the safe was more secure than the storage facilities at [the corporation]"); *Alisa*, *supra*, 35 T.C.M. (CCH) 1113 (concluding that distributions were not dividends where, even though a shareholder had physical control of a cash reserve in a field office, the reserve was used to pay subcontractors and none of the cash was used for personal purposes unless it was

---

Braswell.  See RT at 1398: 23-25; 1399:1-4 ("Q: Now, Mr. Frantz, prior to the indictment being returned in this case, did it ever occur to you that Deleon was a sham corporation?  A: It never occurred to me that Deleon was a sham corporation.  Q: Did you believe it was a bona fide company?  A: I did").

reported); *Rosencrans v. Commissioner*, 13 T.C.M. (CCH) 176, 1954 WL 555 (1954) ("Rosencrans has proven that the $14,000 which he withdrew and kept for Artmar was not a loan or a dividend to him from the corporation but represented funds which he held for the corporation in safe keeping during the time that they were not needed by the corporation. They were returned to the corporation when it needed them and, meanwhile, Rosencrans derived no benefit whatsoever from holding the funds segregated in his safe deposit box"); compare *Han*, *supra*, 83 T.C.M. (CCH) 1824 (finding that a shareholder's testimony regarding intent was contradicted by objective evidence, including the fact that significant funds had not been accounted for, the shareholder's activities harmed his corporations, and the shareholder endeavored to keep the funds in question hidden); *Noble*, *supra*, 2002 WL 1825333 (finding that distributions were properly deemed constructive dividends where they "were for personal expenses such as the cost of petitioner's personal vehicles, home security, and health club dues"); *AJF Transportation Consultants, Inc.*, *supra*, 77 T.C.M. (CCH) 1244 (where a shareholder had "not submitted credible evidence of any cash payments made to casual labor," the income he realized from cashing checks made out to him as a corporate officer and depositing them in his personal account was properly considered a dividend); *St. Augustine Trawlers, Inc. v. Commissioner*, 63 T.C.M. (CCH) 2362, 1992 WL 47967 (1992) (unreported cash paid to the corporation but maintained by a shareholder constituted a dividend where the shareholder "had no intention to return the money to the corporation . . . kept the $35,550 in the trunk of his car for a year [and] testified that he could have spent the money anytime he wanted").[522]

---

[522]In *Corliss v. Bowers*, 281 U.S. 376, 378 (1930), the Supreme Court stated that "the income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, *whether he sees fit to enjoy it or not*." Courts have noted, however, that while this is generally true, it does not preclude a finding that monies held by an individual shareholder on a corporation's behalf are not taxable to the shareholder. See *AJF Transportation Consultants, Inc. v. Commissioner*, 77 T.C.M. (CCH) 1244 (1999) (noting both that "[g]enerally income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not" *and* that "[g]enerally, a taxpayer need not treat as income moneys which he did not receive under a

349.    Much of the objective evidence of Braswell's intent regarding GBDS' payments to the Deleon Account is undisputed.  Of the $9,494,167.56 sent to the Deleon Account by GBDS from 1994 to 1997, $7,346,705.16 was paid out to raw material suppliers.[523]  In 1994, $500,000 was paid to the Deleon Account, and $33,358 was paid out to vendors.  In 1995, $5,373,460 was paid to the Deleon Account and $1,351,032.85 was paid out to vendors.[524]  In 1996, the only charged year where payments to vendors exceeded payments into the account, $2,063,169.98 was paid into the Deleon Account and $4,178,920.78 was disbursed to vendors.[525]  In 1997, $2,007,537.58 was paid to the Deleon account, and $1,780,393.53 was disbursed to vendors.[526]

350.    In 1997, Braswell withdrew $3.5 million from the Deleon Account for his personal use.  Frantz reported this amount on Braswell's 1997 tax return.[527]  Because the amounts paid to Deleon in 1997 totaled $2 million, and because $3.5 million was reported on Braswell's 1997 return, the government has not included in its tax deficiency calculation for 1997 any

---

claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit," and holding that "[n]o tax is imposed upon the receipt of money in a fiduciary or agency capacity").

[523]Stipulated Facts, Ex. 409.

[524]Id.

[525]Id.

[526]Id.

[527]RT at 1195:6-8 ("[O]n the 1997 return, Schedule E, [Braswell reported], I believe, $3,501,452"); see also Ex. 17 at 11 (Schedule E from 1997 tax return); RT at 1391:15-25, 1392:1-25, 1393:1-5 ("Q: [D]id you prepare the return in October of 1998?  A: Yes. . . . Q: Now, this is a very hard copy to read, but in the middle of the page, there is an entry for Deleon Global Trading.  A: I see it.  Q: And can you make out the amount next to that?  A: Well, it's $3,501,000 . . . Q: Was that the amount that you put on the tax return?  A: From Deleon as a distribution to Mr. Braswell, yes").  Frantz testified that this was royalty income because an "advisory group" had determined that "Deleon owed a licensing fee to [Braswell] by virtue of using [the ACF] product name on the product which was sold by Deleon to GVI."  Id.

111

1      amount attributable to the Deleon Account.[528]

2   351.   On cross-examination Sterling, the government's expert, conceded that any monies not

3          paid to vendors prior to Braswell's withdrawal of $3.5 million in 1997 were used for

4          corporate purposes.  Sterling specifically agreed that until Braswell withdrew the $3.5

5          million in 1997, "all the money . . . that was taken out of [Deleon] was used to pay for

6          raw materials, license fees or management fees of Deleon."[529]

7   352.   There is no evidence in the record, therefore, that any monies paid into the Deleon

8          Account were used for Braswell's benefit until the $3.5 million withdrawn from the

9          Account in 1997.  Braswell reported that $3.5 million as income in 1997, and paid tax on

10         it.  Frantz's expert, Hallett, asserted that if Deleon were ultimately found to be a sham

11         corporation, the funds in the Deleon Account – which Hallett conceded were "under

12         [Braswell's] control" – were "being accumulated and expended on behalf of the

---

14      [528]RT at 1195:1-11 (Sterling: "Q: Did you pick up any of these items [on Exhibit 409 to

15   the Stipulated Facts] as unreported income for Mr. Braswell in 1997. . .?  A: No, I did not.  Q:
     And why not?  A: Because on the 1997 return, Schedule E, they are reporting, I believe,

16   $3,501,452.  We have determined that that was from Deleon.  So I considered the 2 million plus
     payment that was paid in 1997 is included in that $3.5 million number that is reported"); see also

17   Ex. 410-D (showing only income from the FS&G Account in the deficiency calculation).

18      [529]See RT at 1250:13-25, 1251:1-25, 1252:1-4 (Q: Approximately 9.9 million was paid to

19   Deleon over the four-year period [from 1994 to 1997]?  A: Approximately, yes.  Q: Okay.  And
     in each of those years, monies were paid out to raw material vendors, correct?  A: Yes.  Q:

20   Totalling approximately $7,346,000?  A: That sounds right, yes.  Q: Okay.  And during those
     years, monies were also paid out from the Deleon account to Hemisphere to pay for various costs,

21   correct?  A: Yes.  Q: And . . . do you recall the testimony that payments were made out during
     that period of time to Eleuthros, a company owned by Mr. Lippman?  A: Yes.  Q: Okay.  And

22   I believe there are CTR's that reflect that in November of 1997 and late October of 1997 Mr.
     Braswell actually took out 3.5 million from the company?  A: Yes.  I recall that . . . Q: Do you

23   also recall the testimony that they stopped using Deleon in around September, October of 1997?

24   Q: Yes.  That sounds right.  Q: So it wasn't until they stopped using Deleon that Mr. Braswell
     actually took money out of the company, correct?  A: I believe so, yes.  Q: And all the money

25   before that was taken out of the company was used to pay for raw materials, license fees, or
     management fees of Deleon?  A: The monies that went out, yes.  Q: Okay.  So while you testified

26   that Mr. Braswell may have had control of the bank account and that is your conclusion, there is
     no evidence that he is taking money out for himself until October of 1997, after the business is

27   dormant?  A: Correct").

28                                            112

1    corporation [GBDS] and there wasn't a real or substantial economic benefit to Mr.

2    Braswell."[530]

3    353.   Sterling testified, by contrast, that, notwithstanding the fact that Braswell expended the

4    monies in the Deleon Account for corporate purposes, "[a]t most he was paying an

5    expense on behalf of the corporation which would be counted as additional paid in capital

6    or loaned to the corporation."[531]   To support this conclusion, the government cites *Betson*

7    *v. Commissioner*, 802 F.2d 365 (9th Cir. 1986).   In *Betson*, the Ninth Circuit held that a

8    shareholder who elected to operate stores through wholly-owned corporations was not

9    entitled to deduct corporate expenses on his individual income tax return.   It stated:

10   "Shareholders, unless they are traders, do not engage in a trade or business when they

11   invest in the stock of a corporation. . . . Consequently, shareholders are generally not

12   permitted to deduct under section 162(a) sums advanced to a corporation to meet its

13   expenses or pay its debts. . . . Such expenditures, if not loans, are generally considered

14   capital contributions." *Id.* at 368.   The court finds *Betson* inapposite where, as here, there

15   is no contention that the shareholder was entitled to deduct the corporate expenses he paid,

16   but only that he was holding funds expended for corporate purposes as an agent of the

17   corporation.

18   354.   Given the manner in which the funds were expended, the court finds the analysis set forth

19   in *Stone*, *Crosby*, and *Nasser* persuasive.   Although there is little contemporaneous

20   evidence from which to judge Braswell's intent at the time of the transfers, subsequent

21   evidence and both experts' testimony suggests that although Braswell controlled the Deleon

22   Account, his intent was to hold the funds paid into that account as an agent or trustee of

23   GBDS.[532]   There is no evidence that Braswell withdrew any monies from the account for

24

25   [530]RT at 1724:1-8.

26   [531]RT at 1202:13-19.

27   [532]The government asserts that Braswell could not have held the funds in the Deleon

28   Account as GBDS' agent because "[o]nce the Deleon 'Investment' Account was eliminated [from

113

his personal use prior to 1997.  At the time that withdrawal was made, moreover, Braswell and Frantz reported the distribution as taxable income on Braswell's tax return.  See *Alisa*, *supra*, 35 T.C.M. (CCH) 1113 (finding that distributions were not dividends where, notwithstanding a shareholder's physical control of a cash reserve, he used the funds for corporate purposes and reported any income used for personal benefit).

355.   Because Frantz has established that Braswell did not personally benefit from the payments made to Deleon tand charged in the indictment as unreported income, and because a finding that those payments "confer[red] an economic benefit [on] the shareholder" is necessary prior to characterizing them as dividend income, the court finds that Frantz has rebutted the logical inference that the payments constituted reportable income to Braswell. See *Miller*, *supra*, 545 F.2d at 1214.  As a result, the court cannot find that the government has proved beyond a reasonable doubt that the payments to the Deleon Account are properly considered income to Braswell for years 1994 through 1997.

**B.     FS&G Account**

**1.     The Disbursements From The FS&G Account Were Not Payments Of The Loans Payable Booked By The Corporations**

356.   The government contends that disbursements from the FS&G Account constituted income to Braswell because Frantz made the disbursements for Braswell's personal benefit.[533]

357.   Frantz counters that disbursements from the FS&G Account cannot constitute income to

---

the corporate books] by arbitrarily re-characterizing $2.2 million as an expense, GBDS and GVI did not identify the payments as being corporate assets, and there is no evidence that the corporations reported the interest earned on the Deleon account on their returns."  (See Gov't. Reply at 23.)  Although the corporations "wrote off" the Deleon Account, the treatment of monies on corporate books is not determinative in assessing whether the funds constitute dividends to a shareholder or whether the shareholder is holding the funds in trust for the corporations.  See *Noble*, *supra*, 368 F.2d at 442-43 (The fact . . . that the corporation and the petitioners did not intend these payments to constitute dividends . . . is not decisive").

[533]Gov't. Mem. at 8; see also RT at 1180:10-13 ("[T]hese were amounts paid to or on behalf of Mr. Braswell clearly for his benefit and for his use.  He clearly had control of these funds and therefore should be taxable to him as received").

1    Braswell under *United States v. D'Agostino*, 145 F.3d 69 (2d Cir. 1998).[534]  There, the

2    Second Circuit reaffirmed its conclusion in *DiZenzo v. Commissioner*, 348 F.2d 122, 125

3    (2d Cir. 1965), that "corporate funds lawfully diverted by a shareholder constitute taxable

4    income only to the extent that the corporation had earnings and profits during the tax year

5    in which the diversion occurred." *D'Agostino*, *supra*, 145 F.3d at 72.  The court noted

6    that under this "no earnings and profits, no income" rule, to the extent a corporation's

7    distribution to a shareholder was not made out of earnings and profits, "I.R.C. § 301(c)(2)

8    treats the distribution as a return of capital to the shareholder that is applied against and

9    made in reduction of the adjusted basis of the shareholder's stock." *Id.*;[535] see also *United*

10   *States v. Bok*, 156 F.3d 157, 162 (2d Cir. 1998) (noting that the circuit has "long

11   recognized that under certain circumstances monies lawfully withdrawn from a corporation

12   by one of its shareholders may constitute a nontaxable return of capital").

13   358.  The court cannot apply *D'Agostino* because, in *Miller*, *supra*, 545 F.2d at 1214, the Ninth

14   Circuit explicitly rejected *DiZenzo*, upon which *D'Agostino* relies.  In *Miller*, the Ninth

15   Circuit concluded that were it to apply the "no earnings, no profits, no income" rule

16   outlined in *DiZenzo*, "an anomalous situation would result.  A taxpayer who diverted funds

17   from his close corporation when it . . . had no earnings and profits would be immune from

18   punishment (to the extent of his basis in the stock) for failure to report such sums as

19   income; while that very same taxpayer would be convicted if the corporation had

---

[534]See Def's. Brief at 5 (stating that under *D'Agostino*, "a diversion of corporate funds, even if carried out with criminal intent, cannot support a conviction as a matter of law if the corporation has no earnings or profits").

[535]In *D'Agostino*, the court noted that the "no earnings and profits, no income" rule had been adopted by the Tax Court in *Truesdell v. Commissioner*, 89 T.C. 1280, 1294-95, 1987 WL 258105 (1987).  It further noted that the IRS had changed its policy in a 1988 Action on Decision, stating that "[f]unds diverted to the shareholder of a wholly owned corporation should be regarded as constructive distributions. . . .  When such funds are received in a shareholder capacity, we will no longer argue that they are ordinary income regardless of earnings and profits." *D.Agostino*, *supra*, 145 F.3d at 69 (quoting Action on Decision, CC-1988-025, 1988 AOD LEXIS 22).

experienced a successful year and had earnings and profits." *Miller*, *supra*, 545 F.2d at 1214. Accordingly, the court concluded, "the constructive distribution rules should not automatically be applied" in criminal cases. *Id.* at 1215. In so holding, *Miller* rejected the *DiZenzo* court's conclusion that if a corporation has no earnings and profits, a shareholder's diversion of funds cannot constitute taxable income. See also *United States v. Davis*, 226 F.2d 331, 334 (6th Cir. 1955) (rejecting defendant's argument that "whether the cash . . . he took from his wholly owned corporation was a 'taxable gain' . . . depends upon whether the corporation had sufficient surplus to cover a dividend distribution," and stating that "it does not make any difference whether [defendant] received it as a legal distribution of cash as the result of a dividend, or whether he took it fraudulently. . . . It is the command over property and the enjoyment of its economic benefit which are recognized as a proper basis for taxation"); *United States v. Williams*, 875 F.2d 846, 851-52 (11th Cir. 1989) (holding that "the government need not characterize diverted income in criminal tax cases," and affirming the conviction of a defendant who "diverted funds from his wholly-owned corporation and failed to account for the diversion on his tax returns," despite the fact that the government did not characterize the income as constructive dividends or prove that the corporation had earnings and profits).

359. Frantz asserts that *Miller* is not controlling because, if *Miller* applies, "the Prosecution actually bears a lower burden of proof in a criminal case than it would in a civil tax collection case."[536] He argues that *D'Agostino* "is controlling here, particularly in light of the fact that Mr. Frantz was not responsible for accounting for the payments at issue in this case."[537] In *D'Agostino*, the Second Circuit noted that the rule articulated in *Miller* and *Williams* posed problems in the criminal context. It stated that the *Williams/Miller* approach "effectively eliminates proof of a tax deficiency as an element of a 26 U.S.C. § 7201 violation. Under the *Williams* rule, the government would only need to prove that

---

[536]Def's. Brief at 5, n. 4.

[537]*Id.*

116

1   the taxpayer willfully intended to exercise domain and control over the diverted funds and

2   took affirmative acts to evade paying taxes.  If Congress intended this showing to suffice

3   to establish a violation of § 7201, it would not have included a tax deficit as a requisite

4   element."  *D'Agostino*, *supra*, 145 F.3d at 73.

5   360.   Notwithstanding the *D'Agostino* court's conclusion, the Ninth Circuit has not overruled

6        *Miller*, and at least one panel has recently cited the case in an unpublished opinion.  See

7        *United States v. Wick*, 34 Fed. Appx. 273, 2002 WL 460393, * 2 (9th Cir. Feb. 11, 2002)

8        (Unpub. Disp.) (noting the *Miller* rule that "[w]here the taxpayer has sought to conceal

9        income by filing a false return, he has violated the tax evasion statutes.  It does not matter

10       that that amount could have somehow been made non-taxable if the taxpayer had proceeded

11       on a different course.  To apply the constructive distribution rules to this situation would

12       nullify all of the taxpayer's prior unlawful acts").  Unless and until *Miller* is overruled by

13       an en banc panel of the Ninth Circuit, it constitutes precedent that is binding on this court.

14       See *United States v. Parker*, 5 F.3d 1322, 1326 (9th Cir. 1993) ("This rule, established

15       by *Sherbondy*, remains controlling precedent until overruled by the Supreme Court, our

16       own court sitting en banc, or subsequent legislation").  As a result, the court cannot accept

17       Frantz's argument that it should apply *D'Agostino* in this case.  Rather, it applies the rule

18       that diverted funds can be treated as income without regard to the earnings and profits of

19       the corporation in question if they are under the taxpayer's control and/or he received

20       economic benefit from them.[538]

---

22   [538]Even if *D'Agostino* governed, its applicability is questionable.  In *Bok*, *supra*, the Second

23   Circuit rejected a defendant's claim that the trial court should have instructed the jury on a return

24   of capital theory.  *Bok*, *supra*, 156 F.3d at 163.  The court held that even though the theory was

     applicable to defendant, he had failed to establish that there was an adequate basis for the

25   proposed charge.  It stated: "Although our earlier cases have not stated it with perfect clarify, a

     defendant does always bear the burden of production – under which the defendant must make an

26   initial showing on each key element of the theory – to receive an instruction on the return of

     capital theory.  That is, *there must be some credible evidence that the corporation did not enjoy*

27   *income or profits for the tax year at issue*, and that the amount of the taxpayer's capital

28   contribution exceeded the amount of the distribution from the corporation."  *Id.* (emphasis added).

361.    *Miller* did not rule out the possibility that diverted funds could constitute a return of
capital, or in this case, a payment on the loans payable owed by the corporations. *Miller*,
*supra*, 545 F.2d at 1215 ("[i]n holding that the constructive distribution rules should not
automatically be applied, it is not herein asserted that diverted funds could never be a
return of capital"). Rather, the court stated that "there must be some demonstration on the
part of the taxpayer and/or the corporation that such distributions were intended to be such

The court concluded that defendant had failed to satisfy this burden because, *inter alia*, "neither Bok nor the government produced any admissible evidence to suggest that [the corporation] lacked earnings or profits for [the year in question]." *Id.* at 164.

Frantz appears to contend that under *D'Agostino*, the sole inquiry is whether the FS&G disbursements exceeded the amount of the loan payable to Braswell. (See Def's. Brief at 5 ("In *D'Agostino*, where the amount defendants diverted from the corporation did not exceed the amounts the corporation owed the defendants, the court looked to the economic reality of the transaction for purposes of determining a tax deficiency")). This approach ignores *D'Agostino's* "no earnings, no profits, no income" rule, however, and also ignores the *Bok* court's holding that the defendant bears the burden of producing evidence that the corporation lacked earnings and profits for the years in question. Here, neither party adduced evidence regarding the corporations' earnings and profits at trial, and both address the issue only in footnotes in their post-trial briefs. (Compare Gov't. Findings at AA:2 (noting that, "[i]n general, whenever the Braswell corporations accumulated money in excess of $100,000, the accounting department would send the money to defendant's FS&G Escrow account," and thus that "money paid out of the FS&G Escrow Account to Braswell came from the Braswell corporations' accumulated earnings which would support a dividend characterization for the payments to Braswell") with Def's. Reply at 9, n. 3 (stating that "the Prosecution asserts that since the companies sent extra cash to the FS&G account, that establishes that the companies had "accumulated earnings.". . . Having 'extra cash' in the companies' bank accounts does not establish that there are accumulated earnings, as that determination requires significant additional information. The Prosecution made no attempt at trial to establish that the companies that paid money to the FS&G account in fact had 'accumulated earnings.' Indeed the corporate tax returns in evidence show that there were not 'accumulated earnings' sufficient to cover the payments made").

Under *D'Agostino*, Frantz is charged with the responsibility of adducing evidence that the corporations lacked earnings and profits for the years in question. Frantz did not proffer such evidence at trial, and the court declines to rely on a footnote in his reply brief to conclude that he has met his burden in this regard. As a result, even were the court inclined to follow *D'Agostino*, there is insufficient evidence in the record to determine the corporations' earnings and profits for the years in question and thus to apply its rule. See *Bok*, *supra*, 156 F.3d at 164.

1    a return." *Id.*[539]    Whether a payment constitutes a return of capital is a question of fact.

2    See *Spangler v. Commissioner*, 323 F.2d 913, 917, n. 8 (9th Cir. 1963) ("Whether

3    payments to stockholders are dividends or distributions in liquidation is a question of

4    fact").    By analogy, whether disbursements from the FS&G Account were intended to

5    reduce the corporations' loans payable to Braswell is a question of fact.

6    362.    In concluding that a taxpayer is required to adduce some evidence that the corporations

7         and/or the taxpayer intended diverted funds to constitute a return of capital (or payment

8         of a loan payable), the *Miller* court applied the general rule, discussed above, that "[t]he

9         government establishes a prima facie case when it demonstrates that the taxpayer had

10        unexplained funds which could be considered as income which the taxpayer fails to report

11        in his return." *Id.* at 1215, n. 13.

12   363.   The question, therefore, is whether Frantz adduced evidence that at the time they were

13        made, disbursements from the FS&G account were intended to reduce the loans payable

14        the corporations owed Braswell.[540]

15   364.   A showing that the intent was contemporaneous with the disbursements is critical.   In

16        *Miller*, the court noted that "[a]t the time the funds are initially diverted, it might well be

17        argued that they could constitute either income or a return of capital.   However, once the

18        taxpayer has assumed control of the funds and then fails to report such funds as income or

19

---

20   [539]Compare *Bok*, *supra*, 156 F.3d at 162, n. 5 (noting that "in return of capital cases, a

21   taxpayer's intent is not determinative in defining the taxpayer's conduct," and stating "[i]n not

     finding intent to be determinative, this Circuit has also followed a different path from at least one

22   of our sister Circuits," citing *Miller*).

23   [540]Frantz asserts that disbursements from the FS&G Account did not constitute taxable

     income to Braswell "either because the payments (a) constituted non-taxable repayments of loans

24   from Braswell to his corporations, or (b) constituted non-taxable loans from the corporations to

     Braswell." (Def.'s Reply at 8.)   Although Frantz asserts these two characterizations are not

25   inconsistent, they are clearly distinct concepts.   As a result, the court will initially consider

     whether Frantz has adduced evidence that disbursements from the FS&G Account can be

26   characterized as a reduction of the loans payable to Braswell by the corporations.   It will then

     examine whether Frantz has adduced evidence that the FS&G Account was considered a loan

27   receivable account by either Braswell or the corporations.

28

119

to make any adjustments in the corporate books to reflect a return of capital, he has already violated the tax evasion statutes." *Miller*, *supra*, 545 F.2d at 1214, n. 12; see also *Wick*, *supra*, 2002 WL 460393 at *2 (relying on *Miller* to reject defendant's argument that "the improperly paid expenses can be redesignated a return of [shareholder] loan principal after the fact").

365.    Frantz adduced some evidence that Braswell and the corporations intended that disbursements from the FS&G Account would constitues payments on the loans payable owed Braswell.  In 1994, Frantz memorialized a conversation with Miller in which Miller told him that "some adjustments would . . . be made at year end to reflect compensation to [Braswell] out of [the FS&G] account."[541]  Adjustments made by Saito and Risoen in 1997[542] and 1998[543] also treated disbursements from the FS&G Account as payments on the loan payable owed Braswell.  Finally, both Saito and Risoen testified that although the necessary reconciliations and adjusting journal entries were not always made, one "proper" way to account for the FS&G disbursements would have been to reduce the loan payable to Braswell.[544]

366.    The court nonetheless concludes that the evidence does not show that Braswell and the corporations considered disbursements from the FS&G Account reductions of the loans payable to Braswell at the time they were made.  Rather, it shows that the corporations made accounting entries at the time of the Nutraceutical audit to treat the disbursements in this fashion.  There is no evidence that entries were made in 1994, 1995 or 1996, that treated disbursements from the FS&G Account as payments on the loans due Braswell.

---

[541]Ex. 636.

[542]Ex. 902 at 13;Ex. 903 at 33; Ex. 912 at 5-6.

[543]Ex. 912 at 10.

[544]RT at 863:19-864:3 (Saito: stating that one of the proper ways to account for disbursements from the FS&G account would have been to reduce the loan payable); RT at 656:24-657:15 (Risoen: same).

The fact that Saito and Risoen testified such treatment would have been proper, and that reconciliations were booked in later years, does not show that, *at the time the disbursements were made*, either the corporations or Braswell viewed the disbursements in this fashion.  See *Miller*, *supra*, 545 F.2d at 1215-16 (noting that "at trial, Miller presented no concrete proof that the amounts were considered, intended, or recorded on the corporate records as a return of capital at the time they were made"); *Wick*, *supra*, 2002 WL 460393 at * 2-3 (noting that it was "irrelevant whether these expenses *could have been* entered on [the corporation's] book[s] so that they would have had no present tax consequences to defendant," and citing *Miller* as support for the proposition that "improperly paid expenses can[not] be redesignated a return of loan principal after the fact").  Similarly, Frantz's 1994 file memorandum and the 1997-98 reconciliations do not show that the corporations intended to treat disbursements in those years as payments on the loan payable.  Frantz's statement that Miller said adjustments would be made to reflect disbursements from the FS&G Account was non-specific, and does not indicate that the adjustments were going to show the disbursements as reductions of the loans payable to Braswell.  More fundamentally, there are no adjustments that are contemporaneous with the disbursements.  Saito testified that prior to 1996, Miller did not instruct him to make any adjusting journal entries for disbursements from the FS&G Account.[545]  Had Miller or the corporations considered the disbursements payments on the loans payable to Braswell, Miller would have instructed Saito to reduce the loans payable by the amount of the disbursements prior to 1997.

367.    The 1997 adjustments, moreover, were after-the-fact, and do not evidence the contemporaneous understanding of either Braswell or the corporations.  See, e.g., *Noble*,

---

[545]RT at 855:7-16 ("Q: You started at Meepos in 1994?  A: Yes.  Q: And you started working with the Braswell companies – I wasn't sure whether it was late '94 or early '95.  A: I'm not sure either.  It was about that time.  Q: Okay.  When you first started there, did you do any work with respect to the check registers at that time?  A: No.  Q: Is it fair to say it wasn't until 1996 that you started – that Mr. Miller started giving them to you to make adjustments with?  A: It was about that time, I believe").

*supra*, 368 F.2d at 443-44 (noting that "at the time payments were made to the Nobles, they were not considered as payments on the loan.  It was not until March 31, 1964, four years after the Nobles received this money, that the books of the corporation were adjusted to reflected the fact that the $17,576.50 was considered as payment on the loan.  The resolution which formed the basis of this action was adopted in May 1962, at least two years after the reimbursement," and rejecting the taxpayers' argument that "these subsequent events . . . prevent this sum from being considered dividends and income" because "[t]he federal income tax program is based on a system of annual reporting. . . . If one year's income could be changed by events occurring in subsequent years, there would never be any finality in the system").

368.    Based on the evidence in the record, the court cannot conclude that either Braswell or the corporations intended, at the time disbursements from the FS&G Account were made, that they would reduce the loans payable to Braswell carried on the books of the Affiliated Corporations.  See *Miller*, *supra*, 545 F.2d at 1215 (noting that "there must be some demonstration on the part of the taxpayer and/or the corporation that such distributions were intended to be such a return").

## 2.    The FS&G Account Was Not A Loan Receivable Account

369.    Frantz contends alternatively that the FS&G Account was a loan receivable from shareholder account.[546]  Loans are not taxable income to a shareholder.  See *Commissioner v. Tufts*, 461 U.S. 300, 307 (1983) ("When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date.  Because of this obligation, the loan proceeds do not qualify as income to the taxpayer.  When he fulfills the obligation, the

---

[546]See Def's. Reply at 9 ("[T]he [FS&G] account was treated as a loan to shareholder account").  Although Hallett, Frantz's expert, testified that the individual disbursements from the FS&G Account could alternatively be considered loans to Braswell (RT at 1783:6-11 ("You could look at it [as] the amounts was transferred over there and it was being held on behalf of GB Data or GVI.  Then when it's disbursed out, it's loan funds.  There is an expectation of repayment")), in post-trial briefing Frantz consistently argues that the *account*, not the *disbursements*, constituted a loan.  (See Def's. Reply at 9.)

1   repayment of the loan likewise has no effect on his tax liability"). Whether a transaction

2   constitutes a loan is a question of fact. *Welch v. Commissioner*, 204 F.3d 1228, 1231 (9th

3   Cir. 2000) (concluding that "the tax court did not clearly err in determining that the

4   transaction between taxpayer and Zurn was not a loan"); *Clark v. Commissioner*, 266 F.2d

5   698, 710-11 (9th Cir. 1959) ("Whether a withdrawal is a loan is a factual question to be

6   determined upon consideration of all the circumstances present in a particular case").

7   370.   In evaluating whether a payment or an account constitutes a loan, the ultimate question is

8         whether, at the time the funds were advanced, the parties actually intended repayment.

9         *Welch*, *supra*, 204 F.3d at 1230; see also *Geftman v. Commissioner*, 154 F.3d 61, 68 (3d

10        Cir. 1998) ("For disbursements to constitute true loans there must have been, at the time

11        the funds were transferred, an unconditional obligation on the part of the transferee to

12        repay the money, and an unconditional intention on the part of the transferor to secure

13        repayment," citing *Haag v. Commissioner*, 88 T.C. 604, 615-16, 1987 WL 49288 (1987));

14        *Crowley v. Commissioner*, 962 F.2d 1077, 1079 (1st Cir. 1992) ("A shareholder

15        distribution is a loan, rather than a constructive dividend, if at the time of its disbursement

16        the parties intended that it be repaid"); *Clark*, *supra*, 266 F.2d at 711 (whether a

17        withdrawal is a loan "depends upon the existence of an intent at the time the withdrawal

18        is made that it should be paid back"); *Commissioner v. Valley Morris Plan*, 305 F.2d 610,

19        618 (9th Cir. 1962) ("In order to have a loan, there must be an agreement, either

20        expressed or implied, whereby one person advances money to the other and the other

21        agrees to repay it upon such terms as to time and rate of interest, or without interest, as

22        the parties may agree").

23  371.   To determine the parties' intent, courts consider a variety of objective factors.  *Geftman*,

24        *supra*, 154 F.3d at 68 (noting that "[i]n the absence of direct evidence of intent, the nature

25        of the transaction may be inferred from its objective characteristics"); *Crowley*, *supra*, 962

26        F.2d at 1079 (noting that "recourse to objective evidence is required to ferret out and

27        corroborate actual intent"); see also *Welch*, *supra*, 204 F.3d at 1230 ("The conventional

28        test is to ask whether, when the funds were advanced, the parties actually intended

123

repayment. . . .   However, courts have considered a number of other factors as relevant in assessing whether a transaction is a true loan"); 1 MERTENS LAW OF FEDERAL INCOME TAXATION, *supra*, § 5:17 ("Whether . . . an [unconditional] obligation [to repay the amount received] exists requires a factual determination which is often difficult to make. All secondary facts which are relevant to the determination of the primary question may be considered").

372.   The types of objective evidence considered in ascertaining the parties' intent include "(1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure repayment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan." *Welch*, *supra*, 204 F.3d at 1230; see also *Geftman*, *supra*, 154 F.3d at 68 (noting that the relevant objective characteristics include "the presence or absence of debt instruments, collateral, interest provisions, repayment schedules or deadlines, book entries recording loan balances or interest payments, actual repayments, and any other attributes indicative of an enforceable obligation to repay the sums advanced"); *Crowley*, *supra*, 962 F.2d at 1079 ("Courts typically determine whether the requisite intent to repay was present by examining available objective evidence of the parties' intentions, including the degree of corporate control enjoyed by the taxpayer; the corporate earnings and dividend history; the use of customary loan documentation, such as promissory notes, security agreements or mortgages; the creation of legal obligations attendant to customary lending transactions, such as payment of interest, repayment schedules and maturity dates; the manner of treatment accorded the disbursements, as reflected in corporate records and financial statements; the existence of restrictions on the amounts of the disbursements; the magnitude of the disbursements; the ability of the shareholder to repay; whether the corporation undertook to enforce repayment; the repayment history; and the taxpayer's disposition of the corporate funds disbursed"); 1

124

MERTENS LAW OF FEDERAL INCOME TAXATION, *supra*, § 5:17 (listing fourteen factors).

373. Courts have also held that when a transaction is between related parties, rather than at arms' length, it must be subjected to special scrutiny. *Geftman*, *supra*, 154 F.3d at 61; see also *In re Uneco, Inv.*, 532 F.2d 1204, 1207 (8th Cir. 1976) ("Advances between a parent corporation and a subsidiary or other affiliate are subject to particular scrutiny because the control element suggests the opportunity to contrive a fictional debt" (citations and internal quotation marks omitted)); *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968) ("In a corporation which has numerous shareholders with varying interests, the arm's-length relationship between the corporation and a shareholder who supplies funds to it inevitably results in a transaction whose form mirrors its substance. Where the corporation is closely held, however, and the same persons occupy both sides of the bargaining table, form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull. This is particularly so where a shareholder can have the funds he advances to a corporation treated as corporate obligations instead of contributions to capital without affecting his proportionate equity interest. Labels, which are perhaps the best expression of the subjective intention of parties to a transaction, thus lose their meaningfulness"); *Cerand & Company, Inc. v. Commissioner*, 76 T.C.M. (CCH) 933, 1998 WL 835518 (1998) (although "[t]he fact that the debtor and creditor are related parties does not preclude the existence of a bona fide debt, the transaction must be closely scrutinized because "the parties are free to mold the transaction"). A related party transaction "must be measured against 'an objective test of economic reality' and characterized as a bona fide loan only if its 'intrinsic economic nature' is that of a genuine indebtedness." *Geftman*, *supra*, 154 F.3d at 68 (citing *Fin Hay*, *supra*, 398 F.2d at 697).

374. Here, there is some evidence that the parties intended to treat the FS&G Account as a loan receivable account. Frantz testified, for example, that he was told at the beginning of his engagement that Braswell's corporations had typically maintained loan receivable

125

shareholder/officer accounts.[547]  GBDS' controller sent Frantz a memorandum in 1992, which suggested that he, Frantz, Miller, and Braswell had discussed reclassifying the FS&G Account as a "loan receivable – officer" officer account.[548]  As the corporate books for subsequent years reflect, however, no reclassification was effected until late 1997 and 1998.

375.  Saito testified that he understood the FS&G Account was used to pay Braswell's personal expenses;[549] additionally, in 1994, he booked Braswell's compensation from Life Force in a manner that was consistent with treatment of the FS&G Account as loan receivable from Braswell.[550]  Specifically, Saito reduced the amount of the FS&G Account, i.e., the "loan receivable" from Braswell, by the amount of salary Life Force owed Braswell for that year, and debited corporate salary expense.

376.  Other than the Life Force entry, and a similar entry on GVI's books in September 1993, however, there is no evidence that the corporations reduced the FS&G Account on a contemporaneous basis to reflect the payment of salary or other monies to Braswell.  See *Geftman*, *supra*, 154 F.3d at 69 (in assessing whether an advance is a loan, the "determinative fact is the intention *as it existed at the time of the transaction*," quoting *Saigh v. Commissioner*, 36 T.C. 395, 420, 1961 WL 1142 (1961) (emphasis added)).  The 1993 GVI and 1994 Life Force entries are isolated events; Braswell's other companies did not make similar journal entries in those or subsequent years to record salary to Braswell

---

[547]RT at 1356:1-25; Ex. 601.

[548]Ex. 726.

[549]RT at 868:23-25, 869:1-17 ("Q: Okay.  So when you prepared this sheet, you knew that all payments made out of the check register or out of the escrow account to Bank of Butterfield were payments made on Mr. Braswell's behalf?  A: Yes.  Q: Okay.  And I take it Mr. Miller told you that?  A: Yes. . . . Q: And it was your understanding that all payments out of the account that were paid to the IRS were payments made on behalf of Mr. Braswell, correct?  A: Yes.  Q: And again, that was based on what Mr. Miller told you?  A: Yes").

[550]See Ex. 906-A.

1    or to link that salary to the FS&G Account.

2    377.   Although the corporations did make journal entries in 1997 and 1998 that reclassified

3    monies in the FS&G Account as a loan receivable shareholder,[551] they also made entries

4    that treated disbursements from the account to pay Braswell's personal expenses as

5    reductions of the loans payable.[552]  This treatment presupposed that the money in the

6    account belonged to the corporations; it did not treat the account as if, in *toto*, it

7    constituted a loan to Braswell.  Thus, even in 1997, the corporations did not consistently

8    treat the account as a loan receivable.

9    378.   More fundamentally, the corporations' reclassification of the account as a loan receivable

10   in 1997 and 1998, and the 1998 journal entries they made to offset the loan against royalty

11   payments due Braswell, and write it off, were after-the-fact characterizations that do not

12   evidence contemporaneous intent.   See *Geftman*, *supra*, 154 F.3d at 69 (noting that

13   "[c]ourts have refused to credit statements of intent made after the time of the transfer,"

14   concluding that a memorandum that post-dated the transfers in question could not "be

15   construed as evidence of a contemporaneous, unconditional intent to create a bona fide

16   debt," and reviewing available objective evidence to determine intent); see also *Georgiou*

17   *v. Commissioner*, 70 T.C.M. (CCH) 1341 (1995) ("backdated documents . . . will be

18   given little weight in our determination because they were created after the years in issue

19   and substantially later than the actual advances"); *Saigh*, *supra*, 36 T.C. at 420 (the

20   parties' intention at the time of a transaction "cannot be vitiated by changed circumstances

21   or subsequent action bred in the cold light of tax consequences").  In *Georgiou*, the court

22   noted that the "repayments" the taxpayer cited as evidence that the parties intended a loan

23   were "primarily adjustments to journal entries. . . .  All of the 1990 repayments were

24   journal entries made in 1991 in an attempt to reduce the balance of the Loan to Shareholder

25   account."  *Georgiou*, *supra*, 70 T.C.M. (CCH) 1341.  Rejecting these entries as evidence

---

27   [551]Ex. 912 at 5, 10-11.

28   [552]*Id.* at 6; Ex. 49.

of an intent to repay, the court cited a prior court's finding that a "$17,540 debit from the cash journal to [a] 'Notes Receivable' account was simply a shift from one account to another," and its holding that ". . . treatment of . . . accounts on the books [of a corporation] is not sufficient to . . . indicate a plan or intention to repay." *Baird v. Commissioner*, 25 T.C. 387, 394 (1955); see also *Noble*, *supra*, 368 F.2d at 444 (noting that under the federal income tax system, "an individual's income tax return is supposed to reflect all income activity of the one reporting year. . . . [T]he present scheme of providing finality for each reporting period . . . would be violated were the taxpayers permitted to alter the effects of earlier income periods by their subsequent acts"); *Saigh*, *supra*, 36 T.C. at 420 (noting that actions subsequent to the date of transfer do not support a finding of intent to create a loan where "[t]he actions taken were tardy, and undertaken only after reflection and a shift in opinion").

379.   Nor do the objective factors identified in the cases cited above support a finding that the parties intended to treat the FS&G Account as a loan receivable shareholder account. As noted, these include whether the promise to repay is evidenced by a note or other instrument; whether interest was charged; whether a fixed schedule for repayments was established; whether collateral was given to secure repayment; whether repayments were made; whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and whether the parties conducted themselves as if the transaction were a loan. *Welch*, *supra*, 204 F.3d at 1230. Other factors may also be relevant, including the manner in which the account or payment is reflected on the corporation's books. "[T]he factors are non-exclusive and no single factor is dispositive." *Id.*

380.   First, the corporations carried the account on their books as an "investment account," in clear contrast to other loan receivable shareholder accounts they maintained.[553] While Frantz is correct that the label placed on an account is not determinative (see, e.g., *Baird*,

_____

[553]Ex. 69 at 3, 10, 14, 17, 20, 24, 35.

1    *supra*, 25 T.C. at 395 ("the treatment of petitioners' withdrawals on the corporate books

2    . . . is not controlling, since it is well settled that book entries may not be used to conceal

3    realities")), "the name by which parties choose to characterize an account is [nonetheless]

4    important." *Concord Village, Inc. v. Commissioner*, 65 T.C. 142, 158 (1975).  Here, the

5    characterization must be given some weight, given that the corporations continued to carry

6    the account on their books as "FSG – Investments," even after their controller suggested

7    in 1992 that it be reclassified as a loan receivable officer account.

8    381.  Second, Braswell never executed a note or other instrument evidencing a promise to repay

9    the sums deposited into the account.  See *Welch*, *supra*, 204 F.3d at 1230 ("In this case,

10   no promissory notes or other instruments were executed by the taxpayer to [the

11   corporation]"); *Geftman*, *supra*, 154 F.3d at 70 (noting that "the trusts did not obtain a

12   debt instrument or other written promise to repay"); *Georgiou*, *supra*, 70 T.C.M. (CCH)

13   1341 ("Noticeably absent are promissory notes.  A taxpayer's execution and delivery to

14   the corporation of promissory notes or other debt instruments in connection with, and in

15   close temporal proximity to, the corporate disbursements is evidence that they are loans").

16   *Haber v. Commissioner*, 52 T.C. 255, 266 (1969) ("No notes or other evidence of

17   indebtedness were given to Beacon Sales Co. by petitioner representing the amounts

18   remaining in the officers' loan accounts").

19   382.  Although Saito sent Frantz a schedule on June 26, 1997, which reflected that GBDS was

20   owed $166,000 in interest on the FS&G Account as of January 31, 1997,[554] there is no

21   evidence that Braswell ever paid the corporations interest, or that a schedule for the

22   payment of interest was established.[555]  See *Slater v. Commissioner*, 56 T.C.M. (CCH)

24   [554]Ex. 735.

25   [555]In addition to disputing whether Braswell was required to pay interest to the corporations

26   on the amounts transferred to the FS&G Account, the parties dispute the proper treatment of the

27   interest that accrued on the monies while they were in the account.  In its proposed findings, the

28   government asserts that "[i]f defendant believed . . . the funds that had been transferred to the

     FS&G Escrow Account constituted Braswell's money, he would have reported the interest earned

1135 (1989) (concluding that the evidence "overwhelmingly" established that no debtor-creditor relationship was created where, *inter alia*, "[t]here was no fixed date of repayment, no notes or other evidence of indebtedness, and no provision for interest").

383.   Third, as in *Georgiou* and *Baird*, despite the fact that the corporations deposited $12,650,000 into the FS&G Account between 1994 and 1997,[556] Braswell did not make any payments to the corporations.   No schedule for repayment, moreover, was established. See *Baird*, *supra*, 25 T.C. at 394 ("The fact that the individual debit balances were allowed to mount steadily each year without any substantial repayment thereon for more than 20 years until they reached a total net withdrawal balance of approximately $98,000 is inconsistent with an intent to borrow and repay"); *Georgiou*, *supra*, 70 T.C.M. (CCH) 1341 ("the repayments [were] insubstantial in relation to the advances.   Failure to repay an ever mounting loan balance points to constructive dividends"); see also *Geftman*, *supra*, 154 F.3d at 71 (noting that in *Gilbert v. Commissioner*, 74 T.C. 60, 65-66 (1980), the court "held that even complete repayment of the amount transferred was not indicative of a bona fide debt since the repayment occurred after a long period without repayments, and thus did not correspond to repayment terms or schedules established at the outset of the transaction," and holding that "[t]he pattern of repayments in this case similarly does not

_____

on Braswell's 1040's, rather than attributing the interest to the corporations. However, defendant never reported any interest from the FS&G Escrow Account on the 1040's." (Gov't. Proposed Findings at AA:5.4.) The government also notes that, "[a]fter the conclusion of the trial," it learned "through a telephone call to the Georgia State Bar . . . that any interest earned on accounts like the FSG Escrow Account is supposed to be paid to the Bar to fund various programs." (*Id.* at AA:5.4, n. 5.) Frantz responds that "[t]hat is exactly what happened here. Under the Georgia State Bar rules, the interest is paid directly from the bank that holds the account to the Bar. Thus, the check registers that have been admitted into evidence do not reflect any increase in account balance based on interest payments, whereas the bank statements do reflect interest." (Def's. Reply at 14 (citing Exs. 944, 11.)) Because the government's inquiry to the Georgia State Bar occurred after the conclusion of trial, and because no evidence was introduced regarding the subject, the court declines to consider the matter in determining whether the parties intended that the FS&G Account be considered a loan receivable shareholder account.

[556]Stipulated Facts, Ex. 409.

1    reveal any established repayment terms or schedules, as the estate made the repayments

2    only on four occasions from May through August 1984, making no other repayments

3    during the period in which it received transfers from the trusts").

4    384.    In sum, neither the parties' contemporaneous treatment of the account nor a majority of

5    the objective factors identified in *Welch* supports a finding that Braswell and the

6    corporations intended to treat the FS&G Account as a loan receivable shareholder account.

7    Frantz's expert, Hallett, conceded that much of the objective evidence did not support

8    characterization of the account as a loan receivable.  He admitted that the account was not

9    carried on the corporate books as a loan receivable shareholder account;[557] that there were

10    no loan documents covering deposits to the FS&G Account;[558] that no documents formally

11    stated the deposits were a loan;[559] that there was no evidence Braswell paid interest on the

12    monies;[560] and that there were no corporate resolutions authorizing loans to Braswell either

13    via deposits to the FS&G account or when disbursements from that account were made.[561]

14    385.    Hallett nonetheless opined, and Frantz asserts, that the FS&G Account was a loan to

15    shareholder account.  Specifically, Frantz contends that although the corporations booked

16    deposits to the account as an investment, they did not reduce the investment when monies

17    from the account were disbursed for Braswell's benefit.[562]  As the government concedes,

---

19    [557]RT at 1797:14-18.

20    [558]*Id.* at 1797:25, 1798:1-2.

21    [559]*Id.* at 1798:13-14.

23    [560]*Id.* at 1798:18-22 ("Q: And when you reviewed the evidence in this case, you didn't
come across any payments of interest by Mr. Braswell on any loans, either as a result of transfers
24    to the FS&G account or as the result of payments to Mr. Braswell out of the FS&G account?  A:
I didn't see evidence of interest paid").

26    [561]*Id.* at 1798:23-25, 1799:1-2.

27    [562]*Id.* at 1726:11-16 ("I see when the disbursements are made out of the account, for
example, 6 million something in 1994 and 1,400,000 something in 1995 that the account on the
28    corporate side is not diminished.  Now, that is consistent with what you would see in a loan

the fact that disbursements from the account for Braswell's benefit were not routinely booked supports a finding that the account was a loan because it reflects a belief that the entire amount in the FS&G Account was Braswell's money and the corporation did not control disbursement of the funds.[563] Frantz's argument, however, is undercut by the fact that the corporations did reduce the FS&G Investment account by $2.9 million in September 1997, to reflect disbursements out of the account for Braswell's benefit. They did this, moreover, at the same time that they reclassified the account – inconsistently – as a loan receivable account.[564]

386. Hallett also testified that the loan payable to Braswell was the corporations' collateral or security for Braswell's obligation to repay monies in the FS&G Account: "I see this officer loan payable, this salary, is sitting there. It's substantial security for the loan receivable to the corporation. You don't have to worry about Mr. Braswell taking the money and running. At least you have there he's owed this salary. He hasn't been paid that salary. It's substantial security."[565]

387. Hallett focused primarily, however, on the fact that the FS&G Account was eventually

_____

account").

[563]See Gov't. Reply at 6 (noting that "if the corporations *had* regarded the investment account as a loan receivable account – i.e. monies that had been loaned to Braswell and that he was required to pay back – no reconciliation would have been necessary, because the actual disbursements from the FSG Escrow Account (i.e. how Braswell had decided to use the loan proceeds) would have been irrelevant"); see also RT at 1726:17-25, 1727:1-5 (Hallett: "In other words, if I loan you $100,000 and I have books, I would set up an asset due for Mr. Pollack $100,000. Now, you put it in an account, you maintain a record of what you spend and you spend $25,000 of it. Say you have an escrow account that you keep track of how you spend it and you spend $25,000 of it. Well, you reduce your balance down to 75, but that doesn't affect my account. I loaned you the money. It's your money to do what you want with, but when you spend it you still owe me $100,000. So I see that the evidence indicates that that is what occurred here. We had the expenditures out of the FS&G account, but those expenditures out of the account did not diminish the account").

[564]See Ex. 49, Ex. 912 at 6.

[565]See RT at 1728:10-15.

132

reclassified and written off in 1997 and 1998.[566]  He conceded that, other than the $1.1 million Life Force adjustment in 1994, and the similar GVI adjustment in 1993, there was no reclassification prior to 1997.[567]  He opined, however, "there [was] nothing . . . wrong about having a payable to a shareholder and a receivable in a shareholder . . . [with] the two going forward in [separate] accounts . . . and at some point in time, two years later, three years later, five years later, they are offset."[568]  This statement presupposes that the FS&G Account is properly characterized as a loan receivable account, however.  It does not take into account the fact that there is no contemporaneous evidence that the parties intended to treat the account as such at the time deposits were made.  It also overlooks the fact that post hoc reclassifications do not provide evidence of such an intent.  See *Noble*, *supra*, 368 F.2d at 443-44.

388.  Because there is no contemporaneous evidence that the parties intended that deposits to the FS&G Account would constitute a loan to Braswell, and because the objective evidence does not support characterizing the FS&G Account as a loan receivable shareholder account, Frantz has failed to overcome the inference that flows from the government's prima facie case – i.e., that disbursements from the FS&G Account constituted income he failed to report.  See *Davis*, *supra*, 226 F.2d at 335-36 ("As for the claim that the trial court erred in placing upon appellant the burden of explaining that the gross receipts of his corporation did not constitute taxable income of appellant, the court did not thrust such a burden upon him.  While, of course, the burden of proof does not shift in a criminal case, it is the rule that when the government establishes a prima facie case, it is then for the

---

[566]*Id*. at 1731-1738.

[567]*Id*. at 1788:3-15 ("Q: [H]ave you seen any adjustments that you have described on the books and records of any of these companies prior to the Esch tax team coming in and doing their cleanup [in 1997]?  A: I see adjustments each year that accrues the salary as a payable.  I see that. Now, a journal entry offsetting that against the receivable I don't see occurring until after the team comes in, as I understand it").

[568]*Id*. at 1788:22-25, 1789:1-9.

1  defendant to overcome the inferences reasonably to be drawn from the proven facts").

2  389.   Any conclusions of law that are deemed to be findings of fact are incorporated herein as

3  such.

### III.  CONCLUSIONS OF LAW

#### A.   Counts Two Through Five (26 U.S.C. § 7201)

1.   In order to obtain a conviction under 26 U.S.C. § 7201 for tax evasion, the government must prove beyond a reasonable doubt (1) the existence of a tax deficiency; (2) willfulness; and (3) an affirmative act constituting an evasion or attempted evasion of tax. *United States v. Conforte*, 624 F.2d 869, 873 (9th Cir. 1980)*; see also Sansone v. United States*, 380 U.S. 343, 351 (1965) ("the elements of § 7201 are [willfullness]; the existence of a tax deficiency . . . and an affirmative act constituting an evasion or attempted evasion of the tax"); *United States v. Hamilton*, 620 F.2d 712, 714 (9th Cir. 1980) ("In framing the law on the subject, the Supreme Court has said that the government, to sustain a conviction, must prove the three elements of the offense: (1) the existence of a tax deficiency, (2) willfulness in evading taxes, and (3) an affirmative act constituting an evasion or attempted evasion of the income tax").  The government established that Frantz prepared and signed Braswell's tax returns.  The Ninth Circuit has held that "the requisite affirmative act[ under § 7201 is] established by the filing of the false tax returns." *United States v. Marabelles*, 724 F.2d 1374, 1380 (9th Cir. 1984) (citing *Sansone, supra*, 380 U.S. at 352 ("the petitioner's filing of a false tax return constituted a sufficient affirmative commission to satisfy that requirement of § 7201")).  The court thus considers whether there is proof beyond a reasonable doubt of a tax deficiency in each of the years charged, and of willfulness.

#### 1.   The Government Has Failed To Prove The Existence Of A Tax Deficiency For Years 1995, 1996, And 1997

2.   To prove a tax deficiency under § 7201, the government must show that "the taxpayer had unreported income, and second, that the income was taxable." *United States v. Chesson*,

933 F.2d 298, 306 (5th Cir. 1991) (citing *United States v. Fogg*, 652 F.2d 551, 555 (5th Cir. 1981)).  There is no deficiency "in the absence of a showing that the government is actually due a tax in excess of that reported." *United States v. Bishop*, 264 F.3d 535, 550 (5th Cir. 2001).  Stated differently, the government must prove beyond a reasonable doubt that "full and proper returns would have resulted in larger tax obligations than those shown in the returns actually filed." *Jones v. United States*, 282 F.2d 745, 747 (4th Cir. 1960).

3.    The government is not required to prove that a § 7201 deficiency is substantial. *United States v. Marashi*, 913 F.2d 724, 735 (9th Cir. 1990) ("The language of § 7201 does not contain a substantiality requirement.  It simply states that willful attempts to evade 'any tax' under the Tax Code is a felony.  Likewise, § 7201's predecessor, 26 U.S.C. § 145(b) (1939), imposed no minimum amount").

4.    Nor is the government required to prove the exact amount of the deficiency.  See *United States v. Johnson*, 319 U.S. 503, 517-18 (1943) ("Of course the government did not have to prove the exact amounts of unreported income by Johnson.  To require more or more meticulous proof than this record discloses that there were unreported profits from an elaborately concealed illegal business, would be tantamount to holding that skilful concealment is an invincible barrier to proof").

5.    The government contends it has proven that "Braswell owed more federal income tax for 1994, 1995, 1996 and 1997 than was declared due on Braswell's 1040's for those years."[569]  Specifically, it asserts that "[t]he funds that GBDS paid to Deleon constituted income to Braswell," and that "[t]he funds that defendant disbursed from the FS&G Escrow Account for Braswell's personal benefit were not loans to Braswell and constituted income to Braswell."[570]

6.    The government did not prove beyond a reasonable doubt that the funds paid to Deleon

---

[569]Gov't. Proposed Findings at 90.

[570]*Id.*

135

constituted income to Braswell.[571]  The government did prove beyond a reasonable doubt, however, that funds disbursed from the FS&G Account constituted income to Braswell.[572]  Accordingly, the court must examine whether, given the income reported on Braswell's tax returns for 1994 through 1997, the government has proved beyond a reasonable doubt that "full and proper returns would have resulted in larger tax obligations than those shown in the returns actually filed."  *Jones*, *supra*, 282 F.2d at 747.

7.    Frantz contends that even if the FS&G disbursements constituted income to Braswell, the government failed to prove the existence of a tax deficiency beyond a reasonable doubt. Specifically, he asserts that the government "offered no evidence that Braswell received any significant income except for (1) payments from the FS&G escrow account . . . and (2) interest payments that were disclosed by Frantz on Braswell's tax returns."[573]  Frantz contends that "[t]he payments received from these two sources were less than the income that Braswell reported on his tax returns."[574]

8.    The parties agree that during 1994, $6,195,000 was disbursed from the FS&G Account for Braswell's benefit.[575]  That same year, Braswell reported $3,100,000 in income from consulting and $87,177 in interest income.[576]

9.    The parties further agree that during 1995, $1,443,343 was disbursed from the FS&G Account for Braswell's benefit,[577] while Braswell reported $4,000,000 in income from

---

[571]See findings 338-355, *supra*.

[572]See findings 356-388, *supra*.

[573]Def's. Proposed Findings at 5.

[574]*Id.*

[575]Stipulated Facts, Ex. 409.

[576]Ex. 13.

[577]Stipulated Facts, Ex. 409.

1    consulting and $402,132 in interest income.[578]

2    10.    During 1996, $2,160,000 was disbursed from the FS&G Account for Braswell's benefit,[579]

3    and Braswell reported $4,000,000 in income from consulting and $758,041 in interest

4    income.[580]

5    11.    In 1997, $2,325,000 was disbursed from the FS&G Account.[581]    That same year, Braswell

6    reported $2,250,222 in income from consulting,$1,660,402 in interest income, and

7    $12,031,312 in royalty income.[582]

8    12.    It is undisputed that the compensation Braswell earned from the Affiliated Corporations

9    was accrued on the corporations' books as a loan payable.[583]    The government asserts that

10    because this compensation was reported by Braswell on his tax returns, the court must find

11    that Braswell received the compensation.    It argues that because Braswell elected to report

12    the accrued compensation for the years in question, he cannot change that election now.[584]

13    13.    The court agrees that Braswell cannot change his election to report the accrued

14    compensation on his tax returns.    The Supreme Court has repeatedly observed "that, while

15    a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so,

16    he must accept the tax consequences of his choice, whether contemplated or not . . . and

17    may not enjoy the benefit of some other route he might have chosen to follow but did not."

18    
---

19    [578]Ex. 14.

20    [579]Stipulated Facts, Ex. 409.

21
22    [580]Ex. 15.

23    [581]Stipulated Facts, Ex. 409.

24    [582]Ex. 17.

25    [583]RT at 1356:1-25; 1257:1-25.

26    [584]Gov't. Mem. at 16 ("[a]t trial . . . defendant admitted that Braswell had made a business
27    decision to report the income on his personal returns, so that the corporations could claim the
       compensation as business expenses or deductions . . . . In such circumstances, the treatment of
28    the income on [Braswell's] returns cannot, at this late date, be changed").

137

1    *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 139 (1974)

2    (citations omitted).

3    14.    The fact that Braswell *reported* the income, and that he cannot change that fact now, does

4    not, however, give rise to an irrebuttable presumption that he *received* the income in the

5    relevant years.   The use of irrebuttable presumptions in the criminal context effects an

6    unconstitutional shifting of the burden of persuasion. See, e.g., *Francis v. Franklin*, 471

7    U.S. 307, 317 (1985) ("A mandatory presumption instructs the jury that it must infer the

8    presumed fact if the State proves certain predicate facts. . . .   Mandatory presumptions

9    must be measured against the standards of [*In re*] *Winship*], 397 U.S. 358 (1970),] as

10    elucidated in *Sandstrom* [*v. Montana*, 442 U.S. 510 (1979)].   Such presumptions violate

11    the Due Process Clause if they relieve the State of the burden of persuasion on an element

12    of an offense").   Were the court to find that Braswell's reporting of the accrued

13    compensation irrefutably established that he received that compensation, it would relieve

14    the government of its obligation to prove the tax deficiency element of a § 7201 violation.

15    15.    Such a conclusion would also be contrary to the evidence adduced at trial.   Frantz testified

16    that he did not believe Braswell received the income booked as a loan by the companies.

17    Rather, Frantz reported the income on Braswell's tax returns because he believed  "that

18    [Braswell] had to report those accruals in order for the company to take the deduction" for

19    the accrued compensation.[585]   Saito also testified that the income reported by Braswell

20    "wasn't actually paid to him," but was "accrued on the books of the company as a loan

21

22

23    [585]RT at 1691:25, 1692:1-20 ("Q: At the time that you were preparing the 1994, 1995, and

24    1996 1040's for Mr. Braswell, did you think that the income that was being reported on those

returns that you were preparing from GB Data Systems had been received, in fact, by Mr.

25    Braswell? A: No.  Q: Why did you report that income on the returns if you thought that he had

not received it?  A: We did some research in 1992, John Grattan in my office, and I may have

26    misinterpreted his research, but he said that GB Data could not deduct those accruals until Mr.

Braswell was paid.  And he may have said, 'or until he included [it in] income.'  I can't remember

27    exactly, but out of that research – our conclusion, we reported those accruals upon the belief that

28    he had to report those accruals in order for the company to take the deduction").

payable."[586]  The government's expert, Sterling, conceded that Braswell did not receive the income he reported, and that the corporations "book[ed] it as a loan payable . . . meaning that they have not paid him the money. . . . [T]hey actually owe it to him."[587]

16.   Because the evidence at trial established that the compensation the corporations recorded as a loan payable was not paid to Braswell when it was booked, the court cannot take that compensation into account in determining whether a tax deficiency exists.[588]  See *Morrison v. United States*, 270 F.2d 1, 4 (4th Cir.) (holding, in a case where the government

---

[586]RT at 863:2-6.

[587]RT at 1176:21-23.

[588]Under the "constructive receipt" doctrine, "a taxpayer recognizes income when the taxpayer has an unqualified, vested right to receive immediate payment."  *Martin v. Commissioner*, 96 T.C. 814, 823 (1991).  For the doctrine to apply, "there must be an amount that is immediately due and owing . . . credited to the taxpayer or set aside for the taxpayer so that the taxpayer has an unrestricted right to receive it immediately, and the taxpayer being aware of these facts, declines to accept the payment."  *Childs v. Commissioner*, 103 T.C. 634, 654 (1994); see also 2 MERTENS LAW OF FEDERAL INCOME TAXATION, *supra*, § 10:01 ("The doctrine of constructive receipt requires that a taxpayer be treated as having received an amount when it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time").  The doctrine is applicable to salary.  *Id.*, § 10:21 ("The principles generally applicable to the application of the constructive receipt doctrine apply in the case of salary and other compensation.  Compensation credited to employees may be taxable in the year credited even though not withdrawn where there are no limitations or restrictions on the employee's power to withdraw").

Whether the constructive receipt doctrine is applicable presents a question of fact.  *Avery v. Commissioner*, 292 U.S. 210, 215 (1934).  The government did not argue that the loans payable booked by the corporations were taxable to Braswell under the constructive receipt doctrine.  Nor did it adduce evidence to this effect.  Accordingly, the court declines to consider whether the doctrine applies.  See *Bowden v. Commissioner*, T.C. Memo. 1996-318 (1996) (rejecting the argument that loans payable constituted a constructive receipt of funds where "[f]rom the record, the nature of these bookkeeping entries is not apparent, and it is not evident that petitioners had an unrestricted right to withdraw money or that it was available to be withdrawn"); see also *Stein v. Commissioner*, 65 T.C. 336, 341 (1976) (rejecting petitioner's argument that "the mere setting up of the loans payable account resulted in the realization of income by the petitioner . . . under the doctrine of constructive receipt," because he presented "[n]o evidence . . . with respect to any agreement, understanding, or resolution which spelled out either the purpose of the loans payable account or the right of the petitioner to withdraw such funds").

computed a tax deficiency using the cash method of reporting income, as this was the method the taxpayer had used, that the "computation would not be admissible if inquiry here was directed simply to the tax obligations of the taxpayer," since the income should have been reported on an accrual basis, but concluding that it was proper to admit the evidence to prove willfulness), cert. denied, 261 U.S. 894 (1959); see also *Miller*, *supra*, 545 F.2d at 1210 (noting that the district court, although finding "evidence that Covina's tax return for the 1969 fiscal year was fraudulent," concluded that "there was insufficient evidence to prove beyond a reasonable doubt that there would have been any tax due for that year (even if the $562,000.00 was added to Covina's income), due to the fact that the $500,000.00 sale [reported on the tax return] was never shown to have occurred during the year"); *United States v. Wilkins*, 385 F.2d 465, 469 (4th Cir. 1967) (citing *Morrison* and rejecting the government's argument that "that the gravamen of an indictment for violation of section 7201 is an attempt to evade or defeat tax obligations and that it is necessary to follow the taxpayer's method [of reporting taxes] in order to demonstrate what he was attempting to do"); *Koontz v. United States*, 277 F.2d 53, 55 (5th Cir. 1960) (holding, in a case where the district court rejected the defendant's argument that he was entitled to show there was no deficiency because he had taken a capital loss for an item that was actually an ordinary loss and this mistake offset his claim of exemption for his deceased wife, that "the law is as contended for by [defendant] below and here, and the district judge erred in holding that the tendered defense was not available in the criminal case because it had not been asserted as a claim through an amendment of the return and a claim on the civil side").

17.   When the accrued compensation is not considered, Braswell reported and paid tax on compensation that exceeded the amount of disbursements received from the FS&G Account in each of years 1995, 1996, and 1997.[589]   Accordingly, the government failed to prove

---

[589]See conclusions 8-11, *supra*.  The court notes that the FS&G disbursements received by Braswell in 1997 exceeded the compensation that was booked as a loan payable by $74,778.  (See conclusion 11, *supra*.)  That same year, however, Braswell paid taxes on more than $12 million

beyond a reasonable doubt that a tax deficiency existed for those years.  See *United States v. Ballard*, 535 F.2d 400, 405 (5th Cir. 1976) (noting, in a tax evasion prosecution, that "[t]he Government's burden . . . is [to] show [the] taxpayer's receipt of taxable income").

### 2.  The Government Has Proved The Existence Of A Tax Deficiency For 1994

18.   The government did meet its burden of proving a deficiency with respect to the 1994 tax year, however.   In 1994, although Braswell reported $3,100,000 in income from consulting and $87,177 in interest income, he received $6,195,000 in disbursements from the FS&G Account.[590]  Based on these figures, the government proved that "the taxpayer had unreported income . . . that . . .was taxable" (*Chesson, supra*, 933 F.2d at 306), and that it was "actually due a tax in excess of that reported" (*Bishop, supra*, 264 F.3d at 550).

---

in royalty income.  (See Ex. 17.)  The evidence demonstrated that the royalty "income" on which Braswell paid taxes resulted from a series of adjusting journal entries made by Saito and Risoen. (See findings 261-64, *supra*; Ex. 812.)  The government did not introduce evidence establishing that Braswell actually received $12,031,312 in royalty payments in 1997, despite the fact that he paid tax on that amount, as well as on  $2,250,222 in consulting income, and  $1,660,402 in interest income.   Accordingly, the court concludes that the government failed to prove a tax deficiency for 1997 beyond a reasonable doubt.

[590]See Stipulated Facts, Ex. 409.  Frantz asserts that no deficiency exists for 1994 because "Braswell's companies' books and records reflect that the corporations already owed Braswell approximately $2.4 million at the end of 1993 (i.e., Braswell was entitled to receive this money without paying additional taxes on it). . . .  In addition, the FS&G account already had a balance of approximately $1.5 million at the end of 1993. . . .  Thus, Braswell reported $3.2 million in income in 1994 and was owed $3.9 million at the end of 1993 (the loan due him from the companies plus the money already in the FS&G account), but only received $6.2 million in 1994 – meaning that his 1994 tax return actually reported approximately $900,000 more in income than Braswell received."  (Def.'s Reply at 7, n. 2 (noting that "[t]he analysis is somewhat complex for 1994").   The court does not find this analysis persuasive.   The argument that Braswell was entitled to offset the $2.4 million in accrued compensation he was owed at year-end 1993 against his withdrawals from the FS&G Account in 1994 presumes that the corporations and Braswell intended that disbursements from the FS&G Account would constitute payments of the loans payable booked by the corporations.   As the court earlier found, however, there is insufficient evidence that the corporations and Braswell had such an intent at the time the disbursements were made.   Accordingly, the premise of Frantz's argument fails.

141

### 3.     The Government Has Not Proved That Frantz Willfully Attempted To Evade The Payment Of Tax In 1994

19.    As noted, one element the government must prove beyond a reasonable doubt to obtain a conviction under 26 U.S.C. § 7201 is that defendant's attempt to evade the payment of tax was willful.  *United States v. Bishop*, 291 F.3d 1100, 1106 (2002) ("Proof of willfulness is essential to support a conviction under 26 U.S.C. § 7201").  In criminal tax cases, willfulness "requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."  *Cheek v. United States*, 498 U.S. 192, 201 (1991).

20.    To carry this burden, the government must "negat[e] a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws."  *Id.* at 202.  "The premise of *Cheek* is that a person cannot be convicted of willful failure to file a tax return if he subjectively believes in good faith that the tax laws do not apply to him."  *United States v. Powell*, 955 F.2d 1206, 1211 (9th Cir. 1992).  Frantz asserts he had a good faith belief that the FS&G Account was a loan receivable account, and/or that disbursements from that account were payments on the loans payable that reflected salary the corporations owed Braswell.  As a consequence, he contends, he did not believe that Braswell was required to pay tax on disbursements from the account.

21.    Evidence of willfulness "is usually circumstantial as direct proof is rarely available."  *Bishop, supra*, 264 F.3d at 550.  In *Spies v. United States*, 317 U.S. 492 (1943), the Supreme Court found that "affirmative willful attempt[s] may be inferred from conduct such as keeping a double set of books, making false entries o[r] alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."  *Id.* at 499; see also *United States v. Frederickson*, 846 F.2d 517, 520-21 (8th Cir. 1988) (holding that there was sufficient evidence of willfulness where the

142

defendant repeatedly lied to IRS investigators during an audit).

22.     The government did not adduce evidence that Frantz engaged in the type of behavior described in *Spies* with respect to the FS&G Account.  Specifically, the government did not prove that Frantz kept a double set of books for the account; that he made false entries or alterations in the check register for the account; or that he destroyed records regarding the account.  Rather, the evidence showed that Frantz sent Miller check registers for the FS&G Account so that Miller could review the registers for corporate activity,[591] and gave the check registers to IRS auditors when they requested information regarding the FS&G Account.[592]

23.     There is substantial evidence, moreover, that Frantz believed in 1994 that the account was a loan receivable account.  Frantz testified that when he was first retained by Braswell, he learned that Braswell's Atlanta corporations made disbursements to Braswell or for his benefit during the year, and reflected those disbursements on their books as a shareholder or officer loan.  At year-end, the loan account was reviewed, and some portion of it was reclassified as income to Braswell, with a corresponding reduction in the balance of the loan account.[593]  In 1992, Frantz met with Braswell, Miller and GBDS' controller, Davis,

---

[591]RT at 1345:13-22; Exs. 627, 636, 647.

[592]See RT at 554:17-20, 578:10-13.  In August 1997, Frantz wrote Miller regarding an IDR issued by the IRS auditors.  He stated, *inter alia*, that he "hope[d] that the agent [was] not asking to see . . . records [of the FS&G Account]," and that he did not "plan to release [his] firm's escrow account."  (Ex. 691.)  At trial, Frantz explained that he made this statement because, in his view, the account pertained to an individual, and the IRS was, at that time, only auditing the corporations.  He said: "Subsequently [the agent] expanded her audit to the individual, and I turned over the escrow account.  I turned over the check register of this account to her."  (RT at 1385:3-7.)  Although Frantz testified that the IRS expanded the audit to cover Braswell's personal returns *after* he sent this letter, Marianna Kaplan testified that the audit was expanded *in* August 1997.  Because the exact date on which the IRS decided to audit Braswell's personal returns is not of record, and because the court cannot ascertain when Frantz learned of the decision, it concludes that Frantz's testimony respecting this issue is credible.  This  conclusion is also supported by the fact that Frantz subsequently provided the check registers to the auditors.

[593]RT at 1356:1-1357:2; *id.* at 1373:5-18; Ex. 601.

and discussed the fact that certain "investment accounts" being carried on the corporations'
books should be reclassified as "loan receivable – officer" accounts.  One of these was the
"Retainer – Frantz, Sanders & Grattan" account.[594]  Frantz testified that initially Davis
offset Braswell's compensation against this account, but that "rapidly" it became the
practice to accrue the compensation he was owed in shareholder payable accounts.[595]
Indeed, in 1993, Frantz had a meeting with Davis in which Davis stated that Braswell's
compensation for that year would be reflected on GBDS' books by a debit to officer
compensation and a credit to the loan payable account.[596] Because Frantz knew that
Braswell was "reporting large sums of money on his tax return based upon [these]
shareholder payable accounts, . . . [his] mindset . . . was that . . . tax had previously been
paid on [the money that came into the FS&G Account] by virtue of those accruals that
were put on his return as income."[597]  He said his view in this regard was strengthened by
Davis' decision to treat the "investment accounts" as loan receivable accounts.[598]

24.    It is clear that subsequently, Frantz learned that the corporations had not reclassified the
investment accounts as loan receivable accounts, and also that they were not deducting
amounts paid out of the FS&G Account from the loan payables reflecting Braswell's
accrued salary on an annual basis.[599]  The evidence does not establish beyond a reasonable

---

[594]Ex. 726; see also Ex. 725.

[595]RT at 1357:3-9; see also Ex. 617.

[596]Ex. 617.

[597]RT at 1357:10-17.

[598]*Id.* at 1357:22-1358:12.

[599]Frantz admitted that he reviewed GBDS' corporate tax returns each year before they
were filed, that the returns did not link Braswell's compensation in any way to the FS&G
Account, and that they did not reflect a loan payable to shareholder or a loan receivable from
shareholder account.  (See, e.g., RT at 1564:11-18 ("Q: Now, at line item 7, loan to
stockholders, that's blank, isn't it? A: That's correct. Q: Which means on the loan to stockholder
line on the balance sheet and assets, GVI was not showing on the face of the return that Mr.

doubt, however, that Frantz knew of these practices in 1994. Rather, the record reflects that in September 1993, GVI booked an adjusting journal entry in which $1 million of Braswell's compensation was used to reduce the FS&G account,[600] and that in December 1994, Life Force made a similar adjusting journal entry that reduced the FS&G investment account by $1.1 million, reflecting Braswell's compensation from that corporation for the year.[601] Although Braswell's compensation from GBDS was not booked in the same way, Frantz could reasonably have concluded, based on the Life Force entry, that the corporations intended to operate as he and Davis had discussed, i.e., that they intended to treat the FS&G Account as a loan receivable account. Certainly, the court cannot find beyond a reasonable doubt that Frantz knew in 1994 this was not the case.

25.    The government argues that Frantz's testimony regarding his beliefs is not credible because he testified both that he thought the FS&G Account was a loan receivable account, and that monies transferred to the account were payments by the corporations of sums owed as accrued salary. The government contends that these two "beliefs" are contradictory, noting the testimony of Frantz's expert, Hallett, that if the monies were a loan, they would

_____

Braswell [owed] the corporation any money, was [it]? A: Correct")). In 1997 and 1998, both before and after the IRS audit began, Frantz sent Miller letters in which he complained about the characterization of the FS&G Account on the corporations' books as an "investment" account. (See Exs. 683, 691.) In March 1997, Frantz noted that "[a]s far as [he] was concerned, [the investment account] description was a fiction." (Ex. 683.) In August, he noted that he had "for some time . . . suggested that [characterizing the account as an investment account] was a misclassification on the balance sheet." (Ex. 691.) This correspondence demonstrates that Frantz learned at some point that the FS&G Account was not being handled on the corporate books in the manner he and Davis had discussed in 1992. Frantz's review of the tax returns also revealed that they did not reflect loans payable to Braswell or the existence of a loan receivable account. The cumulation of this information as the years progressed might warrant a finding that Frantz knew in later years that the FS&G Account was not being treated as a loan receivable account and that payments from the account for Braswell's benefit were not being used to reduce the loans payable. Such a conclusion cannot be drawn, however, with respect to tax year 1994, where the corporations made some accounting entries that were consistent with such treatment.

[600]Ex. 49 at 4.

[601]Ex. 906-A (Life Force Adjusting Journal Entries).

not constitute income and no tax would have to be paid on them.[602]  Frantz responds that it was entirely reasonable for him to believe both of these things – i.e., that disbursements from the FS&G Account constituted repayments of the loans payable booked by the corporations and that, "to the extent . . . the corporations' loans to Braswell were ever fully repaid, additional payments for Braswell's benefit from the escrow account would then constitute a loan from the corporation."[603]  The court agrees with the government that treating the account in *toto* as a loan receivable is inconsistent with treating disbursements from the account as reductions of the loans payable to Braswell.

26.  The court does not discount Frantz's testimony entirely, however – at least as respects tax year 1994 – since it appears from the contemporaneous record that Braswell had historically had his corporations reflect disbursements for his benefit as a loan receivable, and had caused the companies to offset those amounts against the compensation he was due for the year.  It further reflects that Frantz had been told compensation from the California corporations would be handled this way.   At least as of 1994, therefore, Frantz could have believed both that disbursements from the FS&G Account would be treated as a loan receivable and offset against the loans payable.  This is confirmed by a memorandum Frantz wrote regarding a March 1994 conversation with Miller.  In the memorandum, Frantz noted that he had advised Miller "that one of the entities had been making deposits into my escrow account," and that he "wanted to be sure that these transfers were reflected on the corporate transferor's books."  He asked Miller "what the disposition of the investment account was, and [Miller] offered that some adjustments would continue to be made at year end to reflect compensation to [Braswell] out of this account."[604]

27.  The court appreciates that in an accounting sense, either all of the funds deposited to the account constituted a loan, and thus could be spent by Braswell as he saw fit without

---

[602]Gov't. Findings at 63, n. 6.

[603]Def.'s Reply at 11.

[604]Ex. 636.

accounting to the corporations, or they remained an asset of the corporation, such that disbursements for Braswell's benefit reduced the loans payable.  It appears, nonetheless, that Frantz understood the corporations would account for monies deposited to the FS&G Account in some way that would not require Braswell to pay taxes on them.[605]  Cf. *Cheek, supra*, 498 U.S. at 202-03 ("In the end, the issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable. . . .  We thus disagree with the Court of Appeals' requirement that a claimed good-faith belief must be objectively reasonable if it is to be considered as possibly negating the Government's evidence purporting to show a defendant's awareness of the legal duty at issue"); *Powell, supra*, 955 F.2d at 1211 (the good-faith belief test "does not focus on the knowledge of the reasonable person, but rather on the knowledge of the defendant").

28.  While the good faith basis for this belief may have been undermined in subsequent years, as Frantz saw that the corporations were neither treating the account as a loan receivable nor offsetting disbursements from the account against the loan payable, the government failed to prove the existence of a tax deficiency in these later years.  The court cannot charge Frantz in 1994 with knowledge he acquired at a later point in time.[606]  Nor can it

_____

[605]There appears to be no dispute that either method of accounting for the funds would have been appropriate.  Saito testified that "had it been handled properly," the corporations would have recorded payments out of the FS&G Account either as a reduction of the loan payable to Braswell or a reduction of the Investment FS&G Account.  (RT at 863:19-25, 864:1-7.)  Risoen testified that personal expenses paid out of the FS&G Account on Braswell's behalf could have been booked by the corporations "either as [a] reduction to the loan payable account or in addition to a loan receivable [from] Braswell."  (RT at 657:2-4.)

[606]The government and defendant dispute the relevance of a series of letters between Frantz and Miller regarding interest income to be reported by the corporations.  (See Gov't. Findings at 62-63; Def's. Reply at 16.)  Because these letters were written in 1997, they are not relevant in assessing whether Frantz had a good faith belief in 1994 that disbursements from the FS&G Account constituted reportable income to Braswell.  Additionally, the letters are susceptible of multiple interpretations, and do not clearly state that the corporations believed they were entitled

1  discount the fact that Frantz knew the corporations had accounted for at least a portion of

2  Braswell's income in 1993 and 1994 in the manner he and Davis had discussed.[607]

3  29.   It is true, as the government argues, that Frantz reviewed GBDS' tax return for fiscal year

4        1994.[608]  That return linked Braswell's compensation not to the FS&G Account, but to a

5        shareholder loan payable account,[609] and showed substantially more money in the FS&G

6        Account than was actually there.[610]  Frantz stated that the fact the return reflected a higher

7  _____

8  to interest accruing on the FS&G Account.  Consequently, even if they related to the period of

9  time in question, the court would discount their probative value on the issue of Frantz's
   willfulness.

10  [607]As evidence of Frantz's willfulness, the government proffered the testimony of John

11  Disenbruch, GBDS' operations manager or chief operating officer from November or December
   1995 through July 1996.  (RT at 324:1-5.)  Diesenbruch testified that after reviewing GVI's year-

12  end financial statements, he discovered the Yue reclassification of $2.2 million from "investment

13  – Deleon" to cost of goods sold.  (Id. at 331:12-20; see also findings 81-86.)  Diesenbruch said
   that he asked Frantz about the expense, and that Frantz told him that he "was hired for operations

14  and [he] should stay out of that particular area."  (RT at 335:9-11.)  When he pressed Frantz

15  further, Diesenbruch stated, Frantz told him he thought "Mr. Braswell was being a bit of a hog
   in his tax returns[,] . . . that it would be difficult to defend a hog" and that "both [Frantz] and

16  Glenn Braswell liked Bob Miller as a tax accountant because he was pretty much willing to sign
   anything on a tax return."  (RT at 337:14-24.)

17      Diesenbruch's testimony was not particularly credible, given that he admitted he "had

18  trouble recalling certain facts," and that "this happened a long time ago, and it was hard to
   remember."  (RT at 353:1-4.)  More importantly, however, because Diesenbruch's alleged

19  conversation with Frantz occurred after 1994, it cannot be used to support a finding of willfulness

20  in that year.

21  [608]See Ex. 440; RT at 1550:15-18 ("Q.  Now, is this one of the returns you reviewed
   before it was filed?  A.  As a matter of procedure, I probably would have.  Whether or not I did

22  or not, I don't know").

23      [609]Ex. 16.

24      [610]See RT at 1552:13-22 ("Q: So the [1994] return that Mr. Miller had prepared after you

25  made the check register available to him, at least as to this account, the FS&G investment account
   that I just asked you about as shown on exhibit 16, was off by approximately $1,300,000, right?

26  A: If you're comparing numbers, the answer is yes.  Q: The return is showing, as an asset, more
   than $1.3 million than was actually there; isn't that correct?  A: Yes.  Which means Glenn

27  Braswell owes the company the difference.  Q: Okay.  And was that shown on the return?  A:

28  You mean the difference that he owed the company?  No").

148

balance was consistent with his understanding that the account was a loan receivable account – i.e., that the corporations were not concerned with the amount of money actually in the account, but with the amount that they originally deposited to it.[611]    He acknowledged, however, that the return did not list any sum of money as a "loan to stockholder."[612]    While this should have prompted questions on Frantz's part, it does not appear that his review of the returns was thorough,[613] and his failure to question the matter ultimately raises more issues about his complicity in the filing of false corporate returns than it does regarding his intent to evade the payment of Braswell's personal taxes.[614]

30.    The government also cites as evidence of willfulness the fact that Frantz sent check registers for the FS&G Account to Miller only to ensure that Miller accounted for corporate expenses paid out of the account, not so that Miller would account for disbursements made for Braswell's personal benefit.[615]    It is true that in later years, Frantz redacted information regarding Braswell's personal expenditures from the check register

---

[611]RT at 1554:7-10 (". . . When it shows $2,056,522, it's an asset account of the corporation.  In substance it's a shareholder receivable, which means Braswell owes that much money to the company").

[612]Id. at 1564:11-18, 1565:6-17.

[613]Id. at 1527:20-25 ("I looked at the returns, the face of the returns, to see if they appeared correct.  We called it a cold review, C-O-L-D, when I was in accounting, so I gave him a cold review.  I think the purpose was to give Mr. Braswell some comfort level that someone had looked at them after they were prepared by the accountant").

[614]The government elicited substantial evidence that Frantz advised Miller to modify GVI's 1994 return to conceal the fact that Braswell, who devoted time to the company on an "as required" basis, earned $2,000,000 in compensation for the year.  Frantz admitted that he recommended Miller delete a $2,000,000 entry on the officer compensation line of the return, and reflect the salary instead as a payment for consulting services.  (RT at 1539:13-20; Ex. 440.)  He testified he did so because he was concerned that the corporation had not withheld income and FICA taxes on the amount and that it might incur a penalty because the compensation would be found to be unreasonable.  (See RT at 1539:21-1540:21.)  The court does not find this evidence probative of an intent to evade personal income taxes, however, since it is undisputed that Frantz reported the $2,000,000 in question as income on Braswell's personal return.  (Ex. 13.)

[615]Gov't. Findings at AA:6.

149

before sending it to Miller.  In 1994, however, he did not do so.[616]  Coupled with the conversation in which Miller told Frantz that he would make adjustments to the "investment account" to "reflect compensation to [Braswell] out of th[e] account,"[617] the court cannot say the evidence shows beyond a reasonable doubt that Frantz knew in 1994 that Miller was not going to offset personal expenses paid from the FS&G Account against the loans payable.

31.  In short, the evidence is in conflict – i.e., there is evidence suggesting that Frantz had a good faith belief in 1994 that he did not need to report monies deposited in or disbursed from the FS&G Account as income to Braswell, and there is evidence suggesting that he knew the corporations were neither treating the funds as a loan receivable nor reducing the loans payable by the amount of disbursements.  Given the contradictory nature of the evidence, the court cannot find that the government proved beyond a reasonable doubt that Frantz acted willfully to evade the payment of taxes on monies disbursed from the FS&G Account in 1994.

32.  Because the government has failed to prove the existence of a tax deficiency for years 1995 through 1997 beyond a reasonable doubt, and because it has failed to prove beyond a reasonable doubt that defendant acted willfully in 1994, it has not proved that Frantz is guilty of the charges set forth in counts two through five.

## B.    Count One (18 U.S.C. § 371)

### 1.    Legal Standard

33.  18 U.S.C. § 371 prohibits two distinct types of conspiracies – conspiracies to commit a specific offense against the United States and "conspiracies to defraud the United States, or one of its agencies, 'in any manner for any purpose.'"  *United States v. Hurley*, 957 F.2d 1, 3 (1st Cir. 1992); see also 18 U.S.C. § 371 ("If two or more persons conspire

---

[616]See Ex. 35.

[617]Ex. 636.

1    either to commit any offense against the United States, or to defraud the United States, or

2    any agency thereof in any manner or for any purpose, and one or more of such persons do

3    any act to effect the object of the conspiracy, each shall be fined under this title or

4    imprisoned not more than five years, or both"). The second type of conspiracy is typically

5    called a *Klein* conspiracy. See *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957).

6    34.    The indictment returned against defendant charges that

7    "Beginning on or about November 30, 1993 and continuing through on or about

8    October 15, 1998 . . . defendants Braswell and Frantz did willfully and knowingly

9    conspire and agree with each other to commit offenses against the United States,

10    namely to defraud the United States by impeding, impairing, obstructing, and

11    defeating the lawful government functions of the Internal Revenue Service of the

12    Treasury Department by deceit, craft, trickery, or means that are dishonest in the

13    ascertainment, computation, assessment, and collection of revenue, to wit, income

14    taxes, through the preparation and filing of U.S. Individual Income Tax Returns for

15    Braswell which would fail to report income that Braswell received from GBDS in

16    the form of transfers by GBDS of corporate funds to the FS&G Account and the

17    Offshore Accounts for Braswell's personal benefit."[618]

18    35.    In pretrial briefing, Frantz asserted that this language charged a specific offense conspiracy

19    rather than a *Klein* conspiracy, i.e., a conspiracy to file fraudulent tax returns in violation

20    of 26 U.S.C. § 7201. He contended that, "under the plain language of the [indictment]

21    and binding Ninth Circuit precedent, the Government is required to prove beyond a

22    reasonable doubt that he actually entered into an agreement with Braswell with the specific

23    intent to file false individual tax returns."[619] The government countered that "the charged

24    conspiracy is a *Klein* conspiracy extending to conduct beyond filing the tax returns at issue,

---

[618]See Indictment, Count One.

[619]Defendant William E. Frantz's Amended Separate Statement of Law Pertaining To Charged Offenses ("Def's. Stmt.") at 2.

1    including statements made by Frantz during an IRS audit of Braswell's domestic

2    companies."[620]

3    36.   The primary distinction between proof of a *Klein* conspiracy and proof of a specific offense

4          conspiracy is the intent required.  In *United States v. Liccardi*, 30 F.3d 1127 (9th Cir.

5          1994), the Ninth Circuit held that "[i]n the case of a charge of conspiracy to violate [a]

6          federal statute the government 'must prove at least the degree of criminal intent necessary

7          for the substantive offense itself.'" *Id.* at 1131 (citing *United States v. Feola*, 420 U.S.

8          671, 686 (1975)).  If the court were to conclude that the government charged a conspiracy

9          to violate 28 U.S.C. § 7201, therefore, it would have to require the government prove

10         willfulness.  *Conforte*, *supra*, 624 F.2d at 873 ("Conviction under section 7201 requires

11         proof beyond a reasonable doubt of each of the following elements: (1) the existence of a

12         tax deficiency; (2) willfulness; and (3) an affirmative act constituting an evasion or

13         attempted evasion of the tax").[621]  Were the court to conclude that the government charged

14         only a *Klein* conspiracy, however, the government would have to prove only an intent to

15         defraud the United States.  *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989)

16         ("[t]hree elements establish a conspiracy under section 371: An agreement to achieve an

17         unlawful objective, an overt act in furtherance of the illegal purpose, and the requisite

18         intent to defraud the United States," citing *United States v. Everett*, 692 F.2d 596, 601 (9th

19         Cir. 1982)).[622]

20   37.   In *United States v. Little*, 753 F.2d 1420 (9th Cir. 1985), the Ninth Circuit rejected

21         defendant's claim that the enactment of the penal provisions of the Internal Revenue Code

22

---

23         [620]Government's Position On The Areas Of Disagreement Identified In The Joint Statement
24   ("Gov't. Position") at 2.

25         [621]See Def's. Stmt. at 3 (asserting that "the Government should be required to prove that
26   Frantz acted with the same mens rea required to commit the underlying offense [of tax evasion
     under § 7201]").

27         [622]See Gov't. Position at 2 (contending that  the government "need not prove that Frantz
28   specifically intended to commit the offense of tax evasion for purposes of the conspiracy count").

preempted the charging of conspiracies to defraud the IRS under § 371, and held "conspiracies to defraud the IRS are indictable offenses under 18 U.S.C. § 371." *Id.* at 1442 (citing *United States v. Shermetaro*, 625 F.2d 104, 109-111 (6th Cir. 1980) (stating that the language of § 371 "is sufficiently broad on its face to include the offense of which Shermetaro was found guilty. Many cases have upheld convictions of conspiracy to defraud the Treasury Department and Internal Revenue Service"); see also *Dennis*, *supra*, 384 U.S. at 863-64 ("In the present case . . . the allegation as to conspiracy to defraud . . . properly reflects the essence of the alleged offense. . . . The fact that the events include the filing of false statements does not, in and of itself, make the conspiracy-to-defraud clause of § 371 unavailable to the prosecution"); *United States v. Walker*, 653 F.2d 1343, 1346 (9th Cir. 1981) (noting that in *Dennis*, the defendants "were properly charged under § 371 with conspiracy to defraud the government, although they also could have been indicted for a § 371 conspiracy to violate 18 U.S.C. § 1001").

38.   Accordingly, the mere fact that the government's conspiracy charge is based on alleged violations of 28 U.S.C. § 7201 does not preclude it from charging a conspiracy to defraud the IRS under 18 U.S.C. § 371. The critical inquiry is one of pleading – whether the charge that Frantz engaged in a conspiracy to defraud "*through the preparation and filing of U.S. Individual Income Tax Returns* for Braswell which . . . fail[ed] to report income that Braswell received from GBDS"[623] alleges a conspiracy to defraud under 18 U.S.C. § 371 or a conspiracy to commit tax evasion in violation of 26 U.S.C. § 7201.

39.   The court concludes that the use of this language does not reveal an intent to charge a specific offense conspiracy under § 371. Courts have generally held that to charge a specific offense conspiracy, the indictment must identify the statute setting forth the substantive offense. See, e.g., *United States v. Alston*, 77 F.3d 713, 716 (3d Cir. 1996) (stating that "the 'offense' clause [of § 371] requires reference to another part of the criminal code"); *United States v. Harmas*, 974 F.2d 1262, 1265, n. 5 (11th Cir. 1992)

---

[623]See Indictment, Count One.

153

1   ("[t]he conspiracy to commit an offense against the United States clause of section 371

2   requires reference in the indictment to other criminal statutes that define the object of the

3   conspiracy").

4   40.   The balance of the allegations in count one, moreover, indicate that the government

5   intended to charge a conspiracy to defraud rather than a conspiracy to commit a specific

6   offense.  Count one alleges that the conspiracy began in November 1993 and continued

7   through October 1998.  This period encompasses not only the dates on which Frantz filed

8   Braswell's 1994, 1995, 1996, and 1997 tax returns, but also the IRS audit, which

9   commenced in August 1997.  Additionally, the overt acts charged are not limited to the

10   preparation and filing of Braswell's tax returns.  The thirty-seventh overt act states that

11   "[o]n or about March 19, 1998, Frantz told an Internal Revenue Service International

12   Examiner that Braswell did not own Deleon and that he (Frantz) had not been able to

13   obtain written information from Hemisphere regarding Deleon's ownership."[624]

14   41.   As a result, although the government limited the breadth of the conspiracy charged by

15   including a reference to the preparation and filing of Braswell's individual returns, it

16   nonetheless charged a conspiracy to defraud rather than a conspiracy to commit tax

17   evasion.  See *Klein*, *supra*, 247 F.2d at 916 ("[i]t is clear from this wording that the

18   indictment is framed to make a general charge of impeding and obstructing the Treasury

19   Department in the collection of income taxes, with the allegations of concealment, of

20   misreporting . . . and of misstating the . . . book entries as particular instances rather than

21   as substitute and complete allegations of the substantive crime itself");[625] compare *Liccardi*,

22

23   [624]See Indictment at 10, ¶ 37.

24   [625]Like the indictment here, the indictment in *Klein* charged defendants with conspiring "'to
25   defraud the United States by impeding, impairing, obstructing and defeating the lawful functions
    of the Department of Treasury in the collection of the revenue; to wit, income taxes."  *Klein*,
26   *supra*, 247 F.2d at 915.  It then alleged that as a part of the conspiracy, defendants "would
    conceal . . . the nature of their business activities and the source and nature of their income"; that
27   they "claim[ed] net income as capital gains in stated years"; and that they "would make and cause
    to be made entries in certain books and records . . . for the purpose of concealing the nature and

28

1    *supra*, 30 F.3d at 1128 (concluding that the government had charged a conspiracy to

2    commit mail fraud, rather than a conspiracy to defraud, where the object of the conspiracy

3    was defined as "the use of the mails to obtain money . . . by fraud in violation of 18

4    U.S.C. §§ 1341 and 2 and to conduct financial transactions involving the concealment of

5    the proceeds of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)").[626]

6    42.    As noted, however, the court finds that the language used in the indictment – i.e., that

7    Braswell and Frantz engaged in a conspiracy to defraud "through the preparation and

8    _____

9    source of the income received by the defendants herein." *Id.* at 916.

10   [626]In *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989), the Sixth Circuit concluded
     that "the 'offense' and 'defraud' clauses [of § 371] as applied to the facts of [the] case [before it
11   were] mutually exclusive, and the facts proved constitute[d] only a conspiracy under the offense
     clause to violate 26 U.S.C. § 7206(4)." *Id.* at 1187.  It went on to state that where the object of
12   an alleged criminal agreement is covered by a specific criminal statute that "closely defin[es]" a
     citizen's duties, the government cannot prosecute under the "defraud" clause of § 371.  *Id.* at
13   1194-96.  Multiple courts have noted that "the primary problem in *Minarik* was not that the
     government charged defendants under the defraud clause, but that it repeatedly shifted its theory
14   of the case and thus 'used the defraud clause in a way that created great confusion about the
     conduct claimed to be illegal.'"  *Hurley*, *supra*, 957 F.2d at 3; see also *United States v. Sturman*,
15   951 F.2d 1466, 1473 (6th Cir. 1992) (concluding that *Minarik* was inapposite where defendant
     "set up a complex system of foreign and domestic corporations, transactions among the
16   corporations, and foreign bank accounts to prevent the IRS from performing its auditing and
     assessment functions. . . .  No provision of the Tax Code covers the totality and scope of the
17   conspiracy.  This was not a conspiracy to violate specific provisions of the Tax Code but one to
     prevent the IRS from ever being able to enforce the Code. . . .  Only the defraud clause can
18   adequately cover all the nuances"); *United States v. Mohney*, 949 F.2d 899, 903-05 (6th Cir.
     1991) (concluding that *Minarik* was inapplicable because "the indictment clearly alerted the
19   defendants to the charges against them," the conspiracy in question "implicated a variety of
     statutes," and the duties in question were "by no means abstruse or complex").
20
         Frantz contends the government "has previously taken the position that the object of the
21   alleged conspiracy was . . . the filing of false individual income tax returns for Braswell," and
     that it was only "on the eve of trial" that the government alleged "the conspiracy charged in this
22   case extended to conduct *beyond* the filing of the returns at issue."  (Def's. Stmt. at 1-2 (emphasis
     original)).  Although the indictment does identify the primary means of the conspiracy as the
23   "preparation and filing of U.S. Individual Income Tax Returns for Braswell," the temporal scope
     of the allegations and the overt acts charged placed Frantz on notice that the conspiracy charged
24   was one to defraud the Internal Revenue Service under § 371.  Compare *Minarik*, *supra*, 875 F.2d
     at 1196 (stating that "the prosecutors, either intentionally or unintentionally, used the defraud
25   clause in a way that created great confusion about the conduct claimed to be illegal").

26

27

28

155

filing" of returns that failed to report income Braswell received from corporate transfers – limits the scope of the *Klein* conspiracy alleged. Stated differently, the indictment requires the government to prove that Frantz engaged in a conspiracy to defraud the Internal Revenue Service *through the preparation and filing of false tax returns*. See *United States v. Murphy*, 809 F.2d 1427, 1432 (9th Cir. 1987) ("[t]he indictment does not allege a conspiracy to defraud premised upon the defendants' entire laundering operations. It is far more narrowly drawn, stating that defendants conspired to defraud the United States *by impeding the IRS in its collection of information with regard to currency transactions*. In other words, the conspiracy to defraud charge rests solely on the alleged falsehoods in the CTR Olson filed").[627]

43.  Because the court concludes that the government properly charged a *Klein* conspiracy, it must evaluate whether the government proved beyond a reasonable doubt the requisite elements of such a conspiracy: (1) an agreement to achieve an unlawful objective, namely,

---

[627]The government conceded that it was obligated to prove the *Klein* conspiracy charge by proving the specific means alleged in the indictment. (See RT at 12:20-25, 13:1-2 ("All I can say on [the conspiracy charge] is that this was charged from the outset, and we consciously made a decision to charge at the outset as a classic *Klein* conspiracy, which was a conspiracy to defeat and defraud the United States and the lawful functions of the Internal Revenue Service, but we also allege the device through which that would be done would be through the filing of false income tax returns on the personal side"); *id.* at 13:23-25, 14:1-2 ("The distinction is not that we think that we can prove up the conspiracy by simply skirting the issue of whether or not Mr. Frantz intended to file false income tax returns. We do not intend to argue that that is not our burden to prove"); *id.* at 15:6-17 ("THE COURT: Can I rely on the fact that [your] proof is going to track the allegations of the indictment on this conspiracy charge? By which I mean – and I think this is what you were trying to tell me, but I want to make sure that I understand it – that you are going to put on evidence that you contend proves that the defendant knowingly filed false income tax returns in the relevant years, [and] you're not going to rely primarily or exclusively on the notion that the defendant misled the IRS during the course of the civil audit. MR. ROCHMES: No, we're not"); *id.* at 16:8-18 ("[T]he conspiracy continued through the period of the audit, and, in any event, false statements during the audit made by the defendant Frantz attributable to him would constitute evidence of guilty knowledge under the *Klein* conspiracy and also evidence of evasion for the evasion counts. But we do not intent to, at the end of the day, say, your Honor, 'Well, we may have failed to prove up that he was knowingly filing false returns, but we got him anyway because he lied during the audit'").

1    impeding the efforts of the IRS through the preparation and filing of tax returns that failed

2    to report certain income; (2) an overt act in furtherance of the illegal purpose; and (3) an

3    intent to defraud the United States by preparing and filing false tax returns. *Tuohey*,

4    *supra*, 867 F.2d at 537.

### 2. The Government Has Failed To Prove An Agreement To Impede The Functions Of The IRS Through The Preparation And Filing Of False Tax Returns

8    44.    To prove a *Klein* conspiracy, the government must establish that the defendant agreed with

9    at least one other to "impede the IRS." *United States v. Adkinson*, 158 F.3d 1147, 1154

10   (11th Cir. 1998) (stating that under § 371, "the government must . . . allege and prove

11   there was an agreement whose purpose was to impede the IRS (the conspiracy), and that

12   each defendant knowingly participated in that conspiracy"); *United States v. Vogt*, 910

13   F.2d 1184, 1203 (4th Cir. 1990) ("To convict Vogt of participating in a *Klein* conspiracy,

14   the government must also show an agreement between Vogt and at least one other to

15   impede the IRS").

16   45.    Because the essential nature of a *Klein* conspiracy, as any conspiracy, is secrecy, the

17   existence of a conspiratorial agreement or common purpose "may be inferred from the

18   evidence." *United States v. Krasovich*, 819 F.3d 253, 255 (9th Cir. 1987); see also *United

19   States v. Browning*, 723 F.2d 1544 (11th Cir. 1984) ("In prosecutions under 18 U.S.C.A.

20   § 371 for conspiracy to defraud the United States, the government is required to prove the

21   essential element[ ] of an agreement to defraud the United States. . . .    Because the

22   essential nature of conspiracy is secrecy, such an agreement may be proved by

23   circumstantial as well as direct evidence"); *United States v. Becker*, 720 F.2d 1033, 1035

24   (9th Cir. 1983) (stating that a conspiratorial agreement "need not be explicit, but may be

25   inferred from circumstantial evidence").

26   46.    Here, the court can infer from the evidence that Braswell and Frantz agreed not to report

157

disbursements from the FS&G Account as income.[628]  The government proved beyond a reasonable doubt that Frantz disbursed significant amounts from the FS&G Account for Braswell's benefit;[629] that Frantz prepared and filed Braswell's tax returns for the years in question;[630] and that Braswell signed the returns.[631]  Because the amount disbursed from the FS&G Account exceeded the amounts reported by Braswell in 1994, the court can infer that Braswell knew the disbursements for that year were not being reported and agreed with Frantz that they not be included on the return.  Moreover, Frantz testified that Braswell participated in the decision to report his accrued compensation.[632]  Because the business income number on Braswell's tax returns for each of the years in question was identical to the amount of compensation accrued on the corporations' books for that year, it is clear Braswell knew that only that "income" was being reported.  As a result, the court can infer that Braswell agreed *not* to report the disbursements from the FS&G Account.

47.   Although the government proved that Braswell and Frantz agreed not to report the FS&G disbursements as income, the *Klein* court made clear that a "[m]ere failure to disclose income would not be sufficient to show a Section 371 conspiracy to defraud the United States."  *Klein*, *supra*, 247 F.2d at 916; see also *Adkinson*, *supra*, 158 F.3d at 1154 (concluding that a failure to report income cannot, absent other evidence of an agreement to impede the IRS, support a finding that such an agreement existed; "[t]he appellants

---

[628]The court cannot find that the government proved a conspiracy to defraud through the failure to report GBDS' transfers to Deleon.  Because the government failed to prove that the transferred funds constituted income to Braswell, an agreement not to report them cannot constitute a conspiracy to defraud the IRS.

[629]See findings 226-229, *supra*.

[630]Stipulated Facts, ¶ 10.

[631]*Id.*

[632]See RT at 1692:1-25, 1693:1-16.

certainly directed their efforts toward the common goal of making money for themselves and their employer.  But to support a conspiracy conviction, the evidence must establish a common agreement to violate the law. . . .  While the evidence clearly shows that the law was violated, there is insufficient evidence of a common agreement").

48.    As a result, the critical question is whether the government has proved beyond a reasonable doubt that in agreeing not to report the FS&G disbursements, Braswell and Frantz agreed to pursue the common unlawful objective of evading the payment of Braswell's personal income taxes.  *United States v. Gricco*, 277 F.3d 339, 348 (3d Cir. 2002) ("In order for a *Klein* conspiracy to exist, an agreed-upon objective must be to impede the IRS. . . .  This need not be the sole or even a major objective of the conspiracy. . . .  In addition, impeding the IRS need not be an objective that is sought as an end in itself: an intent to hide unlawful income from the IRS in order to conceal an underlying crime is enough. . . .  In the end, however, the evidence must be sufficient to prove beyond a reasonable doubt that impeding the IRS was one of the conspiracy's objects and not merely a foreseeable consequence or collateral effect"); *United States v. Gurary*, 860 F.2d 521, 524 (2d Cir. 1988) (holding, in the context of a *Klein* conspiracy, that "[t]he question presented here is whether the Government presented any evidence from which the jury could infer that defendants knew their scheme would result in the filing of false corporate and individual tax returns, and deliberately proceeded with their scheme in the face of that knowledge").

49.    The evidence is not sufficient to support an inference that Frantz and Braswell agreed not to report the FS&G disbursements for the purpose of impeding the IRS beyond a reasonable doubt.  The government adduced evidence that, sometime prior to 1997 and 1998, Frantz likely knew the corporations had not accounted for the FS&G Account as a loan receivable or for disbursements from the account as reductions of the loans payable.  Nonetheless, he continued not to report the monies on Braswell's tax returns.[633]  From this evidence, the court might infer that *Frantz* failed to report the disbursements to achieve the

---

[633]See conclusion 24, *supra*.

1     unlawful objective of evading the payment of Braswell's taxes.

2   50.    There is scant evidence regarding *Braswell's* intent in not reporting the disbursements,

3     however.  The evidence showed that Braswell had personal and business reasons not

4     associated with tax reduction or evasion for establishing the FS&G Account.  Frantz

5     testified that Braswell asked if he could fund such an account "in the 1991, maybe the 1992

6     time frame."[634]  He said Braswell wanted to establish the account for "three reasons": (1)

7     to pay his taxes; (2) to make gifts to his mother and family; and (3) to pay bonuses to some

8     of his corporate employees.[635]  There was no evidence that these were not Braswell's true

9     motivations in establishing the account.  Accepting that they were, the evidence does not

10    support an inference that Braswell sought to evade the payment of taxes by setting up or

11    receiving disbursements from the FS&G Account. In fact, it is counterintuitive that a

12    taxpayer in Braswell's position would establish an account for the purpose, *inter alia*, of

13    making estimated tax payments if he intended to use that account to divert money to

14    himself from his corporations on which he could avoid paying tax.  As noted earlier,

15    moreover, Braswell met with Frantz, Miller and Davis in 1992, and discussed treating the

16    FS&G Account as a loan receivable account.  There is no evidence that Braswell directed

17    Davis not to adopt this accounting treatment.  Nor is there any evidence – prior to 1997

18    or 1998 – that he was aware the change had not been made.[636]  Finally, there is no other

19    evidence that Braswell knew the monies being disbursed from the FS&G Account should

20    have been reported as income, or that he made a conscious decision or agreed with Frantz

---

[634]RT at 1355:4-5.

[635]RT at 1353:6-25.

[636]Braswell received copies of Esch's November 1997 and January 1998 memoranda discussing the FS&G Account.  The January 1998 memorandum noted that the "potential problem" that the IRS might treat disbursements from the FS&G Account as constructive distributions that had not been reported," and recommended "a reclassification of appropriate amounts to the shareholder receivable/payable account." (Ex. 335.) These reclassifications were thereafter made.

1    to evade taxes by failing to report them.

2    51.   Courts have found it proper to infer the existence of an agreement to impede the functions

3          of the IRS where the government introduces the statement of a co-conspirator that

4          manifests a desire to avoid the payment of personal taxes.  See *United States v. Furkin*,

5          119 F.3d 1276, 1280 (7th Cir. 1997) (concluding, where the evidence showed that co-

6          conspirators "had conversations in which they discussed not paying taxes on the gambling

7          machine income," and where "[d]uring a December 1992 tape-recorded conversation, [one

8          co-conspirator] indicated that he was aware taxes were not being paid on the gambling

9          machines' income . . . [and] agreed that legalizing gambling machines would do away with

10         unreported income," that it was reasonable "to infer that [the co-conspirator's] conduct

11         was also undertaken to hide . . . illegal gambling income from the IRS"); compare *United*

12         *States v. Pritchett*, 908 F.2d 816, 822 (11th Cir. 1990) (concluding that the government

13         failed to prove a *Klein* conspiracy where it adduced "no . . . independent evidence of an

14         intent to evade income taxes.  No statements of co-conspirators manifesting a desire to

15         avoid taxes were presented").

16   52.   Courts have also concluded that the nature of certain schemes supports an inference that

17         the parties involved *knew* the monies in question were reportable and taxable.  See *United*

18         *States v. Goldberg*, 105 F.3d 770, 774-75 (1st Cir. 1997) (affirming the district court's

19         conclusion that one of conspirators' purposes was to interfere with the IRS because,

20         although "[t]here [was] no evidence that Goldberg discussed the filing of false tax

21         documents with other conspirators[,] such conduct was an integral and self-evident part of

22         each conspiracy, permitting the inference that other co-conspirators shared in that purpose.

23         In the case of the Scopa conspiracy, [for example,] false W-2s were given to the straws,

24         who were participants in the scheme, over an extended period.  Scopa himself signed a tax

25         return with his wife, who was one of the straws, that incorporated a false W-2"); *Gurary*,

26         *supra*, 860 F.2d at 524 (affirming a finding that conspirators agreed to impede the

27         functions of the IRS because indirect evidence showed that "over an eight-year period

28         defendants sold, directly and through middlemen, fictitious invoices with a face value of

over $136 million.  For each transaction defendants deducted a fee of five to fifteen percent and split that fee with middlemen.  Defendants created and dissolved thirty-six different corporations, opened and closed bank accounts for the processing of checks and funds, yet conducted no substantive business through those corporations – only the sale of invoices.  Fictitious invoices were prepared and revised in accordance with purchasers' specifications.  Each and every purchaser testifying at trial indicated that they included the fictitious invoices in calculating the deduction for cost-of-goods-sold on their corporate tax returns," and "[i]n addition to this indirect evidence, the Government presented direct evidence indicating defendants knew the fictitious invoices were used to prepare fraudulent tax returns and nevertheless proceeded with the scheme").

53.  The government did not adduce direct statements by Braswell or Frantz indicating that the two agreed not to report the FS&G disbursements in an attempt to evade the payment of tax.  Nor, for the reasons discussed above in assessing willfulness, does the evidence prove beyond a reasonable doubt that Braswell *should have known* the FS&G disbursements were taxable.  Because Braswell's conduct is not "reasonably explainable *only* in terms of motivation to evade taxation" (*Krasovich*, *supra*, 819 F.2d at 255 (emphasis added)), the court cannot conclude that the government proved beyond a reasonable doubt that Frantz and Braswell agreed to pursue the common unlawful objective of impeding the IRS by not reporting the FS&G disbursements.  *Id.* ("In this case, there may well have been ample evidence that Andrea Drummond intended to use Krasovich to hide true ownership of property in order to evade income taxes.  There is, however, no basis on which a reasonable jury could conclude that the defendant Krasovich had the same objective with respect to the transaction alleged in Count Eight.  Nothing in the circumstances of the transaction suggests that Krasovich knew that the purpose of the concealment was to evade taxes"); see also *United States v. Skelton*, 176 F.3d 486, 1999 WL 184572, * 4 (9th Cir. Mar. 29, 1999) (Unpub. Disp.) ("Under *Krasovich*, the government's evidence does not establish that Erik had knowledge of, or agreed to, a conspiracy with the object of defrauding the government through evading taxes. . . .  The government may have proved

1    that Erik participated in structuring transactions, or in hiding the proceeds of prostitution.

2    The government did not, however, offer evidence he did so with the knowledge that tax

3    evasion – personal or corporate – was an object of the conspiracy").

4  54.    In short, the court cannot find that the government produced evidence "showing or tending

5    to show a meeting of the minds to commit an unlawful act." *Adkinson*, *supra*, 158 F.3d

6    at 1154.   As a result, the government failed to prove beyond a reasonable doubt the

7    existence of a *Klein* conspiracy between Braswell and Frantz.

8  55.    Because the government has failed to prove the existence of an agreement to impede the

9    efforts of the IRS beyond a reasonable doubt, it has not proved that Frantz is guilty of the

10    charge set forth in count one.

11  56.    Any findings of fact that are deemed to be conclusions of law are incorporated herein as

12    such.

14  DATED: August 6, 2004

                                MARGARET M. MORROW
                              UNITED STATES DISTRICT JUDGE